**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | | |
|---|---|---|
| STATE OF INDIANA, et al., | ) | |
| *Plaintiffs,* | ) | |
| v. | ) | Civil Action No. 1:23-cv-00106-DMT-CRH |
| ALEJANDRO MAYORKAS, et al., | ) | |
| *Defendants.* | ) | |

<u>**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS COMPLAINT**</u>

Dated:          September 11, 2023          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
Senior Litigation Counsel

*Attorney for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

I.  Processing Under Title 42 and Title 8. ................................................................. 3

II.  The Rule. ............................................................................................................... 5

III.  This Lawsuit ......................................................................................................... 8

LEGAL STANDARDS ................................................................................................ 9

ARGUMENT ................................................................................................................ 9

I.  Plaintiffs Lack Article III Standing ..................................................................... 9

    A.  Indirect and Incidental Effects of Alleged Immigration Non-Enforcement
        Cannot Establish Standing. ........................................................................ 9

    B.  Plaintiffs' Speculative Theory of Injury Cannot Establish Standing. .................. 12

    C.  Plaintiffs' Claimed Injuries Are Not Redressable in this Lawsuit. ....................... 16

II.  Plaintiffs Lack Statutory Standing, and Judicial Review Is Precluded. ........................... 19

III.  Counts I–III and VI–VIII Should be Dismissed for Failure to State a Claim. .................. 20

    A.  Counts I Through III Should Be Dismissed Because the Rule Is within the
        Executive's Statutory Authority. ................................................................ 20

    B.  Counts VI and VII Should Be Dismissed Because the Departments Provided
        Sufficient Opportunity for Comment. ......................................................... 26

    C.  Count VIII Should Be Dismissed Because a Non-Statutory Ultra Vires Claim
        Is Unavailable. ........................................................................................ 32

CONCLUSION ............................................................................................................ 33

## **INTRODUCTION**

Plaintiffs, 18 States located primarily in the country's interior, challenge a critical rule promulgated by the Departments of Homeland Security (DHS) and Justice (DOJ) (collectively, "the Departments") to address an anticipated influx of migrants at the southwest border by limiting the circumstances under which noncitizens are eligible for asylum. *See* Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2013) (the "Rule"); Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704 (Feb. 23, 2023) (notice of proposed rulemaking (NPRM)). As explained below, Plaintiffs lack standing under controlling Supreme Court precedent, and their claims are foreclosed on numerous threshold grounds. Plaintiffs' challenge should be dismissed.

The Rule—adopted after public notice and opportunity to comment—implements a condition on asylum eligibility that applies to certain noncitizens without documents sufficient for lawful admission to the United States and who cross the southwest border after traveling through a third country, subject to certain exceptions and means of rebuttal. The Rule took effect on May 11, 2023, the same day the Centers for Disease Control and Prevention (CDC)'s Title 42 public health Order ended. Under that Order, noncitizens without entry documents at the southwest border were generally not processed into the United States under immigration authorities at Title 8, but were instead expelled to Mexico, Canada, or their home countries. Absent any policy change, the Order's end—which would require the government to process noncitizens under the more time-intensive processes under those pre-existing immigration statutes—was expected to cause the number of migrants seeking to enter the United States without documents sufficient for admission to increase to or remain at record-high numbers.

Facing this urgent situation, and in coordination with actions by Mexico and other countries to jointly address irregular migration in the Western Hemisphere, the Departments deemed it necessary to impose a presumption of asylum ineligibility on those who do not seek protection in countries through which they travel and decline to avail themselves of lawful, safe, and orderly pathways to enter the United States. Those pathways—which exist independently of the Rule—include expanded refugee processing (which allows individuals who would qualify for protection

to obtain such protection from abroad) and parole processes for individuals from certain countries to obtain advance authorization to fly to the United States. Migrants who have already traveled to Mexico may also avoid the presumption of asylum ineligibility by using an orderly process implemented through the CBP One mobile application ("CBP One") to schedule an appointment to present at a Port of Entry (POE) along the southwest border.

Since the Rule went into effect, it has worked as intended. Immediately before the Title 42 Order ended, more than 10,000 migrants illegally crossed the southwest border each day, threatening to overwhelm the immigration system and impair the government's ability to effectively and humanely apprehend, process, detain, and remove, as appropriate, the migrants encountered. As soon as the Rule was implemented, illegal border crossings fell dramatically, and overall DHS encounters with noncitizens without documents sufficient for admission at the southwest border also decreased. Since the Rule's effective date, DHS has also been able to increase its use of expedited removal to remove noncitizens, and the percentage of noncitizens passing their initial fear screening to seek asylum or other forms of protection has decreased. Absent the Rule, the number of irregular entries was anticipated to remain at all-time highs—and many of those encountered would be entitled to remain in the United States pending resolution of their asylum claims, threatening to overwhelm the system and result in more noncitizens released into the United States.

Plaintiffs contend that the Rule—because of its exceptions and provisions for rebutting the presumption of ineligibility—will increase migration, which will have the incidental effect that States will make increased expenditures. But this incidental effect, even if proven, would not support Article III standing. As the Supreme Court recently recognized, States lack any cognizable interest in the federal government's enforcement of the immigration laws. The Supreme Court has also cautioned against recognizing state standing in any context based on such attenuated theories of injury. Further, Plaintiffs' real grievance appears to be with other aspects of the immigration system referred to, but independent of, the Rule that cannot be redressed in this litigation. Thus, not only are Plaintiffs' asserted injuries not cognizable, but the Rule is not likely to cause increased

migration. And any injunction or vacatur of the Rule—including an injunction of only its exceptions—would not likely redress Plaintiffs' claimed harms. Moreover, redressability is not met for the additional reasons that an injunction or vacatur of the Rule or its exceptions is unavailable under the APA and the Immigration and Nationality Act (INA). Plaintiffs also lack statutory standing to challenge the Rule's exceptions because their claims are precluded and they are not within the zone of interests of the relevant immigration statute. Alternatively, the Complaint largely fails to state a claim, because the Rule (including the exceptions to the presumption of asylum ineligibility) comports with the law and with APA's procedural requirements, and because Plaintiffs may not use an equitable *ultra vires* cause of action to challenge agency action.

## **BACKGROUND**

### I.     **Processing Under Title 42 and Title 8.**

From March 20, 2020, until May 11, 2023, most noncitizens without entry documents who sought to enter the United States at its southwest land and adjacent coastal borders—whether or not at a designated POE—were subject to expulsion under a series of public health orders in effect to combat the COVID-19 pandemic ("Title 42 Orders"). Public Health Reassessment and Order Suspending the Right to Introduce Certain Persons from Countries Where a Quarantinable Communicable Disease Exists, 86 Fed. Reg. 42,828 (Aug. 5, 2021). Under these Title 42 Orders, covered noncitizens encountered in the United States were generally expelled to Mexico or their home countries without processing under the immigration authorities at Title 8, including processing for asylum and related protection.

In the absence of the Title 42 public health Orders, noncitizens without documents sufficient for lawful admission may not be promptly expelled but are required to be processed under the substantially more resource-intensive procedures specified in the INA, Title 8 of the U.S. Code. Such noncitizens, whether they present at a POE to seek admission into the United States or are encountered after crossing irregularly between POEs, are treated as applicants for admission and must be inspected by immigration officers. *See* 8 U.S.C. § 1225(a)(1), (3). Applicants for

admission who upon inspection are determined to be inadmissible because they are not in possession of a valid travel document may be subject to expedited removal procedures. *See* 8 U.S.C. § 1225(b)(1)(A).

Congress has provided that individuals who are in the United States may generally apply for asylum, a form of discretionary relief from removal based on a fear of persecution on account of a protected ground. 8 U.S.C. § 1158(a), (b)(1)(A); *see also id.* § 1101(a)(42). Additionally, Congress has mandated that noncitizens may not be removed to a country where they are likely to be persecuted on account of a protected ground or tortured. 8 U.S.C. § 1231(b)(3) (statutory withholding of removal); Pub. L. No. 105-277, div. G, § 2242 (Oct. 21, 1998) (codified at 8 U.S.C. § 1231 note), 8 C.F.R. §§ 1208.16(c), 1208.17(a) (protection under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT)). Thus, if a U.S. Customs and Border Protection (CBP) officer or agent determines that the noncitizen is subject to expedited removal procedures, the noncitizen may be removed without further hearing or review, "unless the alien indicates either an intention to apply for asylum under [8 U.S.C. § 1158] or a fear of persecution," in which case DHS refers the individual to an asylum officer for a credible fear interview to assess the persecution and torture claims. 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. § 208.30(b). If the noncitizen demonstrates a significant possibility that they could establish eligibility for asylum, statutory withholding of removal, or CAT protection, they are either retained by the asylum officer for further review of their asylum application or are placed in removal proceedings under 8 U.S.C. § 1229a before an immigration judge of the Executive Office for Immigration Review (EOIR) in which the noncitizen may apply for asylum. 8 U.S.C. § 1225(b)(1)(B)(ii), (v); 8 C.F.R. §§ 208.30(f), 1208.2(b). CBP officers also have the option to process inadmissible noncitizens at the outset for § 1229a removal proceedings before an immigration judge, *see* 8 U.S.C. § 1225(b)(2)(A), in which the noncitizen may apply for asylum, *see* 8 C.F.R. §§ 1208.2(b), 1240.11(c). Immigration officers may parole inadmissible noncitizens into the United States using the discretionary parole authority under 8 U.S.C. § 1182(d)(5). Under these pre-existing Title 8 procedures, many migrants who assert a fear of persecution or torture are

4

statutorily entitled to remain in the United States pending resolution of their asylum and protection claims. 88 Fed. Reg. at 31,337 (citing 83 percent positive credible-fear screening rate for expedited removal). This may incentivize irregular migration. *Id.* at 31,326, 31,337–38; *see also* 88 Fed. Reg. at 11,716.

## II.    The Rule.

In early 2023, the President announced that the Administration expected to end the public health emergency on May 11, 2023, which would cause the then-operative Title 42 Order to end. *See* 88 Fed. Reg. at 11,708. Absent further action, the end of the Title 42 Order was expected to cause the number of migrants seeking to enter the United States at the southwest border to rise to or remain at all-time highs—an estimated 11,000 migrants daily. 88 Fed. Reg. at 31,331. And, as discussed, many of these individuals would be entitled to remain in the United States pending resolution of their asylum and protection claims. The Departments thus faced a looming urgent situation: absent policy change, the end of the Title 42 Order was expected to result in many more migrants crossing the border and asserting fear claims, which would in turn overwhelm the government's ability to process migrants in a safe, expeditious, and orderly way and lead to an increase of the number of noncitizens released into the country. To prevent this expected increase in the number of migrants at the southwest border seeking to enter the United States without authorization, the Departments promulgated the Rule, following an NPRM, a 33-day comment period, and review of 51,952 comments. *Id.* at 31,314, 31,324; *see also* 88 Fed. Reg. at 11,704. The Rule was effective as of May 11, 2023, and provides that most noncitizens who enter the United States during the next two years at the southwest land border or adjacent coastal borders after traveling through a country other than their native country are subject to a rebuttable presumption of ineligibility for asylum unless they avail themselves of certain orderly pathways for entry into the United States or seek and are denied protection in a third country. 88 Fed. Reg. at 31,321–23. The presumption of asylum ineligibility applies to asylum determinations in any context, including in removal proceedings and in credible fear screenings. 8 C.F.R. §§ 208.13(f), 1208.13(f), 208.33(b), 1208.33(b). The Rule was adopted under the Departments' authority to "by

regulation establish . . . limitations and conditions . . . under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (the Departments "may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter").

Specifically, the Rule provides that "[a] rebuttable presumption of ineligibility for asylum applies to an alien who" "enters the United States from Mexico at the southwest land border or adjacent coastal borders without documents sufficient for lawful admission" "and whose entry was[:]" (1) "between [May 11, 2023] and [May 11, 2025]," (2) "[s]ubsequent to the end of implementation of the Title 42 public health Order," and (3) "[a]fter the alien traveled through a country other than the alien's country of citizenship [or] nationality." 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). The presumption does not apply to unaccompanied children (UCs) and those who used certain orderly processes for entry into the United States or sought protection in a third country—namely, those who were "provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process"; "[p]resented at a port of entry, pursuant to a pre-scheduled time and place"; "presented at a port of entry without a pre-scheduled time and place" but who can "demonstrate[] by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle"; or "[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application." *Id.* §§ 208.33(a)(2), 1208.33(a)(2). Noncitizens who are subject to presumptive asylum ineligibility may rebut the presumption by demonstrating by a preponderance of the evidence that "exceptionally compelling circumstances exist," including by demonstrating that the noncitizen (or a family member with whom the noncitizen is traveling) "[f]aced an acute medical emergency"; "[f]aced an imminent and extreme threat to life or safety, such as an imminent threat of rape, kidnapping, torture, or murder"; or was a "victim of a severe form of trafficking in persons" under 8 C.F.R. § 214.11. *Id.* §§ 208.33(a)(3), 1208.33(a)(3). Noncitizens who are subject to presumptive ineligibility and unable to overcome the presumption are still considered for

statutory withholding of removal and CAT protection. *See* 8 C.F.R. §§ 208.33(b)(2), 1208.33(b)(2)(ii), (4); 88 Fed. Reg. at 11,733.

In short, the Rule encourages migrants to seek asylum or protection in other countries or pursue lawful, safe, and orderly pathways to enter the United States—and thus discourages irregular entry or presenting without an appointment at a southwest-border POE—by generally conditioning eligibility for the discretionary grant of asylum on migrants' availing themselves of such pathways (or demonstrating exceptionally compelling circumstances for failing to do so). It aims to reduce irregular migration, including through human smuggling, and to correspondingly decrease crowding in border facilities and projected severe strains on DHS border resources and facilitate safe, humane processing. *See, e.g.*, 88 Fed. Reg. at 31,324, 31,235.

Although the Rule thus provides incentives to use various pathways for lawful and orderly entry, those pathways are not created by the Rule and exist independently of the Rule. The currently existing lawful pathways to the United States include refugee processing abroad under 8 U.S.C. § 1157, certain country-specific processes to obtain authorization to travel by air to the United States and to seek parole upon arrival (such as the Uniting for Ukraine process (U4U) and similar processes for nationals from Cuba, Haiti, Nicaragua, and Venezuela (CHNV)), and expanded seasonal employment opportunities. 88 Fed. Reg. at 31,317. The CHNV processes were coupled with the Government of Mexico's independent decision to accept the return or removal of nationals of these countries, because these individuals often cannot be returned to their countries of nationality. *Id.*; *see also, e.g.*, Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266, 1,267 (Jan. 9, 2023). These processes generally allow for an applicant with financial support in the United States and who passes national security and public safety vetting to "fly at their own expense to an interior POE, rather than entering at a land POE" to be considered for "case-by-case determination of parole." *E.g.*, 88 Fed. Reg. at 1,243.

Those migrants who have already traveled to Mexico with the intent of entering the United States can avoid the presumption of asylum ineligibility by pre-scheduling an appointment to present at a POE (rather than entering irregularly between POEs or waiting in long lines at a POE).

8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1). Currently, the United States uses the existing, multi-function CBP One app to allow noncitizens without documents sufficient for admission to schedule a time to arrive at POEs for orderly processing. 88 Fed. Reg. at 31,317. For this purpose, CBP One allows "noncitizens located in Central or Northern Mexico who seek to travel to the United States" to submit information in advance and schedule an appointment to present themselves at" eight southwest-border POEs. *See* "Advance Submission and Appointment Scheduling," https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Sept. 8, 2023); Exhibit 1 (Declaration of Blas Nuñez-Neto (Sept. 11, 2023)) ("DHS Decl.") ¶ 22. This appointment system allows POEs to manage the flow into the POE facility of migrants without documents sufficient for admission, efficiently allocate border enforcement resources, and streamline processing through advanced vetting for public safety and national security concerns, thus reducing overall burdens on immigration enforcement at the border. 88 Fed. Reg. at 31,318; DHS Decl. ¶ 22. The Rule does not dictate processing outcomes for those who pre-schedule an appointment, other than to provide that the presumption of asylum ineligibility will not apply. *See generally* 8 C.F.R. §§ 208.33(a), 1208.33(a).

In July, a U.S. District Court in California vacated the Rule based on claims brought by immigration legal services organizations, *East Bay Sanctuary Covenant v. Biden*, 2023 WL 4729278 (N.D. Cal. July 25, 2023), but that order has been stayed pending appeal, *see East Bay Sanctuary Covenant*, No. 23-16032 (9th Cir. Aug. 3, 2023).

### III.     This Lawsuit.

Eighteen states bring this lawsuit seeking to declare unlawful, set aside, and enjoin the Rule's exceptions and the provisions of the Rule allowing the presumption of asylum ineligibility to be rebutted, asserting that these aspects of the Rule exceed the Executive's statutory authority and are arbitrary and capricious, and that the Departments did not follow proper procedures with respect to certain changes from the NPRM. Compl. ¶¶ 121–87 & Prayer for Relief. Plaintiffs allege that the Rule harms Plaintiffs by incentivizing irregular migration and increasing the number of noncitizens within their borders, which allegedly will cost the States money and resources. Compl.

¶¶ 47–120.

## LEGAL STANDARDS

The government moves to dismiss under Rules 12(b)(1) and (6). Under Rule 12(b)(1), the Court "has the authority to dismiss an action for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Johnson v. United States*, 534 F.3d 958, 964 (8th Cir. 2008). Defendants advance a "factual attack" on the allegations underpinning jurisdiction, in which "the court considers matters outside the pleadings, and the non-moving party does not have the benefit of 12(b)(6) safeguards." *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018).

Claims are subject to dismissal pursuant to Rule 12(b)(6) if the complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A Rule 12(b)(6) motion should be granted if "it appears beyond a reasonable doubt that plaintiffs can prove no set of facts in support of a claim entitling him to relief." *Young v. City of St. Charles, Mo.*, 244 F.3d 623, 627 (8th Cir. 2001).

## ARGUMENT

### I.     Plaintiffs Lack Article III Standing.

To establish standing, Plaintiffs must show that as of the filing of the complaint they have suffered or will imminently suffer an "injury in fact" "caused" by the Rule that a favorable decision would "redress." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560–62 (1992); *Missouri v. Yellen*, 39 F.4th 1063, 1063 (8th Cir. 2022). The Court lacks jurisdiction over Plaintiffs' claims because the States have not adequately alleged a legally and judicially cognizable, redressable injury that is caused by any part of the Rule.

### A.     Indirect and Incidental Effects of Alleged Immigration Non-Enforcement Cannot Establish Standing.

Plaintiffs' claimed injuries from immigration policy are not judicially cognizable and

cannot support State standing. Plaintiffs' claimed harms from the Rule are based largely on their assertion that the Rule's exceptions cause some noncitizens without documents sufficient for admission to be released into the country. *E.g.*, Compl. ¶¶ 52, 106–07. But the Supreme Court recently held that a complaint by Texas and Louisiana asserting a similar interest must be dismissed for lack of standing, because third parties like the Plaintiff States have "no judicially cognizable interest in procuring enforcement of the immigration laws." *Sure-Tan v. NLRB*, 467 U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)), *quoted in United States v. Texas*, 143 S. Ct. 1964, 1970 (2023). And just as the States had no standing to challenge the Executive Branch's "enforcement discretion over arrests and prosecutions" based on allegations of indirect and incidental effects on their revenue and spending, *Texas*, 143 S. Ct. at 1972–74 & n.3, the Plaintiff States here are not entitled to challenge a Rule that governs the circumstances in which the Executive Branch may confer the discretionary benefit of asylum. And Plaintiffs likewise cannot justify judicial intrusion into the Executive's decisions as to how to process noncitizens, including whether to release certain noncitizens using the discretionary parole authority at 8 U.S.C. § 1182(d)(5) (which as noted below, is not directly addressed by this Rule in any event).

Plaintiffs' claimed incidental, indirect effects on their public expenditures and general welfare cannot support Article III standing as a matter of law. There are "bedrock Article III constraints in cases brought by States against an executive agency or officer." *Texas*, 143 S. Ct. at 1975 n.3. And "[c]ontingent injuries, especially those arising from the impact of regulations on third parties not before the Court, rarely create cognizable cases or controversies." *Arizona v. Biden*, 40 F.4th 375, 383 (6th Cir. 2022) (citing *Lujan*, 504 U.S. at 562–63). Federal policies routinely have incidental effects on States' expenditures, revenues, and other activities. Yet such effects have historically not been viewed as judicially cognizable injuries, and the Supreme Court recently cautioned against recognition of such "attenuated" claims by States. *See Texas*, 143 S. Ct. at 1972 n.3.

The Supreme Court has held that a State must have suffered a "direct injury" at the hands

of the federal government to sue the United States. *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (holding that Florida lacked standing to challenge a federal inheritance tax because its claimed injury of "withdrawal of property" and resulting diminishment of tax base was "at most, only remote and indirect"). And the Supreme Court did not negate this principle in *Massachusetts v. EPA*, 549 U.S. 497 (2007). In that case, the Supreme Court held that a State had standing to challenge the denial of a rulemaking petition when the denial threatened to diminish its "sovereign territory" and the underlying statute vested it with specific procedural rights. *Id.* at 519; *see also Texas*, 143 S. Ct. at 1975 n.6 (noting that *Massachusetts v. EPA* involved a statutorily authorized petition for rulemaking). Plaintiffs' claimed future injuries are incidental, not direct, and thus do not satisfy this standard. This lawsuit amounts instead to a generalized grievance that "a federal government program is anticipated to produce an increase in that state's population and a concomitant increase in the need for the state's resources," the recognition of which would "permit nearly all state officials to challenge a host of Federal laws." *Arpaio v. Obama*, 27 F. Supp. 3d 185, 202 (D.D.C. 2014).

Nor do the incidental effects on which the States rely even arguably fall into the category of direct injuries. Plaintiffs allege that the Rule causes "sovereign harm" to their ability to "create and enforce a legal code" and "to exclude from the sovereign's territory people who have no right to be there" because it contributes to "increase in lawlessness and criminal activity in border regions, and also within the Plaintiff States." Compl. ¶ 114. Yet Plaintiffs cite no particular state laws regulating behavior or administering a state program that the Rule prevents or prohibits them from enforcing that could give rise to a cognizable injury regarding enforcement of a legal code as in *Wyoming v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008). Instead, their claimed sovereign injury is premised entirely on indirect, speculative increased expenditures they may make for law enforcement, not the inability to enforce their laws. "A theory of injury grounded in rising crime rates seems like it would 'hinge' on third parties committing more crimes." *Arizona*, 40 F.4th at 386–87 (citing *Lujan*, 504 U.S. at 562); *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015) (assuming that a policy change "increase[s] unlawful immigration," does not lead to the

11

inference that it "increase[s] crime"). To the extent Plaintiffs voluntarily choose to devote resources to "coordinated activity" to pursue "suspected unauthorized aliens," Compl. ¶ 115, it is the federal government, not the states, that enforces immigration law and possesses the sovereign interest in arresting noncitizens for immigration violations. *See Arizona*, 40 F.4th at 386–87 (citing *Arizona v. United States*, 567 U.S. 387, 394–97 (2012)); *Texas*, 143 S. Ct. at 1970. Increased migration does not pose a threat to the physical territory of the States as in *Massachusetts v. EPA*, 549 U.S. 497 (2007). Nor do Plaintiffs identify any particular State's proprietary interest on which the Rule imposes an injury. Plaintiffs' claimed injuries are non-cognizable downstream injuries that are not historically recognized as conferring state standing.

      B.    <u>Plaintiffs' Speculative Theory of Injury Cannot Establish Standing.</u>

      Even if they could overcome these structural and historical bars to their claim of Article III standing, Plaintiffs' theory of injury is far too speculative to establish standing, even at the pleadings stage. *See Lujan*, 504 U.S. at 560–62, 570 n.5; *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338, (2016). None of the hypothetical injuries Plaintiffs assert—possible future increases in State education, welfare, and law enforcement expenditures the State may make, Compl. ¶¶ 105–07; *see also id.* ¶¶ 59–104, alleged harm to each State's claimed "sovereign and quasi-sovereign interest in its territory and the welfare of its citizens" due to a claimed future "increase in lawlessness and criminal activity in border regions," *id.* ¶¶ 57, 114; *see also id.* ¶¶ 111, 115, 117, and a hypothetical future public health impact due to a claimed inability to "adequately screen, mitigate, and treat for communicable diseases," *id.* ¶ 118—supports standing, because each of these asserted effects is ultimately based on the same speculation that the Rule will increase the number of "illegal aliens" present in each State. This theory "relies on a highly attenuated chain of possibilities," *Missouri v. Biden*, 52 F.4th 362, 368 (8th Cir. 2022)—first, that there will be more noncitizens who enter or are released into the United States; second, that those additional noncitizens will move to the Plaintiff States; and third, that those additional noncitizens will lead to the claimed effects by taking particular actions such as seeking benefits, not obtaining health insurance, and committing crimes. Plaintiffs cannot even establish the first step in this attenuated chain.

The Complaint does not contain any non-conclusory allegations to support Plaintiffs' speculative theory that the Rule will incentivize more migration and eventually, possibly result in an increased number of noncitizens in their States. The Complaint alleges (¶ 49), and Defendants largely agree, that as of April 2023, border encounters had risen dramatically, reaching historic levels in the days leading up to the end of the Title 42 Orders. *See* DHS Decl. ¶¶ 9–10. But this only demonstrates why the Rule was needed. It does not demonstrate that the Rule, which was implemented when Title 42 ended and instituted a presumption of *ineligibility* for asylum, will contribute to overall *increased* migration from noncitizens who will be released into or reside in the interior of the United States. Plaintiffs' allegation that the Rule "contributes to the perception that the border is open and that immigration policy has become more favorable to aliens illegally crossing the southern border," Compl. ¶ 111, is likewise unsupported by any data or other specific factual allegations.

Moreover, data contradict Plaintiffs' conclusory assertions and have borne out the Departments' expectation that the Rule would "reduce irregular migration, not increase it." 88 Fed. Reg. at 31,438; *see also id.* at 31,316; 88 Fed. Reg. at 11,705–06. Once the Rule was in effect, irregular entries decreased. From May 12 to July 31, 2023, encounters between POEs at the southwest border decreased by 61 percent compared to the immediately preceding one-week period. DHS Decl. ¶ 11. Since the Rule took effect, there has been a dramatic decrease in the percentage of individuals passing a credible-fear screening, with "52 percent of single adults processed under the [R]ule" passing the screening, "compared to an 83 percent screen-in rate in the pre-pandemic period of 2014 to 2019." DHS Decl. ¶ 14. And the Rule has allowed DHS "to significantly increase its use of expedited removal," *id.* ¶ 16, allowing it to repatriate 126,000 noncitizens between May 12 and July 31, 2023, *id.* ¶ 19. Further, the monthly *overall* number of southwest-border encounters with noncitizens without documents sufficient for admission (both at POEs and between POEs) has also declined since the end of Title 42, despite the increase in the average number of noncitizens processed at POEs. *See* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last visited Sept. 8,

2023). These data indicate that, because overall entries have decreased and the availability of expedited removal has increased, there will be fewer inadmissible noncitizens released in the United States with the Rule in place than without. Indeed, since the Rule took effect, overall releases at the southwest border have decreased by 10% compared to the preceding six-month period when the Title 42 Orders were in effect. DHS Decl. ¶ 12 n.4. Even after accounting for those granted parole at an airport POE following use of the CHNV and U4U parole processes, overall releases have decreased since the Rule took effect. *See id.*[1]

Plaintiffs may argue that it is the Rule's *exceptions* to the presumption of asylum ineligibility that will injure them *see* Compl. ¶¶ 6–9, although they assert injury arising from the overall Rule (including the exceptions and rebuttal circumstances), *see, e.g.*, Compl. ¶¶ 58, 111. But the Rule's exceptions go hand-in-hand with the accompanying presumption of asylum ineligibility. Indeed, the Rule's express coupling of disincentives with incentives was based on the success of similar past approaches in curbing irregular migration. *See* 88 Fed. Reg. at 31,430–31. The Complaint contains no factual allegations to show that an unconditional bar on asylum eligibility, without any exceptions to its application, would be more effective than the Rule at reducing migration. To the contrary, the Departments have concluded, after long experience with various measures intended to reduce irregular migration, that imposing consequences alone is insufficient to deter irregular migration; to be effective, those consequences "must be paired with incentives for migrants to use lawful processes." DHS Decl. ¶ 3.

This conclusion is also supported by the attached declaration of Professor of Economics Michael A. Clemens, who found that a prior rule, the "third-country-transit" or "TCT" Bar,[2] which imposed a categorial bar to asylum eligibility without any accompanying incentives to use lawful,

---

[1] Individuals who follow these parole processes, however, are not subject to the Rule because they do not enter at the southwest border, and Plaintiffs do not in any event directly challenge the parole processes in this litigation. *See infra* § III(A)(1). Moreover, because "standing is not dispensed in gross," injury from the exercise of parole authority does not confer standing to challenge the Rule or its exceptions. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996).
[2] Asylum Eligibility and Procedural Modifications, 84 Fed. Reg. 33,829 (July 16, 2019).

orderly processes to enter the United States or any ability to rebut asylum ineligibility, did not have a material impact on trends of the number of southwest-border apprehensions or inadmissible noncitizens presenting at POEs. Exhibit B ("Clemens Report") ¶¶ 20, 25–81; *see also* 88 Fed. Reg. at 31,430 & n.304. Accordingly, contrary to Plaintiffs' claim, experience has shown that such an approach—a presumption of asylum ineligibility without any accompanying incentives to enter via orderly means—would not reduce irregular migration overall. *See* Clemens Report ¶ 20. In contrast, approaches that pair incentives with consequences, as the Rule does, have effectively decreased irregular migration and overall entries. For example, the CHNV processes—which coupled the ability to apply for a travel document to fly to the United States to seek parole with new consequences of quick return or removal to Mexico for those who did not follow those processes—were not only effective in reducing irregular crossings, but also caused an overall decrease in nationals from these countries arriving by any means, including through the parole processes. 88 Fed. Reg. at 31,317 & n.26; 88 Fed. Reg. at 1,243; Clemens Report ¶¶ 83–93; *see also* Exhibit 3 (CHNV Declaration of Blas Nuñez-Neto (June 20, 2023)) ¶ 31 n.16.

Further, the Rule does not itself establish parole processes or put in place a system for scheduling appearances at a POE and thus cannot be the cause of any injury to Plaintiffs stemming from those pathways. *See* Compl. ¶ 52; *id.* ¶¶ 106–07 (claiming financial injury based on "higher numbers of aliens being paroled into the United States"); *see id.* ¶ 5 (alleging that "parole policies," not the Rule, increase "the number of unlawful aliens"). The Rule does not dictate whether noncitizens will be released on parole rather than expeditiously removed or detained pending proceedings. *See, e.g.*, 88 Fed. Reg. at 31,331 (the Rule does not "set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app").

Because the factual premise underlying all of Plaintiffs' claimed injuries—that the Rule or its exceptions will cause increased migration—is speculative, unsupported, and refuted by available evidence, Plaintiffs cannot meet Article III's requirements for that reason alone. The Court thus need not address whether Plaintiffs have adequately alleged facts to show that increased migration will imminently lead them to make increased expenditures and have law enforcement

and public health impacts in the States. Yet it is facially apparent they have not. The chain of events needed to show such effects attributable to migration is far too attenuated and reliant on the actions of third parties to establish injury in fact. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 313 (2014); *Arpaio*, 797 F.3d at 22. Plaintiffs' invocation of "sovereign or quasi-sovereign injury" or injury to a "proprietary interest" cannot overcome these deficiencies. Even if "states are entitled to some undefined 'special solicitude'" in the standing analysis in limited circumstances— a "controversial" question—they still must meet all basic requirements of Article III standing. *Missouri*, 52 F.4th at 369; *see also Texas*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in judgment) (noting that the concept of "special solicitude" has played no meaningful role in Supreme Court jurisprudence since *Massachusetts v. EPA* and suggesting "that lower courts should just leave that idea on the shelf"); *Arizona*, 40 F.4th at 375. Plaintiffs' claimed interest in the welfare of their citizens is still premised on the too-speculative theory that the Rule will cause "[i]ncreased illegal immigration" that will allegedly in turn cause indirect effects such as "increased law enforcement, education, medical, and other costs." Compl. ¶ 111. And holding Plaintiffs to their burden to show some concrete harm before permitting particular States to seek to impose their policy preferences is particularly important in the context of immigration, which is inherently a subject of national concern. *See Arizona*, 567 U.S. at 394–95; *Hines v. Davidowitz*, 312 U.S. 52, 62–63 (1941).

      C.      <u>Plaintiffs' Claimed Injuries Are Not Redressable in this Lawsuit.</u>

      Further, redressability is not met here because injunction or vacatur of the Rule's exceptions is not available relief and would not in any event remedy the claimed harms. *See California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (finding no redressability where any relief the court could grant would have no practical effect). The APA does not contemplate universal vacatur of a rule, and the INA expressly precludes the injunctive relief sought. As Justice Gorsuch recognized in his concurrence in *United States v. Texas*, where the relief sought is precluded by statute and there is no other effective judicial remedy, a court cannot redress the claimed injury. *Texas*, 143 S. Ct. at 1978–79 (Gorsuch, J.) (redressability not met where 8 U.S.C. § 1252(f)(1) precludes injunctive relief).

16

*First*, the INA precludes the relief Plaintiffs seek. The Rule, including its exceptions, "implements" the expedited removal system by "instruct[ing] asylum officers to apply the lawful pathways rebuttable presumption during credible fear screenings," and makes numerous other changes to expedited removal and credible fear procedures for those to whom the presumption applies. 8 C.F.R. §§ 208.33(b), 1208.33(b). The Court lacks jurisdiction to review rules implementing the expedited removal system or to issue injunctive relief affecting that system. *See* 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(1), (3); *Grace v. Barr*, 965 F.3d 883, 891 (D.C. Cir. 2020) (section 1252(e) covers "agency [regulations or] policies governing credible-fear interviews").

Moreover, 8 U.S.C. § 1252(f)—which bars courts from "enjoin[ing] or restrain[ing] the operation of" sections 1221–1231 of Title 8—precludes injunctive relief interfering with the government's chosen means of operating sections 1225(b)(1), 1229a, and 1231, which are implemented by the Rule. *See Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064–65 (2022). The Rule establishes a rebuttable presumption of asylum ineligibility that is applicable in three contexts: affirmative asylum applications under section 1158, *see* 8 C.F.R. § 208.2, credible fear interviews under section 1225(b)(1), and full removal proceedings under section 1229a. Enjoining the Rule's application in expedited removal procedures and section 1229a removal proceedings would interfere with the government's chosen means of implementing those statutes by preventing the agencies from making a credible fear determination under § 1225(b)(1) as prescribed by the rule, by mandating how immigration adjudicators determine whether a noncitizen has met their burden to demonstrate eligibility for relief from removal under § 1229a(c)(4)(A), and by interfering with the agencies' chosen means of implementing the statutory withholding requirement under section 1231. That the Rule was promulgated under the Departments' authority to establish limitations on and conditions to the grant of asylum under section 1158 does not matter, given that it *operates* in expedited and full removal proceedings, and is "the way that [sections 1225, 1229a, and 1231 are] being carried out." *Aleman Gonzalez*, 142 S. Ct. at 2064. Indeed, sections 1225 and 1229 incorporate the asylum and withholding provisions, and "the 'operation of' the relevant statutes is best understood to refer to the Government's efforts to enforce or

17

implement them." *Id.* Any injunction thus would impermissibly compel agency adjudicators "to take actions that (in the Government's view) are not required by" sections 1225, 1229a, and 1231 or their implementing regulations, "and to refrain from actions that (again in the Government's view) are allowed by" those statutes. *Id.* at 2066.

*Second*, the APA, 5 U.S.C. § 706(2)—the basis for all but one of Plaintiffs' claims—does not permit universal vacatur of a regulation. That provision states that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary [and] capricious" or "otherwise not in accordance with law." 5 U.S.C. § 706(2). That provision does not authorize rendering an entire rule, or parts thereof, void. In fact, it does not pertain to remedies at all, which are instead governed by 5 U.S.C. § 703. Section 706(2) instead is a rule of decision governing judicial review that provides the substantive standard for finding agency action "unlawful"; the language "set aside" directs the reviewing court to disregard that unlawful action in resolving the case before it. To interpret section 706 to require universal vacatur of a regulation would allow a broad expansion of available remedies, upsetting the "bedrock practice of case-by-case judgments with respect to the parties in each case." *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (Sutton, J., concurring); *see also California*, 141 S. Ct. at 2115 (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract").

*Third*, even if enjoining or vacatur of the Rule's exceptions were available, such an order would not redress Plaintiffs' claimed harms. To the extent Plaintiffs claim harm from individuals who are released into the United States after use of parole processes or scheduling appointments to present at a POE, a bar to the application of these exceptions would not eliminate the existence of those pathways. The parole processes are not created by the Rule and exist independently of it. Therefore, enjoining or vacatur of the Rule's exceptions would not end the parole processes and would not disincentivize their use. And the Rule applies only to those who enter the United States via the southwest land or adjacent coastal border, *e.g.*, 8 C.F.R. §§ 208.33(a)(1), not to those who use parole processes to obtain authorization to travel by air to the United States. Similarly, enjoining or vacating the exception to asylum ineligibility for pre-scheduled appointments would

not end the use of appointments, as the Rule does not create the scheduling system. Instead, such an order would eliminate the incentive for noncitizens to make appointments to present at a POE by imposing an inflexible transit bar and thus would more likely contribute to more migrants attempting illegal crossings in an attempt to evade detection. Further, to the extent individuals who use the parole processes or make an appointment are ultimately released into the United States, that is attributable to the exercise of parole authority in each case, not to the Rule.[3]

## II.    Plaintiffs Lack Statutory Standing, and Judicial Review Is Precluded.

Even if Plaintiffs could establish Article III standing, their APA claims must be dismissed because Plaintiffs are not within the zone of interests protected by the relevant immigration statute. *See Rosebud Sioux Tribe v. McDivitt,* 286 F.3d 1031, 1036 (8th Cir. 2002). The APA does not "allow suit by every person suffering injury in fact." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 395 (1987). To be "aggrieved" under the APA, 5 U.S.C. § 702, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute . . . in question." *Clarke*, 479 U.S. at 396. When a plaintiff is not itself the object of the challenged regulatory action, it has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399. The Rule sets a condition on eligibility under the asylum statute, 8 U.S.C. § 1158. Nothing in that asylum statute evinces any concern with State sovereigns generally or any policy goal of reducing migration specifically. The opposite is true. *See* 8 U.S.C. § 1158(d)(7) ("Nothing in this subsection shall be construed to create any substantive or procedural right or benefit that is legally enforceable by any party against the United States or its agencies or officers or any other person."). Thus, the interests Plaintiffs seek to vindicate do not fall within section 1158's zone of interests.

---

[3] This case is thus distinct from *Florida v. United States*, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) (cited in Compl. ¶ 70). That ruling on Florida's standing to challenge policies that directly concern release of noncitizens, *see id.* at *8-20, regardless of its merits, has no bearing on whether a state has standing to challenge a rule that imposes presumptive asylum ineligibility and does not directly govern detention choices. *Id.* at *9-10. Regardless, that decision (which the government has appealed) is no longer tenable in light of *United States v. Texas*, 143 S. Ct. 1964 (2023).

Moreover, the INA carefully prescribes a scheme of judicial review of asylum and removal issues that affords only noncitizens—not States or other third parties—an opportunity to challenge them. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e), (g). This demonstrates that Congress did not intend for "judicial review of those issues at the behest of other persons" to occur. *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). The INA thus precludes review by third parties here. 5 U.S.C. § 701(a)(1).

### III.    Counts I–III and VI–VIII Should be Dismissed for Failure to State a Claim.

A.    <u>Counts I Through III Should Be Dismissed Because the Rule Is within the Executive's Statutory Authority.</u>

In Counts I through III, Plaintiffs incorrectly assert that the Rule exceeds the Departments' authority. The Rule is well within both DHS's and DOJ's statutory authority to regulate eligibility for asylum and the conduct of expedited removal. "Agency rules will survive ultra vires allegations so long as [the court] can 'reasonably conclude that the grants of authority in the statutory provisions cited by the government contemplate the issuance.'" *Etsy, Inc. v. Jaddou*, 2023 WL 3689555, at *15 (D. Neb. May 25, 2023) (citing *Iowa League of Cities v. EPA*, 711 F.3d 844, 877 (8th Cir. 2013)). The asylum statute makes clear, and Plaintiffs do not dispute, that DHS and DOJ have discretionary authority to create rules establishing "limitations and conditions" on asylum eligibility beyond those already set out in the statute, so long as they are "consistent with" 8 U.S.C. § 1158. 8 U.S.C. § 1158(b)(2)(C); *see also id.* § 1158(d)(5)(B) (authorizing establishment of "other conditions or limitations" on how an asylum application is to be considered). Invoking this authority, the Rule imposes a condition on asylum eligibility that operates in removal proceedings before EOIR and in asylum adjudications and credible fear proceedings before DHS and EOIR, subject to exceptions and rebuttal circumstances. *See* 88 Fed. Reg. at 31,321–23, 31,449–52; 8 C.F.R. §§ 208.30, 208.33, 1003.42(d), 1208.30, 1208.33. The INA thus expressly provides the Departments authority to adopt the Rule, and the laws Plaintiffs cite do not set any limitations on that statutory authority with which the Rule conflicts.

1.      *Count I Should Be Dismissed Because the Rule Does Not Conflict with Statutory Parole Authority.*

In Count I of their Complaint, Plaintiffs assert that the Rule exceeds the Departments' statutory authority because it creates an exception to the presumption of asylum ineligibility for those who use a DHS-approved parole process to seek entry into the United States, on the theory that the exception relies on "the unlawful programmatic grant of parole to aliens" that is "an unlawful abuse of DHS's . . . parole authority." Compl. ¶¶ 123, 126. This claim is foreclosed by the plain terms of the Rule. Nowhere does the Rule create a "programmatic grant of parole." (Nor, for that matter, do the parole processes, *see supra* at 7.) As explained, although the Rule points to existing or possible future parole processes that individuals can use to enter the United States (by commercial air), those processes exist independently of the Rule, and the Rule does not itself create any new programs or processes. Nor is the use of CBP One a "programmatic grant of parole." *See* Compl. ¶ 125. "The [R]ule does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app." 88 Fed. Reg. at 31,331. Individuals subject to the Rule may still be subject to expedited removal and detention as well as to parole, depending on the circumstances and on the CBP officer's use of DHS's discretionary parole authority at 8 U.S.C. § 1182(d)(5).

Plaintiffs' claim that the Rule's parole-process exception runs afoul of the parole authority is also dependent on a finding that the "DHS-approved parole processes" referred to in the exception are unlawful. Such a determination would be inappropriate in this case, where the Complaint does not challenge particular parole processes or actions. Plaintiffs cannot use a challenge to the Rule to indirectly challenge other portions of the immigration system with which they disagree but which they have not challenged in this case. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 892–93 (1990) ("[I]t is … entirely certain that the flaws in [an] entire 'program' . . . cannot be laid before the courts for wholesale correction under the APA."); *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 61 (2004).

Moreover, were Plaintiffs to seek to amend their Complaint to directly challenge existing

parole processes, such amendment would be futile and violate the rule against claim-splitting because fourteen of the Plaintiffs here are also Plaintiffs in separate, earlier-filed litigation challenging the same CHNV parole processes they assert are unlawful here. *See Texas v. DHS*, No. 6:23-cv-00007, Am. Compl. (ECF No. 20) (S.D. Tex. Feb. 14, 2023). The rule against claim-splitting precludes Plaintiffs from challenging the same parole processes in two separate lawsuits, even if they involve "different theories of recovery." *Daywitt v. Harpestead*, 2022 WL 875290, at *4 (D. Minn. Mar. 24, 2022). Rather, "all claims must be brought together, and cannot be parsed out to be heard by different courts." *Sparkman Learning Ctr. v. Ark. Dep't of Hum. Servs.*, 775 F.3d 993, 1000 (8th Cir. 2014). "A claim should be dismissed for improper claim splitting when the second suit involves 'the same parties or their privies based on the same cause of action.'" *Daywitt*, 2022 WL 875290, at *4 (quoting *Daley v. Marriott Int'l, Inc.*, 415 F.3d 889, 895–96 (8th Cir. 2005), for principles of claim preclusion). Plaintiffs' other lawsuit challenges the CHNV processes on the theory that they exceed DHS's statutory parole authority. *Texas*, No. 6:23-cv-00007, Am. Compl. ¶ 141(a). Thus, if Plaintiffs were to amend their Complaint to challenge the lawfulness of, and seek relief from, the CHNV parole processes, that claim would arise from the same operative facts and assert the same legal theory as their prior lawsuit. It does not matter that there is no final judgment yet in the Texas CHNV challenge. A claim-splitting challenge "need not—indeed, often cannot—wait until the first suit reaches final judgment." *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 987 n.1 (10th Cir. 2002); *see also Provisur Techs., Inc. v. Weber, Inc.*, 2022 WL 202956, at *2 (W.D. Mo. Jan. 21, 2022) ("The prohibition on claim splitting is similar to claim preclusion, but may be applied even if a final judgment has not been entered in either case.") (cleaned up). Accordingly, the Court would have to dismiss any claim that challenges the CHNV parole processes to avoid duplicative litigation.[4]

---

[4] In any event, the exercise of parole authority is not final for APA purposes until it is exercised in individual cases, and it is a wholly discretionary decision for which review is precluded by 8 U.S.C. § 1252(a)(2)(B)(ii) and the APA. 5 U.S.C. § 701(a); *Heckler v. Chaney*, 470 U.S. 821, 838 (1985).

2. *Count II Should Be Dismissed Because the Rule Does Not Violate the Secure Fence Act.*

Plaintiffs contend in Count II that the Rule exceeds the Departments' statutory authority because it violates the Secure Fence Act, Pub. L. No. 109-367, 120 Stat. 2638 (2006). That Act directs the Secretary to, *inter alia*, "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control" over the U.S. border. *See* Secure Fence Act § 2 (codified at 8 U.S.C. § 1701 note). "Operational control" is further defined as the "prevention of all unlawful entries into the United States, including entries by terrorists, other unlawful aliens, instruments of terrorism, narcotics, and other contraband." *See* Secure Fence Act § 2(b). Plaintiffs contend that the "Rule violates the Secure Fence Act because . . . rather than preventing unlawful entries into the United States, it incentivizes them." Compl. ¶ 132. This claim should be dismissed, because the Secure Fence Act does not diminish the Executive authority over asylum rules and there is no inconsistency between the Secure Fence Act and the Rule.

The Secure Fence Act directs the Secretary of Homeland Security to take actions he "*determines necessary and appropriate* to achieve and maintain operational control" over the border, but it does not mandate compliance with that objective through any specific means. Secure Fence Act § 2 (emphasis added). This provision of the Secure Fence Act contains no enforceable or reviewable obligations; rather, its broad terms leave to the discretion of the Secretary the means best calculated to achieve the legislative ends. *See United States v. Arizona*, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) ("The Secure Fence Act's 'operational control' requirement does not mandate a discrete action that the Court could compel under the APA."); 5 U.S.C. § 701(a)(2) (APA does not permit review where action is "committed to agency discretion by law"); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (agency action is committed to agency discretion where there are "no judicially manageable standards . . . available for judging how and when an agency should exercise its discretion").

Moreover, the Rule does not conflict with the "operational control" directive. DHS determined that a comprehensive rule establishing an eligibility condition for asylum, coupled with

23

encouragement to pursue protection in other countries or orderly pathways to enter the United States, is the means best calculated to address the problem of irregular migration on the southwest border. *See, e.g.*, 88 Fed. Reg. at 31,318–19. Thus, even if the Secure Fence Act had some potential application to a Rule regarding asylum eligibility, the Rule promotes the objective of operational control by channeling migration to orderly means and thus enabling more resources to be focused on apprehensions of those who enter irregularly, as well as deterring unlawful migration and providing a more efficient mechanism to quickly screen out certain noncitizens who enter irregularly, now that the Title 42 Order is no longer in place. In essence, Plaintiffs' claim is based on the false premise that the Rule will *not* assist the Secretary in complying with the Secure Fence Act's mandate. Yet the Complaint contains no non-conclusory allegations to support this claim. Accordingly, the Rule does not violate the Secure Fence Act.

> 3.    *Count III Should Be Dismissed Because the Rule Does Not Create Alternate Visa Processing through CBP One.*

Plaintiffs next claim that the Rule exceeds Defendants' statutory authority because it "relies on the existence of an unlawful scheme" to schedule appointments at a POE that allegedly conflicts with parole authority, the immigrant visa process, and the expedited removal process. Compl. ¶ 135. This is incorrect for several reasons.

*First*, while Plaintiffs' allegations take issue with the CBP One app, the Rule does not create CBP One—an appointment system that predates the Rule by many months. The ability for noncitizens to use CBP One to schedule appointments to present at POEs exists independently from the Rule. The Rule merely encourages the use of appointments to avoid a presumption of asylum ineligibility. Such appointments would exist even if the Rule and its exceptions did not. Accordingly, the legality of CBP One or of an appointment system is not properly before this Court.

In any event, an appointment system itself also does not conflict with the statutes Plaintiffs reference (at Compl ¶¶ 135–39) regarding parole authority, the visa system, and the expedited removal process. An appointment is just that: an appointment to present at a POE. *See* "Advance

Submission   and   Appointment   Scheduling,"   https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Sept. 8, 2023). An appointment does not itself confer a particular status or dictate processing outcomes (other than to provide an exception to the presumption of asylum ineligibility under the Rule). Unlike a visa, an appointment does not allow for admission into the United States in a valid immigrant or nonimmigrant status, 88 Fed. Reg. at 31,343, and Plaintiffs do not allege otherwise.[5] Using an appointment system also does not preclude the use of expedited removal procedures. *See* 8 C.F.R. § 208.33(a)(2)(ii)(B) (providing for an exception to the presumption for scheduling an appointment, to apply in expedited removal procedures).[6]

*Second*, the Rule's exception to presumptive asylum ineligibility for those who make appointments does not address or implicate DHS's parole authority or conflict with the visa or expedited removal statutes. The Rule "does not provide for, prohibit, or otherwise set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app," 88 Fed. Reg. at 31,331, and thus it cannot run afoul of the parole statute as Plaintiffs contend (at Compl. ¶ 136). The Rule nowhere confers a visa or any similar immigrant or nonimmigrant status on anyone: "Individuals who lack a visa are generally inadmissible to the United States, *see* . . . 8 U.S.C. § 1182(a)(7), and will remain so under this [R]ule." 88 Fed. Reg. at 31,343. The Rule does not preclude the use of expedited removal for those who make

---

[5] Plaintiffs confuse the use of CBP One to make an appointment to present at a POE—a tool available only to those already in Central or Northern Mexico—with the use of CBP One to apply for travel authorization under the CHNV processes for purposes of traveling by air to the United States to seek parole. *See* Compl. ¶ 137. These are two separate processes, but neither acts as a substitute for a visa and neither is inconsistent with the statutory scheme. *See* https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Sept. 8, 2023).

[6] In addition, the use of CBP One is not final agency action that can be challenged under the APA. "To constitute a final agency action, the agency's action must have inflicted 'an actual, concrete injury' upon the party seeking judicial review." *N.D. Retail Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys.*, 55 F.4th 634, 638 (8th Cir. 2022). No decisions regarding admissibility, expedited removal, referral for consideration of asylum claims, or release on parole occur until the time each individual noncitizen with an appointment is inspected. Thus, CBP One at most "only affects [] rights adversely on the contingency of future administrative action" in an individual case, and its general use is thus "nonfinal." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003).

appointments. *See* 8 C.F.R. § 208.33(b). For these reasons, the Rule does not on its face conflict with the cited provisions of the INA.

      B.      <u>Counts VI and VII Should Be Dismissed Because the Departments Provided Sufficient Opportunity for Comment.</u>

            1.      *Count VI Should Be Dismissed Because Plaintiffs Do Not Identify any Actionable Failure to Provide Opportunity for Comment.*

In Count VI, Plaintiffs challenge six "changes" made in the final Rule that they believe deviated from the NPRM, Compl. ¶ 176, and assert that the Rule violates the Unfunded Mandates Reform Act, *id.* ¶ 179. Plaintiffs cannot state a claim as a matter of law because all of the alleged changes either were not changes at all or were logical outgrowths of the NPRM, and because the Unfunded Mandates Reform Act is inapplicable.

The APA requires that proposed rules include "either the terms or substance of the proposed rule or a description of the subjects and issues involved," 5 U.S.C. § 553(b)(3), and that, unless an exception applies, "interested persons [have] an opportunity to participate in the rule making through submission of written data, views, or arguments," *id.* § 553(c). The notice of proposed rulemaking "need not contain 'every precise proposal which (the agency) may ultimately adopt as a rule.'" *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1319 (8th Cir. 1981) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 48 (D.C. Cir. 1976)). Nevertheless, the final rule must be a "logical outgrowth" of the proposed rule. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). A final rule is a logical outgrowth "if interested parties 'should have anticipated' that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period." *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079–80 (D.C. Cir. 2009). The "logical outgrowth" inquiry is applied "functionally by asking whether the purposes of notice and comment have been adequately served." *Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994).

Plaintiffs claim that six purported changes violate logical outgrowth principles: (1) removing provisions implementing the TCT Bar Final Rule and the Proclamation Bar Interim Final Rule (IFR); (2) including a continuing applicability provision for the rebuttable presumption;

(3) "expanding the meaning" of "final decision" for those who receive a negative final decision on an application from a third country; (4) "expanding the applicability of the Exception for unaccompanied alien children"; (5) expanding the family unity provision; and (6) making structural changes and changes to headings. Compl. ¶ 176. Numbers 1, 2, 3, and 6 were expressly proposed in the NPRM and thus are not substantive changes at all. Number 4 merely provided clarification in response to comments. Only number 5 represents a change, but that change was indeed a logical outgrowth of the NPRM. All six are described below.

*First*, Plaintiffs assert that the Departments did not seek comment before "removing provisions implementing the proclamation bar IFR and the TCT bar final rule." Compl. ¶ 176 (citing 88 Fed. Reg. at 31,912). This is incorrect: the NPRM explicitly asked for comment on proposals to rescind those rules and their implementing provisions. 88 Fed. Reg. at 11,727–28 (section of the NPRM's preamble entitled "Proposed Rescission of TCT Bar Final Rule and Proclamation Bar IFR" providing reasons the Departments proposed to rescind those rules). The final Rule merely added amendatory instructions to make those proposed changes. *See* 88 Fed. Rev. at 31,912, 31,449–52.

*Second*, Plaintiffs assert that the Departments also did not seek comment before "making the rebuttable presumption continue to apply in perpetuity after the rule's two-year period has expired, for aliens who entered under the Rule and then later choose to apply for asylum." Compl. ¶ 176 (citing 88 Fed. Reg. at 31,319–20). Again, this was not a change. The NPRM had the same applicability, as explained in the NPRM's preamble:

> Finally, the Departments emphasize that the proposed rule, if finalized, would not be applied indefinitely. The proposed rule would apply only to those who enter at the southwest land border during the 24-month period. After the sunset date, the proposed rule would continue to apply to those noncitizens.

88 Fed. Reg. at 11,726. This was not stated explicitly in the proposed amendatory text, although the text did not state otherwise. The Departments received and responded to comments on this point. *See* 88 Fed. Reg. at 31,422. "To remove any potential ambiguity regarding the ongoing

applicability of the" rebuttable presumption, the Departments in the final rule added provisions at 8 C.F.R. §§ 208.33(c)(1) and 1208.33(d)(1) to clearly state that the Rule would have perpetual effect for those who enter during the two-year period. 88 Fed. Reg. at 31,320. Because this is not a departure from the NPRM, it is a logical outgrowth of it.

*Third*, Plaintiffs allege that the Departments should have sought comment before "expanding the meaning of the term 'final decision' in the Exception for aliens who applied for asylum in a third country and had received a negative 'final decision.'" Compl. ¶ 176 (citing 88 Fed. Reg. at 31,321). Plaintiffs' claim that the clarification of the term "final decision" "expand[ed] the meaning of the term" is incorrect, but to the extent this is even a "change," the final Rule's clarification of the term is a logical outgrowth of the NPRM. *Id.* The NPRM already included the exception from the presumption for noncitizens who "[s]ought asylum or other protection in a country through which the noncitizen traveled and received a final decision denying that application." 88 Fed. Reg. at 11,750–51 (proposing 8 C.F.R. §§ 208.33(a)(1)(iii), 1208.33(a)(1)(iii)). In the final Rule, the Departments merely clarified that the term "final decision": (1) "includes any denial by a foreign government of the applicant's claim for asylum or other protection through one or more of that government's pathways for that claim"; and (2) "does not include a determination by a foreign government that the alien abandoned the claim." 8 C.F.R. §§ 208.33(a)(2)(ii)(C), 1208.33(a)(2)(ii)(C). The first clarification is not a change from the NPRM. It just ensures that the provision is not construed to include any type of application in another country but rather "is intended to include denials of asylum and other forms of humanitarian protection related to fear of returning to one's home country as well as other temporary protections." 88 Fed. Reg. at 31,416. This does not depart from the NPRM's stated goal for this provision to cover applications for "asylum or other protection." 88 Fed. Reg. at 11,750–51 (proposing 8 C.F.R. §§ 208.33(a)(1)(iii), 1208.33(a)(1)(iii)). And the second clarification narrows the term, consistent with the purposes of the NPRM, by ensuring that the noncitizen actually pursued the claim in the other country because "a denial based on abandonment would be insufficient." 88 Fed. Reg. at 31,321. The Departments explained that they made this addition in

response to comments on the lack of a definition of the term "final decision." 88 Fed. Reg. at 31,415–17. And the clarification is consistent with the purpose of the Rule to promote the "shar[ing] [of] the responsibility of providing asylum and other forms of protection to deserving migrants" with other Western Hemisphere countries. *See* 88 Fed. Reg. at 11,706. Allowing noncitizens to avoid the presumption by applying for asylum and then abandoning those claims would undermine this goal. Plaintiffs were sufficiently on notice that "final decision" would be defined in this manner and thus it is a logical outgrowth of the NPRM.

*Fourth*, Plaintiffs argue that the Departments failed to seek comment on "expanding the applicability of the Exception for unaccompanied alien children." Compl. ¶ 176 (citing 88 Fed. Reg. at 31,321). Yet the substance of the provision did not change, and to the extent there is a change, it is a logical outgrowth of the NPRM. In the NPRM, the Departments proposed a provision stating "[u]naccompanied alien children . . . are not subject to" the presumption of asylum ineligibility. 88 Fed. Reg. at 11,750–51 (proposing 8 C.F.R. §§ 208.33(b), 1208.33(b)). The NPRM did not specify whether the child must qualify as an unaccompanied child at the time of entry or at the time of adjudication. In the final Rule the Departments made clear that the child must meet the "unaccompanied alien child" definition at the time of entry to qualify for this exception. 8 C.F.R. §§ 208.33(a)(2)(i), 1208.33(a)(2)(i) (exempting a noncitizen if "[t]he alien was, at the time of entry, an unaccompanied alien child"). Given that the other exceptions and rebuttal circumstances in the proposed rule generally concern events or circumstances at the time of entry or presentation at a POE, it was reasonable to expect that the unaccompanied child exception would likewise be tethered to entry. *See* 88 Fed. Reg. at 31,321. This is thus a logical outgrowth of the NPRM.

*Fifth*, Plaintiffs fault the Departments for not seeking comment before "expanding the family unity provision." Compl. ¶ 176 (citing 88 Fed. Reg. at 31,321). But the Departments explicitly did seek comment on this provision. In the NPRM, the Departments proposed an approach that would keep families together. Specifically, they proposed that it would be considered an exceptionally compelling circumstance if a principal asylum applicant in removal proceedings

was ineligible for asylum only because of the presumption and was eligible for forms of protection that would not allow their ineligible family members to obtain status through them—which would mean some of the family members would be removed, possibly splitting up the family. *See* 88 Fed. Reg. at 11,752 (proposing 8 C.F.R. § 1208.33(d)). The NPRM also included an explicit request for comments on "[w]hether the Departments should modify, eliminate, or add to the proposed grounds for necessarily rebutting the rebuttable presumption." 88 Fed. Reg. at 11,708 (request for comment in the NPRM). In response to comments on the issue, the Departments added to the family unity provision noncitizens who have spouses or minor children eligible to join them under the asylum statute. 88 Fed. Reg. at 31,321; *id.* at 31,452 (adopting 8 C.F.R. § 1208.33(c)). The Departments reasoned that being unable to obtain asylum and petition for derivatives to follow to join would possibly create an incentive for families to engage in irregular migration rather than risk extended separation—a key problem the Rule intended to address. *Id.* at 31,321. Commenters had sufficient notice that the Departments were considering ways to ensure against family separation through the proposed family unity provision, and the Departments explicitly sought comment on potential modifications to proposed rebuttal grounds. It was therefore reasonably foreseeable that the Departments would expand the family unity provision to cover such noncitizens, and indeed the Departments received comment on this issue specifically. *See* 88 Fed. Reg. at 31,425. Thus, "the purposes of notice and comment [were] adequately served." *See Am. Water Works Ass'n v. EPA*, 40 F.3d 1266, 1274 (D.C. Cir. 1994); c*f. Alto Dairy v. Veneman*, 336 F.3d 560, 569–70 (7th Cir. 2003) ("The law does not require that every alteration in a proposed rule be reissued for notice and comment. If that were the case, an agency could 'learn from the comments on its proposals only at the peril of subjecting itself to rulemaking without end.'") (quoting *First Am. Discount Corp. v. CFTC*, 222 F.3d 1008, 1015 (D.C. Cir. 1991)). Thus, this change was a logical outgrowth of the NPRM.

*Sixth*, Plaintiffs argue that the Departments failed to seek comment on "structural changes and changes to headings." Compl. ¶ 176 (citing 88 Fed. Reg. at 31,321). Plaintiffs provide no authority requiring a new round of notice and comment to respond to non-substantive changes to

the structure and headings of a proposed regulation. Indeed, the APA requires only that the "terms or substance of the proposed rule or a description of the subjects and issues involved" be included in the NPRM, 5 U.S.C. § 553(b)(3), which is precisely what was done here.

*Finally*, Plaintiffs claim that "considering the magnitude of the Circumvention Rule's impact on State authorities, it was incumbent on Defendants to consult with the States on both the wisdom and implementation of such a far-reaching endeavor, and failure to do so was not harmless error." Compl. ¶ 179 (citing 2 U.S.C. § 1534(a) ("Each agency shall, to the extent permitted in law, develop an effective process to permit elected officers of State, local, and tribal governments (or their designated employees with authority to act on their behalf) to provide meaningful and timely input in the development of regulatory proposals containing significant Federal intergovernmental mandates.")). The Departments addressed the Unfunded Mandates Reform Act that Plaintiffs cite and concluded that the Rule was not covered as a relevant mandate because it "would not impose any enforceable duty upon any other level of government or private sector entity." 88 Fed. Reg. at 11,748; 88 Fed. Reg. at 31,439–40. Plaintiffs do not explain why they believe this is wrong. There is no requirement in the APA or the INA that the Executive engage in specific consultation with the States outside the notice-and-comment process. And to the extent Plaintiffs are suggesting that State, local, and tribal governments did not have an opportunity to comment, they did, and many, including Plaintiffs, submitted comments.[7] Accordingly, Plaintiffs cannot state a claim for violation of the Unfunded Mandates Reform Act.

2.   *Count VII Should Be Dismissed Because the Departments Adequately Considered Plaintiffs' Comments.*

In Count VII, Plaintiffs assert that the Departments failed to sufficiently address their

---

[7] *See, e.g.*, https://www.regulations.gov/comment/USCIS-2022-0016-12295 (Attorneys General of Alabama, Arkansas, Florida, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, New Hampshire, Ohio, Oklahoma, South Carolina, Texas, Utah, West Virginia, and Wyoming); https://www.regulations.gov/comment/USCIS-2022-0016-12595 (Attorneys General of California, Delaware, the District of Columbia, Illinois, Massachusetts, Michigan, Minnesota, Nevada, New York, Rhode Island, Vermont, and Washington); https://www.regulations.gov/comment/USCIS-2022-0016-12339 (Governor and Attorney General of Washington).

comments. Compl. ¶¶ 181–84. The Complaint alleges that the Rule "failed to take account of the State's comments, either summarily rejecting them without substantive explanation, or outright ignoring them," and then provides as an example that a comment from 22 States, including most of the Plaintiffs, raised five specific issues. Compl. ¶ 183; *see* https://www.regulations.gov/comment/USCIS-2022-0016-12295. Yet the only specific comment they claim that the Departments did not address was their claim of reliance interests. *Id.* (citing 88 Fed. Reg. at 31,438). But the Departments did substantively engage with Plaintiffs' claims of reliance, explaining that the Rule is expected to reduce irregular migration, not increase it; the comment conflated the Rule with the lawful pathways it accounts for; the Rule does not set a policy against enforcement of Federal immigration laws; and the Departments were unaware of any existing laws or policies that States had a reliance on that the Rule would alter. *See* 88 Fed. Reg. at 31,438. Although Plaintiffs appear to disagree with the Departments' response, this does not state a claim for failure to follow APA procedures. The Departments also addressed the remainder of the comments made by those States. *See, e.g.*, 88 Fed. Reg. at 31,410 (responding to contention that it is improper for the rule to cite the parole processes because they are contrary to statute); *id.* at 31,329–31 (responding to contention that the rule would facilitate entry of large numbers of noncitizens); *id.* at 31,330–31, 31,338 (responding to contention that the presumption will likely increase "illegal immigration"); *id.* at 31,369, 31,370–71 (responding to contention that the Departments should reimplement the Migrant Protection Protocols and increase detention capacity).

      C.    <u>Count VIII Should Be Dismissed Because a Non-Statutory Ultra Vires Claim Is Unavailable.</u>

In Count VIII, Plaintiffs seek equitable ultra vires relief against official action, which is unavailable because the APA provides the cause of action for review of an agency regulation. The APA was amended in 1976 to add 5 U.S.C. § 702, which was intended "to eliminate the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer[,]" *Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989), and thus "do

away with the ultra vires doctrine," *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985). *See also Eagle Tr. Fund v. U.S. Postal Serv.*, 365 F. Supp. 3d 57, 65–66 (D.D.C. 2019), *aff'd*, 811 F. App'x 669 (D.C. Cir. 2020) ("Congress has specifically enacted a statute to provide a catch-all cause of action for plaintiffs who seek to challenge agency decision making where none otherwise exists (i.e., the APA), and where Congress has further acted to preclude even APA review, it is well established that no cause of action remains, much less some undefined 'traditional' equitable remedy."). Here, even if (as Plaintiffs contend and Defendants do not concede), the non-statutory "ultra vires" cause of action survives this amendment to the APA, *see* Compl. ¶ 186, it would only be available if the APA or another statute did not provide a remedy for judicial review. *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022). *But see Apter v. HHS*, 2023 WL 5664191 (5th Cir. Sept. 1, 2023) (holding that plaintiffs may use the APA to assert *ultra vires* claims). And there is no question that the APA provides for review of a final rule as allegedly "ultra vires." *See* 5 U.S.C. § 551(13) (defining "agency action" to include an agency "rule"); 5 U.S.C. § 706(2)(C). The fact that the statutory scheme precludes these plaintiffs from asserting an APA claim is insufficient to permit them to evade the APA's limits on judicial review by asserting a non-APA *ultra vires* claim. But even if an equitable "ultra vires" claim were available, the Departments are well within their statutory authority to enact a Rule governing eligibility for asylum. *See supra* § III(A). Accordingly, this claim must be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss Plaintiffs' Complaint under Rule 12(b)(1) for lack of Article III or statutory standing. Alternatively, the Court should dismiss Counts I–III and VI–VIII for failure to state a claim under Rule 12(b)(6).

Dated: September 11, 2023                    Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General

                                             WILLIAM C. PEACHEY
                                             Director

                                             EREZ REUVENI
                                             Assistant Director

                                             By: /s/ *Katherine J. Shinners*
                                             KATHERINE J. SHINNERS
                                             Senior Litigation Counsel
                                             U.S. Department of Justice, Civil Division
                                             Office of Immigration Litigation – DCS
                                             P.O. Box 868, Ben Franklin Station
                                             Washington, DC 20044
                                             Tel: (202) 598-8259
                                             Email: katherine.j.shinners@usdoj.gov

                                             PATRICK GLEN
                                             CHRISTINA P. GREER
                                             Senior Litigation Counsel

                                             *Attorneys for Defendant*