# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

|  |  |  |
|---|---|---|
| STATE OF INDIANA, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-00106-CRH |
| ALEJANDRO MAYORKAS, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## DECLARATION OF MICHAEL A. CLEMENS

I, Michael A. Clemens, declare as follows:

1.     My name is Michael A. Clemens. I am a full professor with tenure in the Department of Economics at George Mason University in Fairfax, Virginia, and a Non-resident Senior Fellow at the Peterson Institute of International Economics in Washington, DC. I specialize in research on the causes and effects of international migration. I hold my Ph.D. degree from the Department of Economics at Harvard University.

2.     Attached hereto as Exhibit A is my report prepared for the above-captioned litigation (Expert Report).

3.     I declare, under penalty of perjury, that the facts attested hereto and in my Expert Report are true, to the best of my knowledge.

This declaration was executed on September ____8____, 2023, in _Alexandria, VA_

_____
Michael A. Clemens

# EXHIBIT A

**BEFORE THE**

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NORTH DAKOTA**

**WESTERN DIVISION**

In the Matter of

STATE OF INDIANA et al. v. MAYORKAS et al.           1:23-cv-00106-CRH

**EXPERT REPORT OF MICHAEL A. CLEMENS**

**ON BEHALF OF**

**U.S. DEPARTMENT OF JUSTICE**

**September 8, 2023**

# Table of Contents

*I. Introduction* ............................................................................................................................... *1*

**1. Qualifications** ......................................................................................................................... 1

**2. Scope** ....................................................................................................................................... 2

**3. Method to test the claims of fact** ........................................................................................ 4

    a. 'Stick without Carrot' policy..................................................................................................5

    b. 'Carrot and Stick' policy .........................................................................................................5

**4. Summary of results** ............................................................................................................... 6

*II. Background* ............................................................................................................................... *6*

**1. *Stick without Carrot*: the Third Country Transit (TCT) Bar of 2019** ........................... 7

    a. Creation and design of the 2019 TCT Bar ..........................................................................7

    b. Conflicting claims about the impact of the 2019 TCT Bar ...............................................9

**2. *Carrot and Stick*: Venezuela 2022, Nicaragua and Cuba 2023** ..................................... 10

*III. Analysis* ................................................................................................................................. *14*

**1. Border encounters data and method**................................................................................. 14

**2. *Stick without Carrot*: The effect of limits on asylum without a parole process**................. 16

    a. Disaggregate encounters by region of the border.............................................................18

    b. Disaggregate encounters by migrant nationality...............................................................19

    c. Disaggregate encounters between ports of entry vs. at ports of entry............................22

**3. *Carrot and Stick*: The effect of limits on asylum combined with a parole process** ............ 25

*IV. Appendices* ............................................................................................................................. *32*

**1. Michael A. Clemens's publications for the past 10 years** .............................................. 32

**2. Statement of compensation** ............................................................................................... 37

**3. Full CV of Michael A. Clemens (attached below)**............................................................ 37

# Table of Figures

Figure 1: Title 42 expulsions for Venezuela, Nicaragua, and Cuba................................................13

Figure 2: Overview of full dataset on border encounters per month, 2011–2023 .........................15

Figure 3: Overall border encounters per month with key events, Jan. 2019–Dec. 2020 ...............17

Figure 4: Overall border encounters in the 9th Circuit (CA & AZ) vs. elsewhere (TX & NM) .....18

Figure 5: Encounters by TCT Bar applicability, CA & AZ............................................................19

Figure 6: Encounters by TCT Bar applicability, TX & NM...........................................................20

Figure 7: Encounters between ports of entry (USBP) vs. at ports of entry (OFO) .......................22

Figure 8: Encounters between ports of entry (USBP), by region & TCT Bar applicability...........23

Figure 9: Encounters at ports of entry (OFO), by region & TCT Bar applicability.......................24

Figure 10: Border encounters for Venezuela, Nicaragua, and Cuba ..............................................26

# I. Introduction

## 1. Qualifications

(1) My name is Michael A. Clemens. I am a full professor with tenure in the Department of Economics at George Mason University in Fairfax, Virginia, and a Non-resident Senior Fellow at the Peterson Institute of International Economics in Washington, DC. I specialize in research on the causes and effects of international migration. I hold my Ph.D. degree from the Department of Economics at Harvard University.

(2) Economists study the reasons that immigration flows are different across time and across space. Economists also study the effects of immigration on labor markets, public coffers, crime, assimilation, public attitudes, and other outcomes. I am highly familiar with the academic research literature on the causes and effects of immigration, and the data and methods used to establish empirical facts about immigration.

(3) The field of economics has also contributed more generally to a body of statistical tools used to transparently assess cause and effect, collectively known as econometrics. Econometrics is the application of statistical methods to real-world data in order to address economic problems and establish causal relationships between quantitative measures of real-world phenomena. The statistical methods and issues in econometrics are common to quantitative analysis in other branches of the social sciences. I have extensive training and experience in the field of econometrics, including regression and other statistical methods.

(4) I have published 38 articles in peer-reviewed academic journals. As of June 26, 2023, the website *Google Scholar* counted 12,851 citations of my research by other scholars' papers.[1] My citations by other academic economists, in particular, place me in the top 2.1 percent of all-time citations among all academic economists, according to the website *Research Papers in Economics (RePEc)* at the Federal Reserve Bank of Saint Louis.[2] For citations of works written in the past 10 years, my rank is in the top 0.4 percent of all academic economists.[3] My research was awarded the Royal Economic Society Prize in 2013, an annual honor to the best research paper published by the world's oldest professional society of economists.

(5)     I have previously served as an expert witness for the US Department of Justice in the matters of *Texas v. Mayorkas* (US District Court for the Northern District of Texas, 2:22-cv-00094-Z) and *Arizona v. Garland* (US District Court for the Western District of Louisiana, 6:22-cv-01130).

(6)     I hold honorary, unpaid affiliations with the IZA Institute of Labor Economics in Bonn, Germany, the world's leading network of academic labor economists; the Centre for Research and Analysis of Migration in the Department of Economics at University College London, London, United Kingdom, the world's leading network of academic migration economists; and the Center for Global Development in Washington, DC, a nonpartisan think tank that studies policies to reduce global poverty. I serve occasionally as an Expert Development Economist in the Office of the Administrator at the US Agency for International Development, advising the Administrator on policies to improve and enforce pathways for temporary labor migration in the Western Hemisphere. Before joining George Mason University, I served for 20 years as a fellow of the Center for Global Development, which I joined immediately after my doctorate.

## 2. Scope

(7)     I have been asked by the Department of Justice to evaluate the basis for a claim of fact. The claim is made in the complaint for *State of Indiana et al. v. Mayorkas et al.* ("the Complaint").[4] It is a claim about the effect of certain provisions in a new Rule that limits some migrants' eligibility for asylum in the United States. The Complaint claims that those provisions of the Rule are sufficient to cause an increase in migration to the US Southwest border by inadmissible migrants.

(8)     The Rule in question was issued by the Department of Homeland Security and the Department of Justice on May 16, 2023, *Circumvention of Lawful Pathways* (the "Circumvention Rule").[5] This Rule provides, with some exceptions, a presumption of asylum ineligibility for people who migrate to the US after traveling through other countries where they could, in principle, have applied for asylum or other protection. The Circumvention Rule creates a presumption of ineligibility for US asylum for "*noncitizens who enter the United States without authorization from Mexico at the southwest land border or adjacent coastal borders*", between May 11, 2023 and May 11, 2025—unless those at the border can prove that they applied for and were denied asylum or related protection in a third-country through which they traveled en route or meet certain other exceptions.[6] I will call this presumed ineligibility for asylum, based on travel

through third countries, a 'Travel-Based Condition'. By definition, this presumption does not apply to Mexican nationals.

(9)   The provisions of this Rule disputed by the Complaint are several conditions under which the Rule allows a migrant to remain eligible for asylum, even after traveling through a third country. First, the Rule lists several exceptions: types of migrants to whom the Travel-Based Condition does not apply at all. The Rule excepts from the Travel-Based Condition 1) migrants who have been "*provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process*", 2) migrants who "*presented at a POE [Port of Entry], pursuant to a pre-scheduled time and place*" (typically, an appointment in the CBP One app), 3) migrants who demonstrate that it was impossible for them to pre-schedule such an appointment on certain grounds, and 4) unaccompanied children. Second, the Rule establishes rebuttal grounds, in which a migrant can rebut presumption of ineligibility even if it does apply to him or her due to exceptionally compelling grounds, including but not limited to: 1) acute medical emergencies, 2) extreme threats to life or safety, 3) migrants who satisfy the definition of "victim of severe form of trafficking", or 4) migrants in removal proceedings whose family would otherwise be separated under certain circumstances.[7]

(10)   In this analysis I will refer to all of the provisions in the preceding paragraph as "the Exceptions". I do this because this is the terminology used by the Complaint. The Complaint uses the term "the Exceptions" to refer to both what the Circumvention Rule calls "exceptions" and what the Circumvention Rule calls "rebuttal grounds".[8] For the remainder of this document, the term "the Exceptions" should be understood broadly, as in the Complaint, to refer to the various provisions of the Circumvention Rule that allow a migrant to remain eligible for asylum even after traveling through a third country.

(11)   The Complaint claims that one or more of the Exceptions are sufficient to cause an increase in migration to the US border by those who are inadmissible. Referring to the above Exceptions collectively, the Complaint claims, "*The Exceptions will increase the rate of illegal immigration into the United States*[]".[9]

(12)   I am assigned to test whether the above factual claim is consistent or inconsistent with recent patterns in migrant behavior at the US Southwest border. I know the existing research

literature in this field well, and I am not aware of any prior, direct quantitative tests of this claim.

### 3. Method to test the claims of fact

(13)  This claim can be tested with data on migrant encounters at the border. The disputed claim relates to the effect of the Exceptions on the number of inadmissible migrants who decide to migrate to the border. The claim addressed herein is *not* about the effect on the number of migrants who, after they are encountered, are allowed to remain in the US. For example, the Complaint states that the Exceptions in the Rule "*will cause an influx of aliens at the border, causing Defendants to release hundreds of thousands of aliens into the United States monthly and similarly increasing the number of aliens Defendants fail to apprehend initially[] by incentivizing further illegal immigration*" into each plaintiff state.[10] This claim relates to migrants' incentives and their resulting decisions to migrate to the border, which can be directly observed in statistics on migrant encounters.

(14)  One step of logic makes this claim testable with data from the border. The Complaint claims that the Exceptions in the Circumvention Rule are sufficient to cause a substantial *increase* in migration to the border.[11] This claim logically requires the claim that *in the absence of the Exceptions*, the Rule's condition on asylum eligibility by itself (the Travel-Based Condition *per se*) is sufficient to cause a measurable *decrease* in migrant encounters.[12] This is because in general, if any given policy does not affect border encounters, exceptions to that policy could not do so either.

(15)  To see this, consider a hypothetical traffic law that sets a $1 fine for speeding, a law that causes no reduction in drivers' average speed. If the law exempted left-handed drivers, that exemption could not cause a relative increase in the incentive for speeding—because drivers' speeding decisions are apparently determined by incentives separate from and more important than the $1 fine *per se*. Thus the claim that the exemption for left-handed drivers increases the average incentive for speeding can be tested by observing whether or not the $1 fine, by itself, reduces the average incentive for speeding. If the fine by itself does not affect speeding, the exemption cannot do so either.

(16)  On this basis, I evaluate the claim of fact in the Complaint with two types of tests. Both of these tests consider cases in which a policy change limited the availability of asylum for a

substantial share of migrants coming to the border. A *limit on asylum availability* means either limiting migrants' eligibility for asylum or quickly expelling migrants before they could apply for asylum. Both forms of limiting asylum availability substantially reduce the probability that a migrant subject to the limit can remain in the United States, either as an asylum-seeker or asylee. The two types of test I conduct are as follows.

### a. 'Stick without Carrot' policy

(17)   First, if the condition on asylum eligibility in the Travel-Based Condition *per se* is sufficient to reduce border encounters, it must be that a similar condition on asylum availability by itself—enacted without the Exceptions—would cause measurable declines in border encounters. I test this by studying how border encounters evolved when a materially identical limit on asylum eligibility was recently enacted without the Exceptions in the Circumvention Rule. I call this policy *Stick without Carrot.*

### b. 'Carrot and Stick' policy

(18)   Second, it must be that when border policy changes *do* substantially alter the incentives faced by migrants, the effect of those policy changes on migrant behavior can be clearly measured by the same method. This is to address the concern that changes in migrant behavior are largely invisible in border encounter statistics, in which case a finding of no effect on border encounters need not imply lack of effect on migration behavior.[13]

(19)   I test the ability of the method to detect changes in migrant behavior by studying three recent instances in which a policy bundle—including both new country-specific parole processes and the ability to quickly return to Mexico nationals from those countries who did not pursue the parole processes, which had the practical impact of disallowing applications for asylum—was enacted for Southwest land border encounters of migrants from Venezuela, Nicaragua, and Cuba. I call these policies *Carrot and Stick.* (A contemporaneous policy change for migrants from Haiti, as discussed below, did not in practice subject Haitians to Carrot and Stick policy and is thus not suitable for this test.)

**4. Summary of results**

(20)  The limit on asylum availability created by a Travel-Based Condition *per se* is not sufficient, by itself and without the Exceptions, to deter irregular migration to the Southwest border. I find that *Stick without Carrot* policy fails to reduce migration. A Transit Bar enacted in 2019—which likewise established a Travel-Based Condition but lacked a parole process or any of the other Exceptions in the 2023 Circumvention Rule—failed to cause any measurable reduction in the number of border encounters relative to what they would have been without the Transit Bar.

(21)  The same method *can* detect changes in migrant behavior due to other policy changes that do substantially alter migrants' incentives. I find that *Carrot and Stick* policies cause a large, rapid reduction in migrant encounters. A policy bundle that had the effect of limiting asylum availability and the ability to remain in the United States—together with exceptions created by new parole processes—caused more than an 80% decline in border encounters with Venezuelan migrants (after October 19, 2022) and more than a 90% decline in encounters with Nicaraguan and Cuban migrants (after January 9, 2023), within 1 to 3 weeks of each policy's enactment. These patterns are consistent with the method of measuring changes in border encounters reliably measuring changes in migrants' incentives and behavior.

(22)  Collectively, this evidence is not consistent with the claim that the limit on asylum eligibility in the 2023 Circumvention Rule is, by itself, sufficient to cause a reduction in migrant encounters. The effect of the Travel-Based Condition *per se* on border encounters is indistinguishable from zero. In general, if the effect of any given policy is indistinguishable from zero, exceptions to that policy cannot have a substantial effect by themselves.

(23)  Thus I conclude that the core claim of the Complaint—that the Exceptions to the 2023 Circumvention Rule cause a substantial increase in migration to the Southwest border—is inconsistent with the data on migrant encounters at the border. This evidence is also inconsistent with possible concerns that, in general, the effects of efficacious deterrence policies cannot be detected in the data on migrant encounters.

## II. Background

(24)  Here I review the factual context of the policy changes whose effects I study in the Analysis section. Several aspects of each policy change are crucial to evaluating its effects. These include

6

the exact timing of each policy, the limitations it placed on entry or asylum availability, and the exceptions it allowed.

### 1. *Stick without Carrot*: the Third Country Transit (TCT) Bar of 2019

(25)   In 2019, the US government limited asylum availability by limiting migrants' eligibility for asylum for people migrating to the Southwest border based on their prior transit through third countries. This change in asylum policy was known as the Third-Country-Transit Bar IFR ('2019 TCT Bar').[14] The 2019 TCT Bar contained a Travel-Based Condition on asylum eligibility similar to the presumption in the 2023 Circumvention Rule, but *lacked* precisely "the Exceptions" disputed by the Complaint.[15] That is, the 2019 TCT Bar lacked all of the exemptions and rebuttal grounds created by the 2023 Circumvention Rule—except one exemption, which is not disputed by the Complaint and not material to this analysis, a very rare exemption for victims of severe forms of trafficking in persons. In other words, the 2019 TCT Bar enacted a *Stick* of limiting eligibility for asylum without the *Carrot* of substantial exceptions (such as for migrants who are provided appropriate authorization to travel to the United States pursuant to a DHS-approved parole process) and rebuttal grounds (such as for acute medical emergencies). As noted above, I follow the Complaint in using the term "the Exceptions" to refer to both exceptions and rebuttal grounds in the Circumvention Rule.[16]

### a. Creation and design of the 2019 TCT Bar

(26)   The 2019 TCT Bar was applied nationwide from September 11, 2019 through June 30, 2020. It began to be applied somewhat earlier at part of the Southwest border—Texas and New Mexico only—on August 16, 2019.[17] This variation across time and space allows me to test hypotheses about how migrant encounters at the border respond to a Travel-Based Condition *per se*. The rule enacting the 2019 TCT bar stated that "*once migrants learn of these changes to the United States' asylum regulations, the incentive to come to the United States may be reduced*".[18]

(27)   The 2019 TCT Bar rendered the vast majority of people then migrating to the Southwest border ineligible for asylum in the US. A contemporary legal analyst at Georgetown University wrote, "*With limited exceptions, the Transit Bar denies asylum to individuals entering the United States through the southern land border if they passed through other countries en route to the United States and were not denied asylum in those transit countries. Thus, the Transit Bar effectively*

*precludes almost all non-Mexican asylum seekers at the southern border from pursuing refuge in the United States*".[19]

(28)   To be precise, the 2019 TCT Bar limited asylum eligibility for people who migrated to the US border after transiting through any third country—except in rare cases of severe human trafficking such as sex trafficking or slavery—unless

> "*he or she applied for protection from persecution in at least one country outside the alien's country of citizenship, nationality, or last lawful habitual residence through which the alien transited en route to the United States and the alien received a final judgment denying the alien protection in such country,*"
>
> or
>
> "*[t]he only country or countries through which the alien transited en route to the United States were, at the time of the transit, not parties to the 1951 United Nations Convention relating to the Status of Refugees or the 1967 Protocol relating to the Status of Refugees*".[20]

(29)   I establish the exact dates of the TCT Bar's effectiveness because these are essential to the analysis below. The TCT Bar entered force nationwide on July 16, 2019 as an Interim Final Rule (IFR) issued by the Dept. of Homeland Security and the Executive Office for Immigration Review. The Bar was announced just one day before it took effect.[21] This IFR was quickly enjoined nationwide, on July 24, 2019, by a federal judge in the Northern District of California.[22] An appeals court ruled on August 16, 2019 that the injunction applied only within the Ninth Circuit—including the border states of California and Arizona—effectively reinstating the TCT Bar for migrants encountered at parts of the Southwest border located in Texas and New Mexico.[23] For just two days, the nationwide scope of the IFR injunction was restored September 9–10, 2019.[24] But on September 11, 2019, the US Supreme Court reinstated the TCT Bar nationwide by staying the original July 24 injunction everywhere.[25] Finally, the TCT Bar was struck down on June 30, 2020 by a US federal court.[26]

(30)   These events imply that, with minor exceptions, the TCT Bar legally applied to migrants encountered at the Southwest border in Texas and New Mexico from August 16, 2019 through June 30, 2020, and to migrants countered at the Southwest border in California and Arizona between September 11, 2019 and June 20, 2020. The TCT Bar was also in effect nationwide but very briefly from July 15, 2019 until July 24, 2019.

(31)   The relative importance of the TCT Bar diminished for migrants encountered after March 20,
       2020 at 11:59 pm ET. Beginning on that date, the Centers for Disease Control and Prevention
       (CDC) adopted measures that US Customs and Border Protection assisted to implement that
       reduced travel at the Southwest border for the remaining duration of the TCT Bar. Referring to
       the threat of the COVID-19 pandemic, the US Government closed Southwest border ports of
       entry to all but essential travel.[27] Separately, the US Government, pursuant to the CDC order
       began preventing the entry of and expelling certain encountered migrants under CDC's public
       health Order under Title 42 of the U.S. Code ("Title 42 Order").[28]

### b. Conflicting claims about the impact of the 2019 TCT Bar

(32)   The Departments that enacted the 2019 TCT Bar expressed predictions about its expected effect
       on migrant encounters at the Southwest border (SWB), predictions that the same Departments
       later assessed to be contradicted by experience.

(33)   Encounters overall: First, the Departments predicted that the TCT Bar would reduce overall
       migrant encounters at the border, both at and between ports of entry. They stated in 2020 that
       "*the Departments believe that the rule does address some causes of migration, such as the
       incentives for aliens with non-meritorious or non-urgent [asylum] claims to migrate*",[29] and that
       "*once migrants learn of these changes to the United States' asylum regulations, the incentive to
       come to the United States may be reduced*" because many people migrate to the border "*in the
       hope of a lengthy asylum process that will enable them to remain in the United States for years,
       typically free from detention and with work authorization*".[30] These statements apply to all
       migrants, wherever encountered. The Departments expressed the belief that the TCT Bar
       would cause a reduction in overall migrant encounters at the Southwest border.

(34)   The Departments later determined that those predictions did not turn out to be correct. The
       Departments stated in 2023—again assessing the 2019 TCT Bar—that "*the Departments have no
       reason to believe that the TCT Bar IFR had any noticeable impact on encounters along the SWB
       while it was in effect*".[31] This statement follows a passage discussing the number of migrant
       encounters overall—both at and between ports of entry.

(35)   Encounters between ports of entry: Second, the Departments originally predicted that the 2019
       TCT Bar would cause a reduction in attempts at illegal entry without inspection. In 2020, they
       stated that they "*expect that the rule will lead to fewer individuals illegally crossing the border*"

and that they "*promulgated the rule in part to reduce the incentives to cross without inspection in an effort to reduce such practices.*"[32] That is, they expressed the belief that the TCT Bar would cause a reduction in attempts at illegal entry between ports of entry (POEs).

(36)   Again, later statements by the same Departments claim that those predictions did not turn out to be correct. The Departments stated in 2023—assessing the 2019 TCT Bar—that "*the Departments' review does not indicate that the bar had a dramatic effect on the number of noncitizens seeking to cross the SWB between POEs*". Noting that the 2019 TCT Bar was not paired with any expansion of lawful migration pathways such as substantial parole processes, the Departments stated that they "*believe that the TCT Bar's lack of such alternative pathways may have contributed to its failure to dramatically decrease encounters between POEs*".[33]

(37)   That is, the Departments' views on the effect of the 2019 TCT Bar have evolved over time regarding both the effect on migrant encounters overall, and on encounters between ports of entry. In my analysis below, I therefore consider separately the effect of the 2019 TCT Bar on the number of overall encounters, and on the number of encounters at and between ports of entry.

## 2. *Carrot and Stick*: Venezuela 2022, Nicaragua and Cuba 2023

(38)   In three recent instances, the US government enacted *Carrot and Stick* policies: it implemented, through the Circumvention Rule, a limit on asylum availability together with certain new and existing lawful pathways for migration. In this case, asylum availability was limited by quickly expelling many migrants before they were able to apply for asylum.

(39)   One such pathway for lawful migration is the creation of parole processes for Cubans, Nicaraguans, and Venezuelans. Encounters with Venezuelan nationals at the Southwest border rose rapidly in mid-2022. US officials could not expel or remove most of these migrants, given that both the Venezuelan and Mexican governments declined to receive most Venezuelans returned from the US. On October 12, 2022, the Government of Mexico decided to begin accepting Venezuelans who had migrated to the US via the land border with Mexico and were expelled under Title 42.[34]

(40)   After October 12, 2022, Venezuelan nationals subject to the CDC's Title 42 Order could be expelled directly to Mexico. This had the practical effect of limiting access to US asylum for most Venezuelan nationals migrating irregularly to the Southwest border. This is due to the

fact that noncitizens processed under the Title 42 Order were not eligible to seek asylum. Rather, in order for the asylum procedures to apply, the noncitizen must be processed under Title 8 of the U.S. Code. All noncitizens covered by the CDC Title 42 Order were processed under the Title 42 Order unless a customs officer determined they should be excepted based on the totality of the circumstances, including consideration of significant law enforcement, officer and public safety, humanitarian, and public health interests. Individuals excepted from the Title 42 public health order were processed under Title 8, including access to asylum procedures.[35]

(41)  This limitation in the ability to access asylum procedures is shown in Figure 1a. For months before Mexico's October 2022 announcement, almost all Venezuelans encountered at the border were not processed under Title 42 authority but under Title 8 authority, as they were unable to be expelled prior to the announcement. For months after the announcement, the large majority of Venezuelans were instead processed under Title 42, and thus almost universally not subject to the asylum procedures under Title 8. There was no similar increase at the time in the rate of Title 42 processing for nationals of other significant countries.

(42)  Simultaneously with the announcement of this *Stick*, the US Dept. of Homeland Security announced a *Carrot*: It would create a new humanitarian parole process for Venezuelan migrants on October 19, 2022.[36] This parole process allowed up to a cumulative total of 24,000 Venezuelans who were outside of the US to apply from abroad for advance authorization to travel to the US by flying to an interior port of entry and seek parole at the port of entry. Migrants who entered the US between ports of entry or entered either Mexico or Panama without authorization after the announcement of the process were ineligible to participate in the process.[37] That is, it created a substantial new pathway for lawful, humanitarian entry to the US available only to Venezuelans who did not migrate irregularly to the US Southwest border.

(43)  A similar *Carrot and Stick* policy was announced for Nicaraguan and Cuban nationals on January 5, 2023, effective January 9, 2023.[38] The *Stick* was that a large fraction of Nicaraguans and Cubans encountered at the Southwest border would be, for the first time, expelled into Mexico under Title 42 authority. This was made possible by Mexico's decision to accept expelled migrants from Nicaragua and Cuba as part of a monthly quota. Figures 1b and 1c show that Title 42 expulsions of Nicaraguans and Cubans, which had been near zero through

the end of 2022 due to inability to expel them back to their home countries, shot up in January 2023 to comprise a large fraction of encounters for those nationalities. This increase was much larger than the contemporaneous, moderate upward trend in Title 42 processing for other nationalities.

(44)   The simultaneous *Carrot* for Nicaraguan and Cuban migrants was the creation of parole processes for such nationals similar to the Venezuelan parole process, and an expansion in the number of monthly parole slots. Again, this process was available exclusively to migrants who did not migrate irregularly to the US border.[39]



Figure 1: Title 42 expulsions for Venezuela, Nicaragua, and Cuba

*Note: The vertical axis shows the number of encountered migrants processed under Title 42 authority as a fraction of total encounters of the indicated nationality or nationalities. "Non-CNV" means nationals of countries other than Cuba, Nicaragua, and Venezuela. The red shaded area spans the entire month in which the policy change occurred. This is to highlight the fact that data on border encounters for that month (small circles joined by lines) can in principle be affected by the policy regardless of what day of the month the policy change occurred.*

(45)   In other words, Venezuelans, Nicaraguans, and Cubans became subject to a *Carrot and Stick* policy bundle: substantial limits on access to asylum for migrants to the Southwest border, paired simultaneously with the creation of a lawful migration pathway available only to those who did not migrate to the Southwest border. In the analysis to follow, I use data on encounters of migrants from these countries to test whether or not my empirical method can detect substantial changes in behavior by migrants whose incentives are altered by changes in border policy.

(46)   I do not consider encounters with migrants from Haiti, who were included in the January 2023 parole process, because encounters with Haitians were rarely processed under Title 42 before or after January 2023. Thus statistics on encounters with Haitian migrants are uninformative about the effects of *Carrot and Stick* policy.[40]


## III. Analysis

(47)   Here I evaluate the effect of two different classes of policy change on the number of migrants encountered by US Customs and Border Protection at the Southwest border. I first describe the data that I use on migrant encounters. I then proceed to test the effect of *Stick without Carrot* policy: the 2019 TCT Bar. I conclude by testing the effects of the *Carrot and Stick* policies for Venezuelans, Nicaraguans, and Cubans.

### 1. Border encounters data and method

(48)   My analysis below relies on a master database built from two main data sources. The first is the monthly data on overall migrant encounters nationwide, FY2020 (October) through FY2023 (June), published by US Customs and Border Protection (CBP) on its Public Data Portal.[41] The second is the corresponding monthly data on migrant encounters during FY2011 (October) through FY2019 (September) provided by CBP to the Syracuse University Transactional Records Access Clearinghouse (TRAC) under the Freedom of Information Act, and published by TRAC. Both of these series include encounters by CBP overall (US Border Patrol and the Office of Field Operations), under both Title 8 and Title 42, of migrants of any nationality, age, and family status.

(49)   Figure 2 shows the resulting complete monthly series of border encounters from the calendar month of October 2011 through the calendar month of June 2023, the most recent data publicly available from CBP as of this writing.

Figure 2: Overview of full dataset on border encounters per month, 2011–2023



Calendar date, *monthly*

(50)   In Figure 2 and throughout this analysis, the vertical axis measuring levels of encounters is shown on a logarithmic scale, that is, a scale where powers of ten are equally spaced. This has the effect of representing any two equal *percentage changes* in the data as equally-spaced vertical shifts, regardless of the starting *level.* For example, a change from 1,000 to 1,100 is shown in the graph by the same vertical distance as a change from 100,000 to 110,000. This is appropriate when considering the effects of policy interventions that might deter or encourage potential migrants by changing the *probability* that any given person chooses to migrate, by altering their incentives. Intuitively, if a policy change deters 50 percent of potential migrants from migrating, the magnitude of that effect should be assessed independently of the population size considered.

(51)   My analysis tests for a causal relationship between policy changes and migrant encounters at the border using the differences-in-differences method. This method is "*one of the most frequently used methods in impact evaluation studies… and has been widely used in economics, public policy, health research, management and other fields.*"[42] The method was invented in the

field of public health in 1855, has been used in academic social science since 1915, and has been a mainstay of testing causal claims in quantitative social science for the last half century.[43]

(52) The differences-in-differences method considers the change in some outcome of interest after a policy change versus before the policy change (the first "difference"), in some group exposed to the policy change versus some group not exposed (the second "difference"). A difference-in-difference analysis is consistent with a nonzero effect of some policy change on an outcome if the time-trend for the outcome in the policy-exposed group (the "treatment group") begins to differ markedly from the time-tends in the not-exposed group (the "comparison group") shortly after the policy change occurs. The analysis is inconsistent with a substantial effect of the policy change if 1) the time-trend of the outcome is similar in the treatment vs. the comparison group, before vs. after the policy change, or 2) the time-trend of the outcome is similar in the treatment group before vs. after the policy change, and any change in the time-trend of the outcome in the comparison group can be clearly attributed to factors that would not substantially affect the treatment group.

## 2. *Stick without Carrot*: The effect of limits on asylum without a parole process

(53) Measuring the effect of the 2019 TCT Bar on migrant encounters requires comparing actual migrant encounters to what they would have been if the TCT Bar had not been enacted—that is, "counterfactual" encounters.[44] Because counterfactual encounters cannot be directly observed, a statistical assessment of causation relies on comparing actual encounters to some proxy for the unobserved, counterfactual encounters. The best feasible method to proxy for the counterfactual outcome, in this case, is to compare outcomes in the presence of the TCT Bar to outcomes in the absence of the TCT Bar using the differences-in-differences method.[45]

(54) The differences-in-differences analysis below considers whether the migrant encounter data exhibit any downturn starting at or near the advent of the TCT Bar, both relative to trends before the TCT Bar and relative to trends for migrants not subject to the TCT Bar.

(55) Figure 3 gives a broad view of overall migrant encounters at the US Southwest border during the calendar years 2019 and 2020. The 2019 TCT bar was effective nationwide from September 11, 2019 until COVID-related closures in late March 2020 caused border crossings to collapse. The TCT Bar took effect slightly earlier, on August 16, 2019, for migrant encounters outside the



*Figure 3: Overall border encounters per month with key events, Jan. 2019–Dec. 2020*

Ninth Circuit (that is, encounters in Texas and New Mexico). It was overturned on June 30, 2020.

(56) There is no evident downturn in the trend of border encounters after the 2019 TCT Bar took effect. Encounters had been falling rapidly after May 2019. The TCT Bar was publicly announced July 15, and was briefly in effect from July 16 until enjoined July 24. In principle the policy could have had an effect for those few days of July. But the trend of border encounters from June to July was simply to continue the sharp drop, at a similar rate, that occurred from May to June. After the TCT Bar lastingly took effect—August in Texas and New Mexico, September nationwide—border encounters fell more slowly than they had been falling beforehand. For example, during three months after the policy (October through December 2019), encounters fell by 4,462 (10.3%). During three months before the policy lastingly took effect (May through July 2019), monthly encounters fell by 61,514 (43.6%).

(57) This evidence is consistent with a null effect of the 2019 TCT Bar on encounters. It is also possible, in principle, that a negative effect on encounters is difficult to detect amongst the effects of other coincident and more important forces, such as seasonal variation in encounters. But this latter interpretation is inconsistent with the deeper analysis of the data that follows.

***a. Disaggregate encounters by region of the border***

(58)  Figure 4 separates migrant encounters in border states outside the Ninth Circuit (Texas and New Mexico) from encounters in border states of the Ninth Circuit (California and Arizona). In Texas and New Mexico, where the TCT Bar took effect August 16, 2019, migrant encounters in the three months after the policy (September–November 2019) fell more slowly (down 9,901 or 28.9%) than during three months before the policy (May–July 2019, down 43,743 or 41.0%).

(59)  Does this represent a broader seasonal pattern concealing a possible downturn in encounters caused by the TCT Bar? Such an interpretation is rejected by the data on encounters in the Ninth Circuit states of California and Arizona, where the TCT Bar was enacted in September, in Figure 4. In those states, monthly encounters had already fallen by August 2019 to 15,241, very close to their low point for the year. In September, when the policy began on the 11th of the month, encounters were essentially unchanged at 15,122. In October, the month after the policy began, encounters rose to 16,278, and continued rising through the rest of 2019. This

*Figure 4: Overall border encounters in the 9th Circuit (CA & AZ) vs. elsewhere (TX & NM)*



pattern cannot be accounted for by standard seasonal fluctuations, since the summer surge in border encounters had run its course in California and Arizona before the TCT Bar took effect there.

18

(60)   Note also in Figure 4 that, though the TCT bar was announced July 15 and effective for a few days thereafter, there was no downward shift in the trend of encounters from June to July relative to the trend from May to June—in either of the two regions.

(61)   In other words, any claim that Figure 3 is consistent with a deterrent effect of the TCT Bar on migrant encounters would require an explanation of why the TCT Bar had no such effect for people migrating to the US via the western half of the border.

(62)   The clearest candidate for such an explanation, in principle, might be geographic differences in the prevalence of migrants targeted by the policy change. Mexican nationals were exempt from the 2019 TCT Bar. Thus a logically consistent, if somewhat strained explanation for the data in Figure 4 might be that TCT Bar caused a downturn in Texas and New Mexico that was concealed by seasonal variation in those states, and caused a downturn in California and Arizona that was concealed by a relatively low prevalence of non-Mexican migrants in those states.

*Figure 5: Encounters by TCT Bar applicability, CA & AZ*



### b. Disaggregate encounters by migrant nationality

(63)   But this explanation, too, is rejected by the data. Figure 5 shows migrant encounters in California and New Mexico, for Mexicans ("TCT Bar not applicable") versus non-Mexicans ("TCT Bar applicable").

(64) If the TCT Bar deterred migration in these states, we should expect to see encounters of the applicable (non-Mexican) migrants falling relative to encounters of not-applicable (Mexican) migrants, starting at or soon after the advent of the TCT Bar.

(65) Nothing resembling that pattern is evident in Figure 5. Monthly encounters of applicable migrants in California and Arizona had already fallen to a very low level before the policy began (6,110 in August 2019), were similar the month after the policy took effect (5,859 in October 2019), and then rose continuously through the end of 2019. Encounters for applicable and not-applicable migrants followed essentially parallel trends in September, October, and November, when the policy was in effect. There is no sign of a downturn in encounters of applicable migrants relative to not-applicable migrants until January 2020.

(66) There is no reason I am aware of that any incentive effect of TCT Bar would be nil during four months but then arise suddenly in January. I will return, below, to the question of how quickly any effect of the TCT Bar—if present—should have been observable.

(67) Figure 6 shows a breakdown of encounters by non-Mexican (TCT Bar applicable) and Mexican (TCT Bar not applicable) migrants, but now for the states of Texas and New Mexico where the TCT Bar was in effect after August 16.

*Figure 6: Encounters by TCT Bar applicability, TX & NM*



(68)   There is no sign of a substantial effect of the TCT Bar on these trends in Figure 6. If the policy had a substantial deterrent effect on non-Mexican migrants, I would expect to see a downturn in encounters of the affected migrants, narrowing the gap between encounters of affected versus unaffected migrants, starting at or shortly after the advent of the TCT Bar. But for the affected non-Mexican migrants, the month-to-month percentage change in encounters was similar from May through October, despite the policy change in August. The only divergence from trend that begins in the month the policy began is an *upturn* in encounters of migrants *unaffected* by the policy.

(69)   If one observed the narrowing of the gap between affected and unaffected migrant encounters after August in Figure 6, and attributed this narrowing to the effects of the policy, one would have to explain 1) why a downturn of similar magnitude in encounters of affected migrants occurred for months prior to the policy, 2) why the only trend-break evident at the time of the policy change is exhibited by migrants *unaffected* by the policy, and 3) why no such deterrent effect was evident among policy-affected migrants in the western half of the border (Figure 5).

(70)   In sum, although it is possible in principle that the patterns in Figure 4 arose from geographic differences in the prevalence of applicable versus not-applicable migrants, the evidence in Figures 5 and 6 is inconsistent with that explanation. Considering only migrants subject to the TCT Bar, Figures 5 and 6 show no evidence of a trend-break at the time of the policy change in any part of the border. While it is possible in principle that seasonal variations conceal a deterrent effect of the policy on applicable migrants in Texas and New Mexico (Figure 6), if such an effect existed it would require an explanation of why no such deterrent effect existed for applicable migrants in California and Arizona. In general, I am not aware of evidence that people migrating to the US via one half of the border respond differently to incentives than people migrating via the other half.

### c. Disaggregate encounters between ports of entry vs. at ports of entry

(71)   Figure 7 presents similar data to Figure 3, but separates encounters between ports of entry and encounters at ports of entry. There is no sign of a downturn in encounters between ports of entry coincident with the TCT Bar. If anything, the ongoing fall in encounters that began after May 2019 becomes less steep after the TCT Bar begins.

(72)   The pattern for encounters at ports of entry is different in Figure 7. For those encounters, a noticeable downward trend is evident starting soon after the TCT Bar begins. This is consistent with a deterrent effect of the TCT Bar on encounters at ports of entry, but also consistent with other explanations that I probe below.

*Figure 7: Encounters between ports of entry (USBP) vs. at ports of entry (OFO)*



(73)   I investigate further by disaggregating the encounters in Figure 7 by migrants affected by the TCT Bar (non-Mexicans) and migrants not affected by the TCT Bar (Mexicans). I begin with encounters between ports of entry, in Figure 8.

(74)   The left-hand pane of Figure 8 shows encounters between ports of entry, in California and Arizona, separated by policy-affected versus policy-unaffected migrants. The pattern of encounters is very similar to the pattern for overall encounters in Figure 5. Encounters with policy-affected migrants fell relative to unaffected migrants *before* the policy began. Starting the month that the TCT Bar, encounters with affected migrants rose continuously for the rest of 2019. Encounters with policy-affected migrants rose *more*, during those four months, than

encounters of policy-unaffected migrants. All of these features of Figure 8 are inconsistent with a substantial effect of the policy on encounters between ports of entry in California and Arizona.

(75) The right-hand pane of Figure 8 shows encounters between ports of entry, in Texas and New Mexico, separated by policy-affect versus policy-unaffected migrants. The pattern of encounters is very similar to the pattern for overall encounters in Figure 6. Here, again, encounters fell more for policy-affected migrants than for policy-unaffected migrants, but this difference in trends began months before the TCT Bar. The only anomaly in relative trends between affected and unaffected migrants coincident with the TCT Bar is an *upturn* in encounters for migrants *unaffected* by the policy.



*Figure 8: Encounters between ports of entry (USBP), by region & TCT Bar applicability*



(76) In short, both panes of Figure 8 are inconsistent with a substantial effect of the TCT Bar on migrant encounters between ports of entry, either in the western half or eastern half of the border.

(77) Finally, Figure 9 presents similar data to Figure 7, but for encounters at ports of entry. The left-hand pane of Figure 9 shows migrant encounters at ports of entry in California and Arizona, separated by migrants affected by the TCT Bar versus migrants unaffected by the TCT Bar. The gap between affected and unaffected migrants is similar in percentage terms from July 2019 through and including December 2019. There is no sign of a downturn in encounters with

affected migrants relative to unaffected migrants in the four months between when the policy began and the end of 2019.

(78) The right-hand pane of Figure 9 shows the same statistics for migrant encounters at ports of entry outside of the Ninth Circuit (that is, encounters in Texas and New Mexico). There is a clear downward trend in encounters for policy-affected migrants versus policy-unaffected migrants. But this trend began months before the TCT Bar and continued in the same percentage magnitude after the TCT Bar. The percentage change in encounters for policy-affected migrants in the three months prior to the TCT Bar in those states (May through July) is very similar to the percentage change in the three months after the TCT Bar (September through November).

*Figure 9: Encounters at ports of entry (OFO), by region & TCT Bar applicability*



(79) In other words, the evidence in Figure 8 is inconsistent with a substantial effect of the TCT Bar on migrant encounters between ports of entry, and the evidence in Figure 9 is inconsistent with a substantial effect on encounters at ports of entry.

(80) Thus the impression that one might take from the right-hand pane of Figure 7—that encounters at ports of entry began a downturn at the start of the TCT Bar—is an illusion created by aggregating the statistics for the two regions of the border in Figure 9. Encounters in California and Arizona did not begin a relative downturn until four months *after* the TCT Bar; the downturn in encounters at the rest of the border began months *before* the TCT Bar.

(81)   I conclude that the evidence on migrant encounters at the Southwest border is inconsistent with any material effect of the 2019 TCT Bar during a window of time extending several months after the policy was enacted. In the data above, any substantial downturn in encounters with policy-affected migrants, either in absolute terms or relative to policy-unaffected migrants, either occurred months before the policy took effect or months after the policy took effect—either of which is inconsistent with attribution of those patterns to the 2019 TCT Bar.

(82)   But how can we know that the method above is capable of detecting changes in migrant behavior, when a given policy change at the border does substantially alter migrants' incentives? Hypothetically, for example, the method above would be unable to detect such changes in migrant behavior if the effects only occurred several months after the policy change, or if the affected migrants were able to enter the US without being encountered and were thus invisible in statistics on border encounters. For this reason I proceed to test the same method to evaluate the effects of other, recent, and related policy changes on migrant behavior.

## 3. *Carrot and Stick*: The effect of limits on asylum combined with a parole process

(83)   I now turn to evaluating the effects on migrant encounters arising from *Carrot and Stick* policy—limits on the application of Title 8 asylum procedures combined with substantial Exceptions that include alternative pathways for orderly entry. The evidence is consistent with a large and rapid decline in migrant encounters at the Southwest border caused by *Carrot and Stick* policy for Venezuelans. Figure 10a shows how monthly encounters with Venezuelan nationals changed after the October 19, 2022 policy change.

(84)   Before the policy change, in September 2022, Venezuelan nationals were encountered at the Southwest border 33,804 times. After the policy change, in November 2022, this dropped to 8,023, a decline of 76%.

*Figure 10: Border encounters for Venezuela, Nicaragua, and Cuba*



Note: "Non-CNV" means nationals of countries other than Cuba, Nicaragua, and Venezuela. The red shaded area spans the entire month in which the policy change occurred. This is to highlight the fact that data on border encounters for that month (small circles joined by lines) can in principle be affected by the policy regardless of what day of the month the policy change occurred.

(85)   The evidence is clearly consistent with this drop being caused by the policy change. For non-CNV nationals (migrants other than Cubans, Nicaraguans, and Venezuelans), the trend in border encounters in the same months was either flat or upward. The drop in encounters for Venezuelans in the month of October occurred almost immediately after the policy change: Although CBP does not generally release data on daily or weekly encounters, it publicly reported that daily encounters with Venezuelan migrants fell by 82% "within a week" of the advent of the policy.[46]

(86)   Similarly, the evidence is consistent with a large and rapid decline in migrant encounters at the Southwest border caused by *Carrot and Stick* policy for Nicaraguans and Cubans starting January 9, 2023.

(87)   Figure 10b shows that before the policy change, in December 2022, Nicaraguan nationals were encountered at the Southwest border 35,387 times; after the policy change, in February 2023, Nicaraguans were encountered just 637 times, a decline of 98%. Figure 10c shows that encounters with Cuban nationals declined from 42,651 in December 2022 to just 753 in February 2023, likewise a decline of 98%.

(88)   Again, the evidence is clearly consistent with these drops being caused by the policy change in January 2023. There is no substantial simultaneous percentage change in the number of encounters for non-CNV nationals, or for any major specific nationality that did not become subject to *Carrot and Stick* policy at the time. Daily encounters of both Nicaraguans and Cubans remained high up to the day of the policy change announcement, January 5, 2023, and plummeted in the three weeks thereafter.[47]

(89)   In sum, this evidence on *Carrot and Stick* policies shows that those policies can have large deterrent effects on irregular migration to the Southwest border, effects that arise within 1–3 weeks of the advent of the policy and show up clearly in data on border encounters.

(90)   I summarize the evidence above as follows. CBP's statistics on migrant encounters at the Southwest border are inconsistent with a substantial effect on migrants' incentives for irregular migration arising from *Stick without Carrot* policy, that is, a Transit-Based Condition of ineligibility for asylum without substantial Exceptions. The statistics are, however, consistent with a substantial effect from *Carrot and Stick* policy, that is, a Travel-Based Condition bundled with substantial Exceptions.

(91)  Because exceptions to any given policy cannot have a substantial effect if the policy itself does not have a substantial effect, the evidence is thus inconsistent with the Complaint's claim that the Exceptions to the Travel-Based Condition in the Circumvention Rule cause increased migration to the Southwest border.

(92)  The evidence is also inconsistent with possible concerns that in general, analysis of migrant encounter data is incapable of detecting large and rapid changes in migrant behavior caused by related changes in border policy. This is because the evidence is consistent with effects on migrant encounters due to a Travel-Based Condition when bundled with substantial Exceptions, effects that are large (over 80% reduction in encounters) and rapid (in 1–3 weeks).

(93)  Alternative interpretations of the migrant encounters data would require highly speculative and unsupported assumptions—such as the assumption that migrants encountered at the western half of the border respond differently to incentives than migrants from the same country encountered at the eastern half of the border.

(94)  I am not aware of more informative quantitative tests that could be conducted with the data available to me, but I may supplement, clarify, or revise my opinion if I receive new data during this ongoing matter.  ∎



Michael A. Clemens

---

[1] Michael A. Clemens's research publications with citations compiled by *Google Scholar*: https://scholar.google.com/citations?user=DdtBDnkAAAAJ

[2] 1,362 citations by academic economists, in the top 2.1 percent of 66,166 academic economists rated by RePEc, "Top 5% Authors, Number of Citations, as of March 2023": https://ideas.repec.org/top/top.person.nbcites.html

[3] Number 290 out of 66,407 economists registered, as of April 2023: https://ideas.repec.org/top/top.person.all10.html

[4] The Complaint, filed May 31, 2023, is available at https://www.courtlistener.com/docket/67461516/indiana-state-of-v-mayorkas and https://dockets.justia.com/docket/north-dakota/nddce/1:2023cv00106/60197.

[5] 88 FR 31314, https://www.federalregister.gov/d/2023-10146

[6] 88 FR 31318, https://www.federalregister.gov/d/2023-10146/p-82; and 88 FR 31321, https://www.federalregister.gov/d/2023-10146/p-115

[7] 88 FR 31321–31322, https://www.federalregister.gov/d/2023-10146/p-115; and 88 FR 31334, https://www.federalregister.gov/d/2023-10146/p-228. The 2023 Circumvention Rule, like the 2019 Transit Bar, also makes exception for victims of relatively rare, severe forms of human trafficking such as slavery or sex trafficking.

[8] The Complaint reads, "*The Circumvention Rule's exceptions to the 'rebuttable presumption,' and the factors allowing the presumption to be rebutted (the 'Exceptions') render the 'rebuttable presumption' entirely toothless*" (para. 165).

[9] Complaint, para. 147 and 168.

[10] Complaint, para. 68, 73, 75, 81, *passim*. If the claimed effect simply acted by producing the release of a larger fraction of migrants who had already been encountered, this would not necessarily be reflected in the number of encounters.

[11] The Complaint reads, "*The Circumvention Rule is thus a direct, but-for cause of these imminent injuries*" (para. 54), but several portions of the Complaint clarify that it claims the harms arise not from the Rule overall but specifically and exclusively from the Exceptions. "*The rebuttable presumption created by the Circumvention Rule is lawful,*" reads the Complaint, "*However, the exemptions to that rebuttable presumption are not. … This Court should therefore declare the exceptions to the Circumvention Rule to be unlawful, vacate those exceptions, and enjoin Defendants from implementing them*" (Para. 9). For example, the Complaint claims harm to Tennessee as a consequences of its claim that "*the Circumvention Rule, through its exceptions, will result in the presence of more aliens in Tennessee*[]" (para. 98, emphasis added).

[12] To see this equivalence, consider that logically the Travel-Based Condition per se can only have a positive, zero, or negative effect on migration behavior. First, there is no reason to believe that a Travel-Based Condition per se would have a positive effect on the incentive to migrate. The Complaint agrees: The only reason it does not expect the Rule to "*deter illegal border crossings*" is the "*exceptions*" it contains (para. 4). Second, if the Travel-Based Condition per se had zero effect on the incentive to migrate, then the effect of the Exceptions must be zero as well. In general, if any given rule does not alter behavior in the first place, neither can exceptions to that rule. The Complaint's claim of fact—that the Exceptions must cause an increase in migration to the border—logically requires that a Travel-Based Condition *per se* would cause a decrease in migration to the border, that is that the limits on asylum eligibility created by the Travel-Based Condition *per se* are sufficient to cause reduced migrant encounters at the border. The claim also implies that the limits are a *necessary* condition of such deterrence: if the Exceptions cause an increase in migrant encounters, then the only portion of the Rule that could cause a reduction in encounters is the Travel-Based Condition.

[13] That is, limits on asylum availability must in some circumstances be a "NESS" cause of decreased migrant encounters at the border. "NESS" means "necessary element of a sufficient set" (Wright, Richard W. "Causation in tort law", *Calif. L. Rev.* 73 (1985): 1735). If there were no bundles of policies including limits on asylum availability that had been shown to cause measurably reduced migrant encounters, there would be no reason to believe that *exceptions* to those limits could cause measurably increased border encounters.

[14] Dept. of Homeland Security Department and the Executive Office for Immigration Review, "Asylum Eligibility and Procedural Modifications", Interim Final Rule 84 FR 33829, July 16, 2019; Final Rule 85 FR 82260, December 17, 2020.

[15] The 2019 TCT Bar made almost all non-Mexican nationals who migrated to the US via the border with Mexico ineligible to apply for US asylum (Shelby McGuire-Smith, "The Trump Administration's Third Country Transit Bar." *Georgetown Immigration Law Journal*, vol. 34, no. 2, Winter 2020, pp. 539-543. https://heinonline.org/HOL/P?h=hein.journals/geoimlj34&i=546). Like the 2023 Circumvention Rule, it made exception for a very small number of migrants who could prove that they had applied for asylum, and were rejected, in Mexico or another third country through which they had traveled. And like the 2023 Circumvention Rule, the 2019 TCT Bar also made exception for a very small number of victims of the most severe forms of human trafficking, such as sex trafficking and slavery. But the 2019 TCT Bar contained no other exceptions, such as for unaccompanied children, for migrants enrolled in a parole process, or for migrants facing medical emergencies or imminent threats. In other words, the 2019 TCT Bar contained exactly the strict Travel-Based Condition that the Complaint describes as the "*lawful*" portion of the Circumvention Rule.

[16] Complaint, para. 165.

[17] The TCT Bar applied nationwide briefly during July 16–24, 2019, and was enjoined nationwide briefly during September 9–10, 2019, as explained below.

[18] 85 FR 82281, https://www.federalregister.gov/d/2020-27856/p-210

[19] McGuire-Smith, *op. cit.*

[20] 85 FR 82289, https://www.federalregister.gov/d/2020-27856/p-296

[21] Dept. of Homeland Security, "DHS and DOJ Issue Third-Country Asylum Rule", Press Release, July 15, 2019.

[22] *East Bay Sanctuary Covenant et al. v. William P. Barr et al.*, 4:19-cv-04073, (N.D. Cal. Jul 24, 2019) ECF No. 42, 385 F.Supp.3d 922.

[23] *East Bay Sanctuary Covenant, et al., v. William P. Barr et al.* ("East Bay Sanctuary (II)"), Nos. 19-16487, United States Court of Appeals for the Ninth Circuit, 16 August 2019, 934 F.3d 1028.

[24] *East Bay Sanctuary Covenant, et al. v. William Barr, et al.*, Case No. 19-cv-04073-JST. 391 F.Supp.3d 974

[25] *Barr v. East Bay Sanctuary Covenant*, No. 19A230, 2019 WL 4292781 (U.S. Sept. 11, 2019), https://www.supremecourt.gov/opinions/18pdf/19a230_k53l.pdf

[26] Capital Area Immigrants' Rights Coalition et al. v. Donald J. Trump et al., Civil Action No. 19-2117 (TJK), 471 F.Supp.3d 25.

[27] Under CBP authorities at 19 U.S.C. 1318(b)(1)(C) and (b)(2). CBP rule in 85 FR 16547, https://www.federalregister.gov/d/2020-06253.

[28] *See* Notification of Temporary Travel Restrictions Applicable to Land Ports of Entry and Ferries Service Between the United States and Mexico, 85 FR 16547; https://www.federalregister.gov/d/2020-06253, , *see also* Centers for Disease Control and Prevention, Suspension of Introduction of Persons Into United States From Designated Foreign Countries or Places for Public Health Purposes, 85 FR 16559, https://www.federalregister.gov/d/2020-06238. 42 U.S.C. 265, 268.

[29] 85 FR 82280, https://www.federalregister.gov/d/2020-27856/p-204

[30] 85 FR 82281, https://www.federalregister.gov/d/2020-27856/p-208; and 85 FR 82260 https://www.federalregister.gov/d/2020-27856/p-11

[31] 88 FR 31430, https://www.federalregister.gov/d/2023-10146/p-1103

[32] 85 FR 82281, https://www.federalregister.gov/d/2020-27856/p-208

[33] 88 FR 31430, https://www.federalregister.gov/d/2023-10146/p-1103

[34] US Dept. of Homeland Security press release, "DHS Announces New Migration Enforcement Process for Venezuelans", October 12, 2022, https://www.dhs.gov/news/2022/10/12/dhs-announces-new-migration-enforcement-process-venezuelans; and Mexican Ministry of Foreign Affairs press release, "México coordina con EE.UU. nuevo enfoque para una migración ordenada, segura, regular y humana en la región", October 12, 2022, https://www.gob.mx/sre/prensa/mexico-coordina-con-ee-uu-nuevo-enfoque-para-una-migracion-ordenada-segura-regular-y-humana-en-la-region.

[35] The Department of Health and Human Services confirmed on September 11, 2020 that there was no legal process for a migrant expelled under Title 42 to apply for asylum. In response to a comment on its Interim Final Rule on Title 42 expulsions alleging that "*the IFR fails to provide legal process to individuals subject to the rule, including asylum-seekers, even though U.S. law guarantees aliens an opportunity to request protection at POEs after crossing into the United States*", HHS replied, "*In section 362 of the PHS Act, Congress authorized the suspension of the introduction of persons into the United States when a suspension of the right to introduce persons is required in the interest of U.S. public health. Congress did not exempt from the scope of section 362 any category of persons or any rights of introduction under specific laws, including any found in Title 8 of the U.S. Code.*" 85 FR 56450, https://www.federalregister.gov/d/2020-20036/p-432. Title 8 of the US code contains the legal process to apply for asylum.

[36] 87 FR 63507, https://www.federalregister.gov/d/2022-22739

[37] 87 FR 63508, https://www.federalregister.gov/d/2022-22739/p-16. The Rule reads, "*individuals are ineligible if they have been ordered removed from the United States within the prior five years; they are also ineligible if they have crossed into the United States between POEs, or entered Mexico or Panama without authorization, after October 19, 2022.*" The cumulative total of 24,000 parole slots for Venezuelans was replaced on January 9, 2023 with a quota of 30,000 *monthly* slots for CHNV nationals combined: 88 FR 1279, https://www.federalregister.gov/d/2023-00253

[38] President Joseph Biden, "Remarks by President Biden on Border Security and Enforcement", January 5, 2023, https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/01/05/remarks-by-president-biden-on-border-security-and-enforcement. US Dept. of Homeland Security press release, "DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes", January 5, 2023; https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and; 88 FR 1255, https://www.federalregister.gov/d/2023-00254; 88 FR 1266, https://www.federalregister.gov/d/2023-00252. Mexico's decision was to accept up to 30,000 expelled or removed migrants per month from Venezuela, Cuba, Nicaragua, and Haiti.

[39] The parole program was expanded to 1) include nationals of Cuba, Nicaragua, and Haiti, and 2) create parole slots for up to 30,000 migrants per month from Venezuela, Nicaragua, Cuba, and Haiti collectively.

[40] The fraction of Haitian encounters processed under Title 42 before the policy change, in December 2022, was 0.058%. The fraction after the policy change, in February 2023, was just 0.61%. It remained similarly low in the months thereafter. I am not aware of a public document explaining the reasons why border officials prioritized other CHNV nationals for the monthly quota of 30,000 Title 42 expulsions rather than Haitians. But in practice the *de facto* limits on asylum applications by other CHNV nationals after January 2023 were not applied to Haitians, thus Haitian encounters do not offer an example of *Carrot and Stick* policy.

[41] Overall migrant encounters at the Southwest land border, by month, "FY20 - FY23(YTD) Nationwide Encounters (June)", from Customs and Border Protection, "Public Data Portal: Nationwide Encounters", last updated July 13, 2023, accessed August 4, 2023.

[42] Anders Fredriksson and Gustavo Magalhães de Oliveira. "Impact evaluation using Difference-in-Differences." *RAUSP Management Journal* 54 (2019): 519–532. DOI:10.1108/RAUSP-05-2019-0112

[43] Michael Lechner, "The estimation of causal effects by difference-in-difference methods." *Foundations and Trends in Econometrics* 4, no. 3 (2011): 165–224. DOI:10.1561/0800000014

[44] Richard Scheines, "Causation, Statistics, and the Law," *Journal of Law and Policy* 16, no. 1 (2007–2008): 135–176. https://heinonline.org/HOL/P?h=hein.journals/jlawp16&i=139

[45] Reviewed by Daniel E. Ho and Donald B. Rubin, "Credible Causal Inference for Empirical Legal Studies," *Annual Review of Law and Social Science* 2011 7:1, 17–40. DOI:10.1146/annurev-lawsocsci-102510-105423

[46] 88 FR 1279, https://www.federalregister.gov/d/2023-00253/p-10.

[47] US Dept. of Homeland Security press release, "CBP Releases January 2023 Monthly Operational Update", February 10, 2023. https://www.cbp.gov/newsroom/national-media-release/cbp-releases-january-2023-monthly-operational-update

# IV. Appendices

## 1. Michael A. Clemens's publications for the past 10 years

*Below is a list of all of Michael Clemens's academic and non-academic publications from 2013 through the time of writing in 2023, in reverse chronological order.*

2023: "Human Capital Investment under Exit Options: Evidence from a Natural Quasi-Experiment", *Journal of Development Economics*, 163: 103112 (with Satish Chand).

2023: "Labour Mobility with Vocational Skill: Australian Demand and Pacific Supply", forthcoming in *Australian Ec. Rev.* (with Satish Chand).

2023: "Why We Won't Reach a 'Climate Migrant' Protection Category—And What We Can Do Instead", Washington, DC: Center for Global Development, Jun. 8 (with Sam Huckstep).

2023: "Climate Change and Migration: An Omnibus Overview for Policymakers and Development Practitioners", CGD Policy Paper 292, Washington, DC: Center for Global Development, May 9 (with Sam Huckstep).

2022: "The economic and fiscal effects on the United States from reduced numbers of refugees and asylum seekers", *Oxford Review of Economic Policy*, 38 (3): 449–486.

2022: "The effect of seasonal work visas on native employment: Evidence from U.S. farm work in the Great Recession", *Review of International Economics*, 30 (5): 1348–1374.

2022: "A Pacific Skills Visa: Improving Opportunities for Skilled Migration Throughout the Pacific Region", *Asia & the Pacific Policy Studies*, 9 (3): 430–446 (with Satish Chand and Helen Dempster).

2022: "The effect of low-skill immigration restrictions on US firms and workers: Evidence from a randomized lottery", NBER Working Paper 30589. Cambridge, MA: National Bureau of Economic Research (with Ethan G. Lewis).

2022: "Do Cash Transfers Deter Migration?", CGD Policy Paper 270, Washington, DC: Center for Global Development, Oct. 19.

2022: "Pathways for Labor Migration from Northern Central America: Five Difficult but Necessary Proposals", North and Central American Task Force on Migration, World Refugee and Migration Council, Jan. 13.

2022: "Doing Refugee Integration Better: Three Lessons from the Latest Research", Washington, DC: Center for Global Development, Oct. 19.

2021: "Violence, development, and migration waves: Evidence from Central American child migrant apprehensions", *Journal of Urban Economics*, 124 (July): 103355.

2021: "The Fiscal Effect of Immigration: Reducing Bias in Influential Estimates", CGD Working Paper, Washington, DC: Center for Global Development.

2021: "Australia needs more Pacific mid-skill migration: Here's how to facilitate it", *DevPolicy*, Oct. 15 (with Satish Chand and Helen Dempster).

2021: "Expanding Legal Migration Pathways from Nigeria to Europe: From Brain Drain to Brain Gain", World Bank-CGD report, Jul. 19 (with Samik Adhikari, Helen Dempster, and Nkechi Linda Ekeator).

2021: "The Real Root Causes of America's Border Crisis: And How Biden Can Address Them", *Foreign Affairs*, Jun. 7.

2021: "Ethical Recruitment of Health Workers: Using Bilateral Cooperation to Fulfill the World Health Organization's Global Code of Practice", CGD Policy Paper 212 (with Helen Dempster), May 27.

2021: "Should the Threat of Pandemics End the Age of Mobility?", *Think Global Health*, Jan. 28 (with Thomas Ginn).

2020: "Global Mobility and the Threat of Pandemics: Evidence from Three Centuries", CGD Working Paper 560, Washington, DC: Center for Global Development (with Thomas Ginn).

2020: "Migration from Developing Countries: Selection, Income Elasticity, and Simpson's Paradox", CGD Working Paper 539, Washington, DC: Center for Global Development (with Mariapia Mendola).

2020: "The Emigration Life Cycle: How Development Shapes Emigration from Poor Countries", CGD Working Paper 540, Washington, DC: Center for Global Development.

2020: "How economic development shapes migration: Facing the emigration life cycle", *Migration Policy Practice*, 10 (4): 31–34 (with Cassandra Zimmer).

2020: "Restricting Mobility Will Not Stop the Next Pandemic", CGD Commentary and Analysis, Dec. 10 (with Thomas Ginn and Reva Resstack).

2020: "Harnessing Northern Triangle Migration for Mutual Benefit", White House and the World Policy Brief, Dec. 3 (with Reva Resstack and Cassandra Zimmer).

2020: "How economic development shapes emigration", *VoxDev* (commissioned), Sep. 21.

2020: "The Future of Legal Migration: Labour Migration Pathways Between Europe and Africa", in Matteo Villa, ed., The Future of Migration to Europe, Milan: ISPI Istituto per gli Studi di Politica Internazionale (with Helen Dempster and Katelyn Gough).

2020: "Migration and household finances: How a different framing can improve thinking about migration", *Development Policy Review*, 38 (1): 3–27 (with Timothy N. Ogden).

2020: "Shared Border, Shared Future: A U.S.-Mexican Bilateral Worker Agreement", in Alex Nowrasteh and David J. Bier, eds., *12 New Immigration Ideas for the 21st Century*, Washington, DC: Cato Institute.

2019: "The Place Premium: Bounding the Price Equivalent of Migration Barriers", *Review of Economics and Statistics*, 101 (2): 201–213 (with Claudio Montenegro and Lant Pritchett).

2019: "The New Economic Case for Migration Restrictions: An Assessment", *Journal of Development Economics*, 138: 153–164 (with Lant Pritchett).

2019: "The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results", *ILR Review*, 72 (4): 818–857 (with Jennifer Hunt).

2019: "Measuring the Spatial Misallocation of Labor: The Returns to India-Gulf Guest Work in a Natural Experiment", CGD Working Paper.

2019: "Promoting New Kinds of Legal Labour Migration Pathways Between Europe and Africa", CGD Policy Brief (with Helen Dempster and Katelyn Gough).

2019: "La migración es lo que hacemos de ella", *Política Exterior*, No. 187. Jan./Feb. (with Cindy Huang, Jimmy Graham, and Kate Gough).

2018: "Immigration Restrictions as Active Labor Market Policy: Evidence from the Mexican Bracero Exclusion", *American Economic Review*, 108 (6): 1468–1487 (with Ethan G. Lewis and Hannah M. Postel).

2018: "Why don't remittances appear to affect growth?", *Economic Journal*, 128 (612): F179–F209 (with David McKenzie).

2018: "Deterring Emigration with Foreign Aid: An Overview of Evidence from Low-Income Countries", *Population and Development Review*, 44 (4): 667–693 (with Hannah M. Postel).

2018: "Testing for repugnance in economic transactions: Evidence from guest work in the Gulf", *Journal of Legal Studies*, 47 (S1): S5–S44.

2018: "A Tool to Implement the Global Compact for Migration: Ten Key Steps for Building Global Skill Partnerships", CGD Brief, Dec. 4.

2018: "Migration as a form of development: New kinds of regulations to create shared benefits", *Migration Policy Practice*, 8 (3): 6–11.

2018: "The Economic and Fiscal Effects of Granting Refugees Formal Labor Market Access", CGD Working Paper 496 (with Cindy Huang and Jimmy Graham).

2018: "Countries should train migrants coming to work—before they arrive", *Apolitical*, June 29 (with Kate Gough).

2018: "Migration Is What You Make It: Seven Policy Decisions that Turned Challenges into Opportunities", CGD Note, May 30 (with Cindy Huang, Jimmy Graham, and Kate Gough).

2018: "Can Development Assistance Deter Emigration?", CGD Policy Brief, Feb. 12 (with Hannah Postel).

2018: "The Best Ideas for Making Migration Work", *Refugees Deeply*, Jan. 25 (with Katelyn Gough).

2017: "Split Decisions: Household Finance When a Policy Discontinuity Allocates Overseas Work", *Review of Economics and Statistics*, 99 (3); 531–543 (with Erwin R. Tiongson).

2017: "The Meaning of Failed Replications: A Review and Proposal", *Journal of Economic Surveys*, 31 (1): 326–342.

2017: "Temporary Work Visas as U.S.-Haiti Development Cooperation: A Preliminary Impact Evaluation", *IZA Journal of Labor & Development*, 6: 4 (with Hannah Postel).

2017: "Migration is a Form of Development: The Need for Innovation to Regulate Migration for Mutual Benefit", Technical Paper No. 2017/8, UN Department of Economic and Social Affairs, Population Division. New York: United Nations.

2017: "Regional Security Means Border Security: New Data on Why Central American Children Flee to the United States", *War on the Rocks*, Texas National Security Network, 30 November.

2017: "Migrants will keep coming. We should give them the skills they need to thrive", *World Economic Forum Agenda*, 15 November.

2017: "The Need for a Bilateral Labor Agreement Between the US and Mexico, and the Responsibility for Leadership", Keynote speech at the conference *¿Qué hacer frente a la crisis migratoria? Nuevas visiones y propuestas de acción*, Universidad Nacional Autónoma de México, Mexico City, jointly sponsored by Colmex and CIDE, 23 October. En español

2017: "The labour market impact of refugee waves", *CentrePiece* 22 (3, October): 26–28. London: Centre for Economic Performance, London School of Economics (with Jennifer Hunt).

2017: "The economic effects of refugees are largely down to decisions made by the countries which take them", *American Politics and Policy blog*, LSE United States Centre, Oct. 20.

2017: "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", CGD Policy Brief, Oct. 11.

2017: "Global Skill Partnerships: A Proposal for Technical Training in Settings of Forced Displacement", CGD Policy Brief, Oct. 11 (with Katelyn Gough).

2017: "Foreign Policy Is Migration Policy: Lessons from the Drivers of Central American Child Migration", CGD Policy Brief, Sep. 13 (with Hannah Postel).

2017: "How Central American Youth Test Outdated U.S. Immigration Laws", Americas Quarterly, Aug. 15. 2017"The Real Economic Cost of Accepting Refugees", *Refugees Deeply*, Aug. 8.

2017: "Trump says banning immigrants helps US workers. A leading economist says he's wrong", Vox.com, Aug. 3.

2017: "The debate over the Mariel boatlift, economics' most famous immigration controversy, explained", Vox.com, Jun. 23.

2017: "Does Kicking Out Mexicans Create Jobs? Here's what happened the last time an American president promised to create jobs by removing Mexican immigrants", *Politico*, Feb. 15.

2017: "Walling the U.S. Off From Mexico Won't Work", *U.S. News & World Report*, Feb. 2.

2016: "The New Role for the World Bank", *Journal of Economic Perspectives*, 30 (1): 53–76 (with Michael Kremer).

2016: "Losing Our Minds? New research directions on skilled migration and development", *International Journal of Manpower*, 37 (7): 1227–1248.

2017: "Don't despair, innovate—Now is the time to try new forms of development cooperation", Devex Global Views, Feb. 23.

2016: Shared Border, Shared Future: A Blueprint to Regulate US-Mexico Labor Mobility, Washington, DC: Center for Global Development (with Ernesto Zedillo and Carlos Gutierrez).

2016: "Development Aid to Deter Migration Will Do Nothing of the Kind", *Refugees Deeply*, Oct. 31.

2016: "World Bank's US dependency has to end: It's time to choose the institution's president based on merit rather than geopolitical considerations", *Politico Europe*, September 13.

2016: "Why today's migration crisis is an issue of global economic inequality", Ford Foundation Equals Change blog, July 29.

2016: "Time for philanthropists to get on board with migration", *Alliance* magazine, March.

2015: "Global Skill Partnerships: A proposal for technical training in a mobile world", IZA *Journal of Labor Policy*, 4:2.

2015: "Does Development Reduce Migration?", in Robert E. B. Lucas, ed., *International Handbook on Migration and Economic Development*, Northampton, Mass.: Edward Elgar Publishing, pp. 152–185.

2015: "Skill Development and Regional Mobility: Lessons from the Australia-Pacific Technical College", *Journal of Development Studies*, 51 (11): 1502–1517 (with Colum Graham and Stephen Howes).

2015: "A Self-Interested Approach to Migration Crises: Push Factors, Pull Factors, and Investing In Refugees", *Foreign Affairs*, Sept. 27 (with Justin Sandefur).

2015: "Gestionar la crisis migratoria desde el interés propio", *Política Exterior*, November-December (with Justin Sandefur).

2015: "Smart policy toward high-skill emigrants", *IZA World of Labor* 203, November.

2015: "Zero Illegal Immigration: A Thought Experiment (with Time Travel)", *Peregrine*, Issue 1502, Hoover Institution, Oct. 23.

2015: "The South Pacific Secret to Breaking the Poverty Cycle", Huffington Post: Impact, Sep. 15.

2015: "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", in Bertelsmann Stiftung, ed., A Fair Deal on Talent: Fostering Just Migration Governance, Gütersloh: Verlag Bertelsmann Stiftung, pp. 297–304.

2015: "In Haiti, U.S. rectifies missed opportunity to help", The Hill Congress Blog, Jan. 12 (with Royce Bernstein Murray).

2014: "A case against taxes and quotas on skilled emigration", *Journal of Globalization and Development*, 5 (1): 1–39.

2014: "Migration and Development Research Is Moving Far Beyond Remittances", *World Development*, 64: 121–124 (with Çağlar Özden and Hillel Rapoport).

2014: "The WHO Global Code of Practice: A Useful Guide for Recruiting Health Care Professionals? Lessons from Germany and Beyond", CGD Essay (with Steffen Angenendt and Meiko Merda).

2014: "Let the People Go: The Problem With Strict Migration Limits", *Foreign Affairs*, 93 (1, Jan./Feb.): 152–159 (with Justin Sandefur).

2014: "Skilled Migration from Mexico: Trends, Concerns, and Outlook", CGD Essay. Washington, DC: Center for Global Development.

2013: "Why Do Programmers Earn More in Houston than Hyderabad? Evidence from Randomized Processing of U.S. Visas", *American Economic Review, Papers & Proceedings*, 103 (3): 198–202.

2013: "Seize the Spotlight: A Case for GCC Engagement in Research on the Effects of Labor Migration". In *Labor Mobility: An Enabler for Sustainable Development*, Abu Dhabi: Emirates Center for Strategic Studies and Research, pp. 103–120.

2013: "Blunt Instruments: Avoiding Common Pitfalls in Identifying the Causes of Economic Growth", *American Economic Journal: Macroeconomics*, 5 (2): 152–186 (with Sami Bazzi).

2013: "More Unskilled Workers, Please: The new immigration bill doesn't do nearly enough to address America's real labor shortage", *Foreign Policy*, July 8.

2013: "What Nativists Don't Want You to Know About Immigrants", *Boston Review*, June 3.

2013: "The New Transparency in Development Economics: Lessons from the Millennium Villages Controversy", *World Economics Journal* 14 (4): 77–97 (with Gabriel Demombynes).

2013: "On the Move: The Highly Skilled (Turning 'Brain Drain' into 'Brain Gain')", World Bank Blog, October.

2013: "What Do We Know About Skilled Migration and Development?", Policy Brief No. 3, September. Washington, DC: Migration Policy Institute.

2013: "The Big Picture on Global Talent: How to better compete for, and grow talent". Paper prepared for the Salzburg Trilogue, August 30. Bertelsmann Stiftung (with Christal Morehouse).

## 2. Statement of compensation

For the research presented in this report I was compensated at the hourly rate of $600.00.

## 3. Full CV of Michael A. Clemens (attached below)

# Michael A. Clemens

George Mason University          🔗 mclem.org
4400 University Drive, 3G4       @ econtwitter.net/@m_clem
Fairfax, VA 22030 USA           ✉ mcleme@gmu.edu

## Affiliations

| | |
|---|---|
| 2023−present | Dept. of Economics, George Mason University (Fairfax, VA); *Full Professor with tenure* |
| 2023−present | Peterson Institute for International Economics (Washington, DC); *Non-Resident Senior Fellow* |
| 2014−present | IZA–Institute of Labor Economics (Bonn, Germany); *Research Fellow* |
| 2021−present | Centre for Research and Analysis of Migration (CReAM), Department of Economics, University College London; *External Research Fellow* |
| 2023−present | Center for Global Development (Washington, DC); *Distinguished Non-Resident Fellow* |
| 2021−present | Office of the Administrator, USAID; *Expert Development Economist* |
| | ▹ *Security clearance TS* |
| 2002−2023 | Center for Global Development (Washington, DC) |
| | ▹ *Director for Migration, Displacement, & Humanitarian Policy, 2019–2023* |
| | ▹ *Co-Director for Migration, Displacement, & Humanitarian Policy, 2017–2019* |
| | ▹ *Research Fellow, 2002–2010; Senior Fellow, 2010–2023; Research Manager, 2011–2017* |
| 2022 | Georgetown University (SFS & McCourt School); *Adjunct Professor* |
| 2016−2022 | *Journal of Population Economics* (Springer); *Associate Editor* |
| 2016−2020 | *World Development* (Elsevier); *Associate Editor* |
| 2011 | Dept. of Economics & Wagner School, New York University; *Visiting Scholar* |
| 2003−2010 | McCourt School of Public Policy, Georgetown University; *Affiliated Associate Professor* |
| 2000−2002 | Center for International Development, Harvard University; *Research Fellow* |
| 1998−2000 | World Bank; *Consultant*, environmental economics |
| 1999 | Bain & Company (Istanbul, Turkey); *Associate Consultant* |
| 1996 & 1997 | World Bank; *Summer Assistant*, environmental economics |
| 1994−1995 | Thomas J. Watson Foundation; *Watson Fellow* in Bogotá, Colombia & Cuiabá, Brazil |

## Academic Journal Articles

| | |
|---|---|
| 2023 | "Human Capital Investment under Exit Options: Evidence from a Natural Quasi-Experiment", *Journal of Development Economics*, 163: 103112 (with Satish Chand). ⟨*Pre-pub. versions at CGD and IZA*⟩ |
| | ▹ Covered by *The Economist*, *The Atlantic* (bis), *Guardian Nigeria* |
| 2023 | "Labour Mobility with Vocational Skill: Australian Demand and Pacific Supply", forthcoming in *Australian Ec. Rev.* (with Satish Chand). ⟨Pre-pub. versions at IZA and CGD⟩ |
| 2022 | "The economic and fiscal effects on the United States from reduced numbers of refugees and asylum seekers", *Oxford Review of Economic Policy*, 38 (3): 449–486. ⟨*Pre-pub. versions at IZA and CGD*⟩ |
| | ▹ Covered by *Boston Globe*, *Marketwatch*, *Forbes*, *El País*, *NewsNation*, *Dziennik Gazeta* |
| 2022 | "Migration on the Rise, a Paradigm in Decline: The Last Half-Century of Global Mobility", *AEA Papers & Proceedings*, 112: 257–261. ⟨*Pre-pub. versions at IZA, CReAM, and CGD*⟩ |

## Academic Journal Articles, *continued*

2022    "The effect of seasonal work visas on native employment: Evidence from U.S. farm work in the Great Recession", *Review of International Economics*, 30 (5): 1348–1374. ⟨*Pre-pub. versions at* IZA *and CGD*⟩

     ▹ Covered by the *Washington Post* (bis), *Fortune*, *News & Observer*

     ▹ Referenced in U.S. Congress debate (video)

2022    "A Pacific Skills Visa: Improving Opportunities for Skilled Migration Throughout the Pacific Region", *Asia & the Pacific Policy Studies*, 9 (3): 430–446 (with Satish Chand and Helen Dempster). ⟨*Pre-pub. version at* CGD *and* IZA⟩

2021    "Violence, development, and migration waves: Evidence from Central American child migrant apprehensions", *Journal of Urban Economics*, 124 (July): 103355. ⟨*Pre-pub. versions at* IZA *and* CGD⟩

     ▹ Covered by *New Yorker*; *Washington Post* (bis); *Wall Street Journal*; *The Atlantic*; *American Prospect*; *Forbes*; *PolitiFact*

2019    "The Place Premium: Bounding the Price Equivalent of Migration Barriers", *Review of Economics and Statistics*, 101 (2): 201–213 (with Claudio Montenegro and Lant Pritchett). ⟨*Pre-pub. versions at* CGD, *Harvard University*⟩

     ▹ Covered by the *New York Times*; *The Economist* (bis); *The Atlantic*; *Axios*; *El País*; *Quartz*; *Vox*

     ▹ Replication code at DOI:10.7910/DVN/DHZUOT

2019    "The New Economic Case for Migration Restrictions: An Assessment", *Journal of Development Economics*, 138: 153–164 (with Lant Pritchett). ⟨*Pre-pub. versions at* CGD, IZA, *and* Harvard University⟩

     ▹ Covered by the *New York Times* and *The Economist*

     ▹ Replication code and data at DOI:10.7910/DVN/HFTDQZ

2019    "The Labor Market Effects of Refugee Waves: Reconciling Conflicting Results", *ILR Review*, 72 (4): 818–857 (with Jennifer Hunt). ⟨*Pre-pub. version*; *Co-released with* CGD, LSE, IZA, *and* CEPR⟩

     ▹ Summary for VoxEU

     ▹ Covered by *New York Times*; *Bloomberg*; *Wall Street Journal*; *The Economist* (bis); *Washington Post*; *U.S. News*; *Miami New Times*; *Huffington Post*; Bloomberg Surveillance (1:20:15)

2018    "Immigration Restrictions as Active Labor Market Policy: Evidence from the Mexican *Bracero* Exclusion", *American Economic Review*, 108 (6): 1468–1487 (with Ethan G. Lewis and Hannah M. Postel). ⟨*Pre-pub. versions at* NBER, CGD, *and* IZA⟩

     ▹ Summary for VoxEU

     ▹ Covered by *New York Times* (bis); *The Economist* (bis); *WSJ*; AP; *Frankfurter Allgemeine Zeitung*; Vox; *El Diario*; *Newsweek*; *NY Daily News*; Bloomberg; featured by *NBER Digest*

     ▹ Replication code and data at https://dataverse.harvard.edu/dataverse/bracero

2018    "Why don't remittances appear to affect growth?", *Economic Journal*, 128 (612): F179–F209 (with David McKenzie). ⟨*Pre-pub. version*; *Co-released with World Bank*⟩

     ▹ Covered by *The Economist*

2018    "Deterring Emigration with Foreign Aid: An Overview of Evidence from Low-Income Countries", *Population and Development Review*, 44 (4): 667–693 (with Hannah M. Postel). ⟨*Pre-pub. version*; *Co-released with* GLM-LIC *and* IZA⟩

     ▹ Covered by *Financial Times*; *New York Times*; *The Economist*; *Washington Post*; *The Guardian*; *Mother Jones*; *CS Monitor*; *Die Welt*; *El País*; *De Standaard*; *CQ Researcher*; *Vox*

2018    "Testing for repugnance in economic transactions: Evidence from guest work in the Gulf", *Journal of Legal Studies*, 47 (S1): S5–S44. ⟨*Pre-pub. version*; *Co-released with* IZA⟩

## Academic Journal Articles, *continued*

|  |  |
|---|---|
|  | ▷ Covered by the *Washington Post* |
| 2017 | "Split Decisions: Household Finance When a Policy Discontinuity Allocates Overseas Work", *Review of Economics and Statistics*, 99 (3); 531–543 (with Erwin R. Tiongson). ⟨*Pre-pub. version*⟩ |
|  | ▷ Replication code and data at DOI:10.7910/DVN/2DO8QP |
| 2017 | "The Meaning of Failed Replications: A Review and Proposal", *Journal of Economic Surveys*, 31 (1): 326–342. ⟨*Pre-pub. version*⟩ |
| 2017 | "Temporary Work Visas as U.S.-Haiti Development Cooperation: A Preliminary Impact Evaluation", *IZA Journal of Labor & Development*, 6: 4 (with Hannah Postel). ⟨*Pre-pub. version*⟩ |
|  | ▷ Replication code and data at DOI:10.7910/DVN/J6P2KT |
|  | ▷ Covered by *The Economist* (bis, ter); *Washington Post*; Reuters; NBC; CNN; UPI; *Miami Herald*; *La Opinión* |
| 2016 | "The New Role for the World Bank", *Journal of Economic Perspectives*, 30 (1): 53–76 (with Michael Kremer). ⟨*Pre-pub. version*⟩ |
|  | ▷ Covered by *Vox* |
| 2016 | "Losing Our Minds? New research directions on skilled migration and development", *International Journal of Manpower*, 37 (7): 1227–1248. ⟨*Pre-pub. version*⟩ |
|  | ▷ Covered by the *Financial Times* |
| 2015 | "Global Skill Partnerships: A proposal for technical training in a mobile world", *IZA Journal of Labor Policy*, 4:2. ⟨*Pre-pub. version*⟩ |
|  | ▷ Proposal endorsed by the UN Secretary General and the UN Marrakesh Compact for Migration, Objective 18. Covered by Inter Press Service; *El País* |
| 2015 | "Skill Development and Regional Mobility: Lessons from the Australia-Pacific Technical College", *Journal of Development Studies*, 51 (11): 1502–1517 (with Colum Graham and Stephen Howes). ⟨*Pre-pub. version*⟩ |
| 2014 | "A case against taxes and quotas on skilled emigration", *Journal of Globalization and Development*, 5 (1): 1–39. ⟨*Pre-pub. version*⟩ |
| 2014 | "Migration and Development Research Is Moving Far Beyond Remittances", *World Development*, 64: 121–124 (with Çağlar Özden and Hillel Rapoport). ⟨*Pre-pub. version*⟩ |
| 2013 | "Why Do Programmers Earn More in Houston than Hyderabad? Evidence from Randomized Processing of U.S. Visas", *American Economic Review*, Papers & Proceedings, 103 (3): 198–202. ⟨*Pre-pub. version*⟩ |
|  | ▷ Covered by *Bloomberg* and *Slate* |
| 2013 | "Blunt Instruments: Avoiding Common Pitfalls in Identifying the Causes of Economic Growth", *American Economic Journal: Macroeconomics*, 5 (2): 152–186 (with Sami Bazzi). ⟨*Pre-pub. version*⟩ |
| 2012 | "Counting chickens when they hatch: Timing and the effects of aid on growth", *Economic Journal*, 122 (561), 590–617 (with Steven Radelet, Rikhil Bhavnani, and Sami Bazzi). ⟨*Pre-pub. version*⟩ |
|  | ▷ Paper awarded the Royal Economic Society Prize |
| 2012 | "Why were Latin America's tariffs so much higher than Asia's before 1950?", *Journal of Iberian and Latin American Economic History*, 30 (1): 12–39 (with Jeffrey G. Williamson). ⟨*Pre-pub. version*⟩ |
| 2011 | "Economics and Emigration: Trillion-Dollar Bills on the Sidewalk?", *Journal of Economic Perspectives*, 25 (3): 83–106. ⟨*Pre-pub. version*⟩ |

## Academic Journal Articles, *continued*

> ▷ Covered by the *New Yorker*; *New York Times*; *The Economist* (bis); *Fortune*; *Forbes* (bis); *The Atlantic*; *Salon*; NPR
>
> ▷ Subject of the American Economic Association's *inaugural* Research Highlight *2015*

2011 "When Does Rigorous Impact Evaluation Make a Difference? The Case of the Millennium Villages", *Journal of Development Effectiveness*, 3 (3): 305–339 (with Gabriel Demombynes). ⟨*Pre-pub. version*⟩

> ▷ Replication code and data at DOI:10.7910/DVN/28146
>
> ▷ Covered by the *Financial Times*; *New York Times* (bis); *The Economist*; *Nature* (bis); *Daily Mail*

2008 "Income Per Natural: Measuring Development for People rather than Places", *Population and Development Review*, 34 (3): 395–434 (with Lant Pritchett). ⟨*Pre-pub. version*⟩

> ▷ Covered by *The Economist* and *The Atlantic*

2008 "New data on African health professionals abroad", *Human Resources for Health*, 6:1 (with Gunilla Pettersson).

> ▷ Replication code and data at DOI:10.7910/DVN/28161

2007 "The trouble with the MDGs: Confronting expectations of aid and development success", *World Development*, 35 (5): 735–751 (with Charles Kenny and Todd J. Moss). ⟨*Pre-pub. version*⟩

2007 "The ghost of 0.7%: Origins and relevance of the international aid target", *International Journal of Development Issues*, 6 (1): 3–25 (with Todd J. Moss). ⟨*Pre-pub. version*⟩

2004 "Wealth Bias in the First Global Capital Market Boom, 1870-1913", *Economic Journal*, 114 (495): 304–337 (with Jeffrey G. Williamson). ⟨*Pre-pub. version*⟩

2004 "Why Did the Tariff-Growth Correlation Change after 1950?", *Journal of Economic Growth*, 9 (1): 5–46 (with Jeffrey G. Williamson). ⟨*Pre-pub. version*⟩

1999 "Genuine Savings Rates in Developing Countries", *World Bank Economic Review*, 13 (2): 333–356 (with Kirk Hamilton). ⟨*Pre-pub. version*⟩

1999 "Reserve Design for Species Preservation", *European Journal of Operational Research*, 112 (2): 273–283 (with Charles R. ReVelle and Justin Williams).

1993 "Homologous and illegitimate recombination in developing *Xenopus* oocytes and eggs", *Molecular and Cellular Biology*, 13 (11): 6897–6906 (with Chris W. Lehman, David K. Worthylake, Jonathan K. Trautman, and Dana Carroll).

## Books

2024 *The Walls of Nations*, New York: Columbia University Press, forthcoming.

1991 *Geometry for the Classroom*, New York: Springer-Verlag (with C. Herbert Clemens).

## Papers Under Review

2022 "The effect of low-skill immigration restrictions on US firms and workers: Evidence from a randomized lottery", NBER Working Paper 30589. Cambridge, MA: National Bureau of Economic Research (with Ethan G. Lewis). ⟨*Co-released with IZA, CReAM, CESifo, and CGD*⟩

> ▷ Summary for VoxEU; Featured in the NBER Digest, December 2022; Referenced by White House Council of Economic Advisers in *Economic Report of the President*, March 2023

## Papers Under Review, *continued*

▷ Covered by *Wall Street Journal* [bis], NPR, NBC, *Bloomberg Law* [bis], *Forbes*, IZA News-room (*Auf Deutsch*)

2021 "The Fiscal Effect of Immigration: Reducing Bias in Influential Estimates", CGD Working Paper, Washington, DC: Center for Global Development. ⟨*Co-released with IZA, CReAM and CESifo*⟩

▷ Covered by *Forbes*

2020 "Global Mobility and the Threat of Pandemics: Evidence from Three Centuries", CGD Working Paper 560, Washington, DC: Center for Global Development (with Thomas Ginn). ⟨*Co-released with IZA*⟩

▷ Covered by *Bloomberg*

2020 "Migration from Developing Countries: Selection, Income Elasticity, and Simpson's Paradox", CGD Working Paper 539, Washington, DC: Center for Global Development (with Mariapia Mendola). ⟨*Co-released with IZA and Centro Studi Luca d'Agliano*⟩

▷ Covered by *The Economist*; *United Nations Dispatch*; *Bistandsaktuelt*; IZA Newsroom

2020 "The Emigration Life Cycle: How Development Shapes Emigration from Poor Countries", CGD Working Paper 540, Washington, DC: Center for Global Development. ⟨*Co-released with IZA*⟩

▷ Covered by *The Economist*; IZA Newsroom; *The Correspondent*; *Foreign Policy*; *Washington Examiner*; *Kehitys-Utveckling*

2019 "Measuring the Spatial Misallocation of Labor: The Returns to India-Gulf Guest Work in a Natural Experiment", CGD Working Paper. ⟨*Co-released with IZA*⟩

▷ Covered by *India Times*; *Khaleej Times*; *Gulf News*; *The National*

## Expert Reports in Litigation

2020 *Human Rights First v. Chad F. Wolf et al.* (US District Court DC, 1:20-cv-03764)

▷ The challenged Rule was enjoined by *Pangea Legal Services v. DHS* (3:20-cv-09253-JD)

## Book Chapters

2015 "Does Development Reduce Migration?", in Robert E. B. Lucas, ed., *International Handbook on Migration and Economic Development*, Northampton, Mass.: Edward Elgar Publishing, pp. 152–185. ⟨*Pre-pub. version*⟩

▷ Covered by *The Economist*; *New York Times*; *Foreign Policy*; *Der Spiegel*; *Neue Zürcher Zeitung*

2013 "Seize the Spotlight: A Case for GCC Engagement in Research on the Effects of Labor Migration". In *Labor Mobility: An Enabler for Sustainable Development*, Abu Dhabi: Emirates Center for Strategic Studies and Research, pp. 103–120. ⟨*Pre-pub. version*⟩

2012 "The Collision of Development Goals and Impact Evaluation", in Robert Peccoud, ed., *Evaluation and its Discontents: Do We Learn from Experience in Development?*, Proceedings of the 9th AFD-EUDN Conference, Paris: Agence Française de Développement, pp. 169–197.

2012 "Income per Natural: Measuring Development for People Rather Than Places", in Oliver Bakewell, ed., *Migration and Development*, The International Library of Studies on Migration series, London: Edward Elgar Publishing, Ch. 34 (with Lant Pritchett).

## Book Chapters, *continued*

2011    "The Labor Mobility Agenda for Development", in Nancy Birdsall and Francis Fukuyama, eds. *New Ideas on Development after the Financial Crisis*, Baltimore: The Johns Hopkins University Press, pp. 260–287.

2011    "The Financial Consequences of High-Skill Emigration: Lessons from African Doctors Abroad", in Sonia Plaza and Dilip Ratha, eds. *Diaspora for Development in Africa*, Washington, DC: World Bank, pp. 165–182.

2011    "Genuine Savings Rates in Developing Countries", in Karl-Gustaf Löfgren and Chuan-Zhong Li, eds. *Green National Accounting And Sustainability*, Northampton, MA: Edward Elgar, pp. 653–676 (with Kirk Hamilton).

2010    "The Biggest Idea in Development That No One Really Tried", in Emily Chamlee-Wright, ed., *The Annual Proceedings of the Wealth and Well-Being of Nations: 2009–2010, Volume II*, Beloit, WI: Beloit College Press, pp. 25–50.

2006    "Aid and Growth: The Current Debate and Some New Evidence", in Peter Isard, Leslie Lipschitz, Alexandros Mourmouras, and Boriana Yontcheva, eds., *The Macroeconomic Management of Foreign Aid: Opportunities and Pitfalls*, Washington, DC: International Monetary Fund, pp 43–60 (with Steven Radelet and Rikhil Bhavnani).

2006    "A first look at the consequences of African health professional emigration", in Treasury of Australia and Reserve Bank of Australia, *G-20 Workshop on Demographic Challenges and Migration: Sydney, 27-28 August 2005*, Canberra: Commonwealth of Australia, pp. 195–231.

2003    "Absorptive capacity: How much is too much?" and "Exit: How long should the MCA commitment last?", in Steven Radelet, *Challenging Foreign Aid: A Policymaker's Guide to the Millennium Challenge Account*, Washington, DC: Center for Global Development (with Steven Radelet).

2001    "Are we saving enough for the future?", in Jonathan M. Harris, Timothy A. Wise, Kevin P. Gallagher, and Neva R. Goodwin, eds., *A Survey of Sustainable Development: Social and Economic Dimensions*, Washington, DC: Island Press, pp. 37–41 (with Kirk Hamilton).

1997    "Are we saving enough for the future?", in World Bank, *Expanding the Measure of Wealth: Indicators of Environmentally Sustainable Development*, Environmentally Sustainable Development Studies and Monographs Series, No. 17, Washington, DC: World Bank (with Kirk Hamilton).

1997    "The Hidrovia Paraguay-Parana: A Review and Analysis of the Feasibility Studies and Environmental Assessment in the Context of Regional Development", in Environmental Defense Fund, *The Hidrovia Paraguay-Parana Navigation Project: Report of an Independent Review*, Washington, DC: Environmental Defense Fund and Fundação Centro Brasileiro de Referência e Apoio Cultural/CEBRAC (with Thayer Scudder).

## Policy Writings

2023    "Why We Won't Reach a 'Climate Migrant' Protection Category—And What We Can Do Instead", Washington, DC: Center for Global Development, Jun. 8 (with Sam Huckstep).

2023    "Climate Change and Migration: An Omnibus Overview for Policymakers and Development Practitioners", CGD Policy Paper 292, Washington, DC: Center for Global Development, May 9 (with Sam Huckstep).

2022    "Do Cash Transfers Deter Migration?", CGD Policy Paper 270, Washington, DC: Center for Global Development, Oct. 19. ⟨*Co-released with IZA*⟩

2022    "Doing Refugee Integration Better: Three Lessons from the Latest Research", Washington, DC: Center for Global Development, Oct. 19.

## Policy Writings, *continued*

2022 "Pathways for Labor Migration from Northern Central America: Five Difficult but Necessary Proposals", *North and Central American Task Force on Migration*, World Refugee and Migration Council, Jan. 13. ⟨*Co-released with CGD and IZA*⟩

2021 "Australia needs more Pacific mid-skill migration: Here's how to facilitate it", *DevPolicy*, Oct. 15 (with Satish Chand and Helen Dempster).

2021 "Expanding Legal Migration Pathways from Nigeria to Europe: From Brain Drain to Brain Gain", World Bank-CGD report, Jul. 19 (with Samik Adhikari, Helen Dempster, and Nkechi Linda Ekeator). ⟨*Jointly released by World Bank*⟩

　　　▷ Policy brief: "Why Europe Should Build Legal Migration Pathways with Nigeria"
　　　▷ Covered by *Handelsblatt*, *This Day*

2021 "The Real Root Causes of America's Border Crisis: And How Biden Can Address Them", *Foreign Affairs*, Jun. 7.

2021 "Ethical Recruitment of Health Workers: Using Bilateral Cooperation to Fulfill the World Health Organization's Global Code of Practice", CGD Policy Paper 212 (with Helen Dempster), May 27.

　　　▷ Covered by *New York Times*

2021 "The Missing Piece in Biden's Plan for Central America: Bilateral Labor Agreements", CGD blog, Feb. 9.

2021 "Should the Threat of Pandemics End the Age of Mobility?", *Think Global Health*, Jan. 28 (with Thomas Ginn).

2020 "How economic development shapes migration: Facing the emigration life cycle", *Migration Policy Practice*, 10 (4): 31–34 (with Cassandra Zimmer).

2020 "Restricting Mobility Will Not Stop the Next Pandemic", CGD Commentary and Analysis, Dec. 10 (with Thomas Ginn and Reva Resstack).

2020 "Harnessing Northern Triangle Migration for Mutual Benefit", *White House and the World Policy Brief*, Dec. 3 (with Reva Resstack and Cassandra Zimmer).

2020 "How economic development shapes emigration", *VoxDev* (commissioned), Sep. 21.

2020 "Emigration Rises Along with Economic Development. Aid Agencies Should Face This, but Not Fear It", CGD blog, Aug. 18.

2020 "The Future of Legal Migration: Labour Migration Pathways Between Europe and Africa", in Matteo Villa, ed., *The Future of Migration to Europe*, Milan: ISPI Istituto per gli Studi di Politica Internazionale (with Helen Dempster and Katelyn Gough).

2020 "Migration and household finances: How a different framing can improve thinking about migration", *Development Policy Review*, 38 (1): 3–27 (with Timothy N. Ogden). ⟨*Pre-pub. version at CGD*⟩

2020 "Shared Border, Shared Future: A U.S.-Mexican Bilateral Worker Agreement", in Alex Nowrasteh and David J. Bier, eds., *12 New Immigration Ideas for the 21st Century*, Washington, DC: Cato Institute.

2019 "Three Facts You Haven't Heard Much About Are Keys to Better Policy Toward Central America", CGD blog, Nov. 1 (with Jimmy Graham).

　　　▷ Covered by *Mother Jones*

2019 "Promoting New Kinds of Legal Labour Migration Pathways Between Europe and Africa", CGD Policy Brief (with Helen Dempster and Katelyn Gough).

2019 "The President Has Mostly Wiped out US Refugee Resettlement. Other Countries Aren't Picking up the Slack", CGD blog, Feb. 6.

2019 "La migración es lo que hacemos de ella", *Política Exterior*, No. 187. Jan./Feb. (with Cindy Huang, Jimmy Graham, and Kate Gough).

# Policy Writings, *continued*

2018 "A Tool to Implement the Global Compact for Migration: Ten Key Steps for Building Global Skill Partnerships", CGD Brief, Dec. 4.

2018 "Migration as a form of development: New kinds of regulations to create shared benefits", *Migration Policy Practice*, 8 (3): 6–11.

2018 "The Economic and Fiscal Effects of Granting Refugees Formal Labor Market Access", CGD Working Paper 496 (with Cindy Huang and Jimmy Graham).

    ▷ Covered by *Politico*, *Apolitical*

2018 "Countries should train migrants coming to work—before they arrive", *Apolitical*, June 29 (with Kate Gough).

2018 "Migration Is What You Make It: Seven Policy Decisions that Turned Challenges into Opportunities", CGD Note, May 30 (with Cindy Huang, Jimmy Graham, and Kate Gough).

2018 "Can Development Assistance Deter Emigration?", CGD Policy Brief, Feb. 12 (with Hannah Postel).

2018 "The Best Ideas for Making Migration Work", *Refugees Deeply*, Jan. 25 (with Katelyn Gough).

2017 "Migration is a Form of Development: The Need for Innovation to Regulate Migration for Mutual Benefit", Technical Paper No. 2017/8, UN Department of Economic and Social Affairs, Population Division. New York: United Nations.

    ▷ Covered by *El Periódico*

2017 "Regional Security Means Border Security: New Data on Why Central American Children Flee to the United States ", *War on the Rocks*, Texas National Security Network, 30 November.

2017 "Migrants will keep coming. We should give them the skills they need to thrive", World Economic Forum *Agenda*, 15 November.

2017 "The Need for a Bilateral Labor Agreement Between the US and Mexico, and the Responsibility for Leadership", Keynote speech at the conference *¿Qué hacer frente a la crisis migratoria? Nuevas visiones y propuestas de acción*, Universidad Nacional Autónoma de México, Mexico City, jointly sponsored by Colmex and CIDE, 23 October. ⟨*En español*⟩

2017 "The labour market impact of refugee waves", *CentrePiece* 22 (3, October): 26–28. London: Centre for Economic Performance, London School of Economics (with Jennifer Hunt).

2017 "The economic effects of refugees are largely down to decisions made by the countries which take them", *American Politics and Policy* blog, LSE United States Centre, Oct. 20.

2017 "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", CGD Policy Brief, Oct. 11.

2017 "Global Skill Partnerships: A Proposal for Technical Training in Settings of Forced Displacement", CGD Policy Brief, Oct. 11 (with Katelyn Gough).

2017 "Foreign Policy Is Migration Policy: Lessons from the Drivers of Central American Child Migration", CGD Policy Brief, Sep. 13 (with Hannah Postel).

2017 "How Central American Youth Test Outdated U.S. Immigration Laws", *Americas Quarterly*, Aug. 15.

2017 "The Real Economic Cost of Accepting Refugees", *Refugees Deeply*, Aug. 8.

2017 "Trump says banning immigrants helps US workers.  A leading economist says he's wrong", *Vox.com*, Aug. 3.

2017 "The debate over the Mariel boatlift, economics' most famous immigration controversy, explained", *Vox.com*, Jun. 23.

# Policy Writings, *continued*

2017  "Does Kicking Out Mexicans Create Jobs? Here's what happened the last time an American president promised to create jobs by removing Mexican immigrants", *Politico*, Feb. 15.

2017  "Walling the U.S. Off From Mexico Won't Work", *U.S. News & World Report*, Feb. 2.

2017  "Don't despair, innovate—Now is the time to try new forms of development cooperation", *Devex* Global Views, Feb. 23.

2016  *Shared Border, Shared Future: A Blueprint to Regulate US-Mexico Labor Mobility*, Washington, DC: Center for Global Development (with Ernesto Zedillo and Carlos Gutierrez). ⟨*En español*⟩
   ▷ Covered by the *New York Times*; *Washington Post* [*bis*]; National Public Radio; *El Universal*; *La Crónica*

2016  "Development Aid to Deter Migration Will Do Nothing of the Kind", *Refugees Deeply*, Oct. 31.

2016  "World Bank's US dependency has to end: It's time to choose the institution's president based on merit rather than geopolitical considerations", *Politico Europe*, September 13.

2016  "Why today's migration crisis is an issue of global economic inequality", Ford Foundation *Equals Change* blog, July 29.

2016  "Global Skill Partnerships: A proposal for technical training in a mobile world", *OECD Development Centre blog*, April 19.

2016  "Time for philanthropists to get on board with migration", *Alliance* magazine, March.

2015  "A Self-Interested Approach to Migration Crises: Push Factors, Pull Factors, and Investing In Refugees", *Foreign Affairs*, Sept. 27 (with Justin Sandefur).

2015  "Gestionar la crisis migratoria desde el interés propio", *Política Exterior*, November-December (with Justin Sandefur).

2015  "Remittances 101 for Populist Politicians", *Views from the Center* blog, August 24.
   ▷ Covered by *Newsweek* and *ABC News*

2015  "Smart policy toward high-skill emigrants", *IZA World of Labor* 203, November.

2015  "Zero Illegal Immigration: A Thought Experiment (with Time Travel)", *Peregrine*, Issue 1502, Hoover Institution, Oct. 23.

2015  "The South Pacific Secret to Breaking the Poverty Cycle", *Huffington Post: Impact*, Sep. 15.

2015  "Why It's Time to Drop the 'Brain Drain' Refrain", *CGD Blog*, Jun. 30.
   ▷ Covered by *Forbes*

2015  "Global Skill Partnerships: A Proposal for Technical Training in a Mobile World", in Bertelsmann Stiftung, ed., *A Fair Deal on Talent: Fostering Just Migration Governance*, Gütersloh: Verlag Bertelsmann Stiftung, pp. 297–304.

2015  "In Haiti, U.S. rectifies missed opportunity to help", *The Hill* Congress Blog, Jan. 12 (with Royce Bernstein Murray).

2014  "The WHO Global Code of Practice: A Useful Guide for Recruiting Health Care Professionals? Lessons from Germany and Beyond", CGD Essay (with Steffen Angenendt and Meiko Merda). ⟨*Auf Deutsch*⟩

2014  "Let the People Go: The Problem With Strict Migration Limits", *Foreign Affairs*, 93 (1, Jan./Feb.): 152–159 (with Justin Sandefur). ⟨*Pre-pub. version*⟩

2014  "Skilled Migration from Mexico: Trends, Concerns, and Outlook", CGD Essay. Washington, DC: Center for Global Development. ⟨*En español*⟩

# Policy Writings, *continued*

2013 "Temporary Work Visas: A Four-Way Win for the Middle Class, Low-Skill Workers, Border Security, and Migrants", CGD Brief, April.  Washington, DC: Center for Global Development (with Lant Pritchett).

2013 "More Unskilled Workers, Please: The new immigration bill doesn't do nearly enough to address America's real labor shortage", *Foreign Policy*, July 8.

2013 "What Nativists Don't Want You to Know About Immigrants", *Boston Review*, June 3.

2013 "The New Transparency in Development Economics: Lessons from the Millennium Villages Controversy", *World Economics Journal* 14 (4): 77–97 (with Gabriel Demombynes). ⟨*Pre-pub. version*⟩

2013 "On the Move: The Highly Skilled (Turning 'Brain Drain' into 'Brain Gain')", World Bank Blog, October.

2013 "What Do We Know About Skilled Migration and Development?", Policy Brief No. 3, September. Washington, DC: Migration Policy Institute.

2013 "The Big Picture on Global Talent: How to better compete for, and grow talent". Paper prepared for the Salzburg Trilogue, August 30. Bertelsmann Stiftung (with Christal Morehouse).

2012 "L'affrontement entre les objectifs de développement et l'évaluation d'impact", *Revue d'économie du développement*, 26 (4): 175–205.

2012 "Crossing borders to escape natural calamities is no easy option", *The Guardian*, Aug. 23.

2012 "How the Training of Emigrant Professionals Can Be Financed by Destination Countries", Presentation at the Global Economic Symposium, 2012, Rio de Janeiro, October 16–17.

> ▷ *First public discussion of the Global Skill Parntership proposal*

2011 "Putting solutions on trial: Impact Evaluation and the Millennium Villages Experiment in Africa", *Boston Review*, June 16.

2011 "Memo to the WHO: Blocking health worker migration is not the answer", *AidWatch* blog, April 26 (with Amanda Glassman).

2010 "The year when shrinking was good", *Foreign Policy*, Jun. 21.

2010 "Let Haitians come to the U.S.: The best way to help Haiti rebuild is through immigration", *Global Post*, Feb. 26.

2010 "Let them leave: Why migration is the best solution for Haiti's recovery", *Foreign Policy*, Jan. 27.

2010 "To help Haiti's earthquake victims, change U.S. immigration laws", *Washington Post*, Jan. 24, p. B2.

2010 "Heath Worker Migration: Disease or Symptom?", *Global Health*, Winter issue.

2009 "Migrants Count: Report of the Commission on International Migration Data for Development Research and Policy", Washington: Center for Global Development (with Patricia A. Santo Tomas and Lawrence H. Summers). ⟨*Arabic*, *French*, *Russian*, *Spanish*⟩

2009 "Skill Flow: A fundamental reconsideration of skilled-worker migration and development", background paper for the *Human Development Report 2009*, New York: United Nations Development Program.

2009 "Think Again: Brain Drain—The movement of skilled workers from poor countries to rich ones is nothing to fear. In the long run, it will benefit both.", *Foreign Policy*, Oct. 22 (with David McKenzie).

2008 "Immigrants are an Engine of Prosperity ", *Atlanta Journal-Constitution*, Nov. 27.

## Policy Writings, *continued*

2007    "Smart Samaritans: Is There a Third Way in the Development Debate?", *Foreign Affairs*, 86 (5, Sept./Oct.): 132–140.

2006    "Le mythe des 0,7% : origines et pertinence de la cible fixée pour l'aide internationale au développement", *Afrique Contemporaine*, 219: 173-201 (with Todd J. Moss).

2005    "The Millennium Development Goals, Aid Targets, and the Costs of Over-Expectations", *Sustainable Development Law & Policy*, 6 (1): 58–84 (with Charles J. Kenny and Todd J. Moss).

2005    "Costs and Causes of Zimbabwe's Crisis", CGD Note, Washington, DC: Center for Global Development (with Todd J. Moss).

2005    "Aid and Growth: New evidence shows that aid flows aimed at growth have produced results", *Finance and Development*, 42 (3): 16–20 (with Steven Radelet and Rikhil Bhavnani).

2005    "Interpréter les OMD", *Courrier de la Planète*. 76: 18–21 (with Charles Kenny and Todd J. Moss).

## Comments and Reviews

2023    "A Landmark Study Debunks Populist Anti-Immigrant Narratives: Review of *Streets of Gold* by Abramitzky and Boustan", *The UnPopulist*, August 3.

2017    "Review of Patrick Kingsley, *The New Odyssey: The Story of the Twenty-First-Century Refugee Crisis*", *Population and Development Review*, 43 (2).

2015    "Mapping the Worm Wars: What the Public Should Take Away from the Scientific Debate about Mass Deworming", Views from the Center blog, July 30 (with Justin Sandefur).

2013    "Comments on 'Gender Equality and Development' by Esther Duflo", in Justin Yifu Lin and Claudia Paz Sepúlveda, eds., *Development Challenges in a Post-crisis World*, Annual World Bank Conference on Development Economics 2011, Washington, DC: World Bank.

2012    "Concerns about the Millennium Villages project report", *The Lancet*, 379 (9830): 1945 (with Jesse B. Bump, Gabriel Demombynes, and Lawrence Haddad).
▷ *This comment resulted in a retraction of findings in the critiqued paper.*

2012    "Multisector intervention to accelerate reductions in child stunting: an independent critique of scientific method", *American Journal of Clinical Nutrition*, 95 (3): 774–775 (with Gabriel Demombynes).

2009    "Thesis of a rigid revivalist: Review of *Dead Aid* by Dambisa Moyo", *Finance and Development*, 46 (3): 53–54.

2003    "Paul Streeten, *Globalisation: Threat or Opportunity?*", *Economic Development and Cultural Change*, 52 (1): 243–245.

## Other Research Papers

2007    "Do visas kill? Health Effects of African Health Professional Emigration", CGD Working Paper 114, Washington, DC: Center for Global Development.

2004    "The long walk to school: Development goals in historical perspective", CGD Working Paper 37, Washington, DC: Center for Global Development.

2004    "Inequality, Institutions and Long-Term Growth in Colombia", Manuscript (with William Easterly and Carlos Esteban Posada).

## Other Research Papers, *continued*

| 2003 | "Who Protected and Why? Tariffs the World Around 1870–1938", Harvard Institute of Economic Research Discussion Paper No. 2010, Dept. of Economics, Harvard University (with Christopher Blattman and Jeffrey G. Williamson). |
| 2002 | "World Bank Capital Neither Complements Nor Substitutes for Private Capital", CGD Working Paper 20, Washington, DC: Center for Global Development. |
| 2002 | "Do Rich Countries Invest Less in Poor Countries Than the Poor Countries Themselves?", CGD Working Paper 19, Washington, DC: Center for Global Development. |
| 1998 | "Estimating National Wealth: Methodology and Results", Environmental Economics Series, Paper Number 57, Washington, DC: World Bank (with Arundhati Kunte, Kirk Hamilton, and John Dixon). |

## Influence

| *Research* | Academic citation statistics at: Google Scholar │ SSRN │ RePEc IDEAS │ ResearchGate |
| | Invited to IOM Migration Research Leaders Syndicate, 2017 |
| | Top 0.4% of academic economists on RePEc IDEAS (221/61709), March 2011–March 2021 |
| | Replication data and code: https://dataverse.harvard.edu/dataverse/mclem |
| | "Six Vital Voices on the Economics of Migration", by *NewsDeeply* |
| *Social media* | "20 most influential think tank experts on Twitter, 2017" by ESGlobal. |
| | *Foreign Policy* magazine "Who's who of the foreign policy Twitterverse" 2012 and 2013. |

## Teaching

| 2023 | **Economic Problems and Public Policies** (Undergrad.), George Mason University |
| 2022 | **How Migration Policy Shapes Economies, Local and Global** (Master's), Georgetown University McCourt School of Public Policy and Walsh School of Foreign Service |
| 2003–2010 | **Macroeconomics** and **Thesis Advising** (Master's), Georgetown University McCourt School of Public Policy |
| 2005 | **Foreign Aid Effectiveness** (Ph.D.), University of Copenhagen |
| 2002 | Certificate of Distinction in Teaching, Derek Bok Center for Teaching & Learning, Harvard Univ. |
| 2001–2002 | **Economic Development in East Asia** (Undergrad.), Harvard Univ. Dept. of Economics |
| 2001 | **Globalization and History** (Undergrad.), Harvard Univ. Dept. of Economics |

## Education

| 2002 | **Ph.D., economics**, Harvard University Dept. of Economics, Cambridge, MA |
| | ▷ *NSF Graduate Research Fellowship; Derek Bok certificate of distinction in teaching* |
| 1997 | **M.S., econ. & environmental management**, Johns Hopkins University, Baltimore, MD |

▷ *Abel Wolman Merit Scholarship*

1994    **B.S., engineering and applied science**, California Institute of Technology, Pasadena, CA

## Honors

2013    Royal Economic Society Prize for best paper published in the *Economic Journal* in 2012 (with co-authors Steven Radelet, Rikhil Bhavnani, and Sami Bazzi).

2010    Invited for 15th Sir Arthur Lewis Memorial Lecture, Eastern Caribbean Central Bank.

2010    Devex.com "40 young leaders shaping the way international relief and development assistance are being delivered".

1996–2000    National Science Foundation Graduate Research Fellowship.

## Peer Reviews

Referee reports for *American Economic Review*, *Quarterly Journal of Economics*, *Review of Economic Studies*, *Review of Economics and Statistics*, *Journal of the European Economic Association*, *Journal of Economic Literature*, *American Economic Journal: Applied Economics*, *American Economic Journal: Macroeconomics*, *Journal of Labor Economics*, *Journal of Human Resources*, *ILR Review*, *Labour Economics*, *Journal of Development Economics*, *Science*, *Science Advances*, *Journal of Economic Growth*, *Journal of Economic History*, *Economic Development and Cultural Change*, *Journal of International Economics*, *World Development*, *Journal of Population Economics*, *Journal of Health Economics*, *World Bank Economic Review*, *Journal of Politics*, *Scandinavian Journal of Economics*, *Economic Inquiry*, *Public Choice*, *European Economic Review*, *The Lancet*, *International Migration Review*, *Population and Development Review*, *Journal of Globalization and Development*, *Regional Science and Urban Economics*, *Journal of Economic Surveys*, *European Economic History Review*, *Journal of Development Effectiveness*, *Review of World Economics*, *Journal of Iberian and Latin American History*, *Journal of International Money and Finance*, *Economic Notes*, National Science Foundation, World Bank Research Committee, Princeton University Press, Oxford University Press, MIT Press, Stanford University Press, Zed Books, *Journal of Economics and Growth of Developing Areas*, *Health Affairs*, *Human Resources for Health*, *Financial History Review*, *Social Science & Medicine*, *Georgetown University Public Policy Review*, several external academic tenure reviews.

## Personal

Languages    English (native); Spanish (advanced)
Portuguese, French, Turkish (intermediate)

*Updated August 24, 2023*