# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.* | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No. 6:23-cv-00007 |
| | ) | |
| DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |

**DECLARATION OF BLAS NUÑEZ-NETO**

I, Blas Nuñez-Neto, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and documents and information made known or available to me from official records and reasonably relied upon in the course of my employment, hereby declare as follows:

1.     I am the Assistant Secretary for Border and Immigration Policy with the U.S. Department of Homeland Security ("DHS") and have served in this role since March 26, 2023. I previously served as the Acting Assistant Secretary for Border and Immigration Policy since October 1, 2021.  Prior to this acting role, I served as the Chief Operating Officer for U.S. Customs and Border Protection ("CBP"), a DHS component, since March 5, 2021. In a prior administration, I served DHS as Senior Advisor to then-CBP Commissioner Richard Gil Kerlikowske, from January 12, 2015 to January 16, 2017.

2.     This Declaration pertains to four parole processes that fall within DHS authority: Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507 (Oct. 19, 2022);[1]

---

[1] *See also* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

1

Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243 (Jan. 9, 2023);[2]

Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); and

Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023).[3]

**<u>Background</u>**

      3.      Economic and political instability around the world is fueling the highest levels

of migration since World War II, testing the immigration systems of many nations, including

our own.  This challenge is compounded by the fact that DHS is operating within a broken and

outdated immigration and asylum system that was not built to handle the shifting

demographics being encountered at the border today.

      4.      Over the last two years, DHS has responded to increases in migration at the

Southwest Border ("SWB") that have at times strained DHS's operational capacity.  These

increases, or surges, have been driven, in large part, by a significant increase in migration

from Cuba, Haiti, Nicaragua, and Venezuela ("CHNV")—countries that DHS has never

encountered at these levels in its history.  This increase has been especially challenging

because nationals from CHNV countries are difficult for DHS to remove to their home

countries.

      5.      In response, DHS has implemented innovative processes that seek to

disincentivize unlawful and unauthorized entries at the SWB by pairing a consequence—

namely, return or removal to Mexico—with a substantial incentive to use lawful, safe, and

orderly pathways and processes to come directly to the United States.[4]  These measures have

---

[2] *See also* Implementation of a Change to the Parole Process for Haitians, 88 Fed. Reg. 26,327 (Apr. 28, 2023).
[3] *See also* Implementation of a Change to the Parole Process for Cubans, 88 Fed. Reg. 26,329 (Apr. 28, 2023).
[4] Consequences are, by themselves, not sufficient to deter irregular migration.  Migrants have, time and time again, shown that they are willing to endure unfathomable suffering for an opportunity to come to the United States.  To be effective, the consequences applied must be paired with incentives for migrants to use lawful processes.  Thus, DHS has overseen a historic increase in access to lawful processes for migrants to come to the United States in a safe,

worked.  Encounters of CHNV nationals have, as detailed below, decreased significantly since

DHS implemented the process for Venezuelans in October 2022 and processes for Cubans,

Haitians, and Venezuelans in January 2023 (collectively, "CHNV processes").  This decrease

in encounters has occurred despite the fact that the underlying conditions driving migration

from these four countries have not changed.  As detailed more fully below, conditional

releases[5] of CHNV nationals into the United States have also declined significantly as a result

of these processes.

      6.      The CHNV processes are dependent on the Government of Mexico's

willingness to accept the return at the SWB of CHNV nationals who do not avail themselves

of these lawful, safe, and orderly pathways and processes to come directly to the United

States.  At the processes' inception, these returns took place under the Centers for Disease

Control and Prevention's ("CDC") Title 42 public health Order, which DHS was required to

implement at the land border on behalf of the CDC.  In recognition of the significant reduction

in irregular migration as a result of the CHNV processes, and to ensure that they continued

after Title 42 ended, on May 2, 2023, the Government of Mexico announced[6] it would

continue to accept returns or removals of CHNV nationals encountered at the SWB under

---

orderly, and lawful manner. But similarly, incentives without consequences are insufficient to deter irregular
migration—they must go hand-in-hand. This is why DHS has implemented, for example, the CHNV processes.
[5] For the purpose of this declaration, a "conditional release" refers to the fact that noncitizens released from DHS
custody are subject to strict conditions, with limited exceptions.  Individuals who are released from DHS custody
and issued a Notice to Appear are required to appear before an immigration judge for their removal
proceedings.  Individuals who were encountered between ports of entry and released via parole are required to
request a charging document by mail or to report to an U.S. Immigration and Customs Enforcement facility in order
to be issued a charging document, as appropriate, with limited exceptions.  The discussion of conditional release
numbers in this document refers to noncitizens who were encountered after crossing unlawfully between ports of
entry, or without authorization at a port of entry.
[6] *See* The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration* (May 2, 2023),
https://www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-
joint-humanitarian-plan-on-migration/; U.S. Dep't of Homeland Sec., *DHS and DOJ Finalize Rule to Incentivize
Use of Lawful Immigration Pathways* (May 10, 2023), https://www.dhs.gov/news/2023/05/10/dhs-and-doj-finalize-
rule-incentivize-use-lawful-immigration-pathways.

Title 8 authorities. This is the first time in the bilateral history of the United States and Mexico that the Government of Mexico is allowing the United States to systematically return or remove non-Mexican nationals at the border.

7.      The Government of Mexico has made clear that its willingness to continue to accept returns of CHNV nationals to Mexico is contingent on the continued availability of lawful processes for nationals from those countries to come directly to the United States.  In other words, if DHS cannot provide lawful processes for some CHNV nationals to come directly to the United States, Mexico will almost certainly stop accepting returns or removals of CHNV nationals at the SWB.  DHS expects, in turn, that without both the incentives *and* disincentives associated with the CHNV processes that have led individuals from those countries to wait for lawful, safe and orderly pathways and processes to come to the United States, there will be another increase in migration at the SWB—the precise outcome that Plaintiffs allegedly seek to *avoid.*

**Increase in Migration Driven by CHNV Nationals**

8.      Surges in migration and encounters at the SWB have occurred during the last three Administrations under Presidents of both parties.  In the early 2010s, after three decades of bipartisan investments in border security and strategy, encounters along the SWB reached modern lows, averaging fewer than 400,000 per year from 2011 to 2017.  This followed decades during which annual encounters routinely numbered in the millions.[7]  Even during this period of relatively low encounters at the border, however, DHS experienced surges of unaccompanied children in 2014 and families in 2016 that significantly strained its operations given the unique vulnerabilities of those demographics.  Between 2017 and 2019, encounters along the SWB more

---

[7] From 1980 – 2006, the USBP averaged 1.14 million encounters per year along the SW Border, exceeding one million encounters in 19 out of those 27 years.

than doubled, and—following a significant drop during the beginning of the COVID-19 pandemic, which shut down travel across the world—continued to increase in 2021 and 2022.

9.      In fiscal year ("FY") 2021, encounters at the SWB reached levels not seen since the early 2000s with U.S. Border Patrol ("USBP") making 1.7 million encounters.  Encounters of CHNV nationals increased throughout FY 2021, totaling 181,264 compared to an average of 6,409 total encounters in the pre-pandemic period (FY 2014– FY 2019).  USBP encounters of CHNV nationals more than doubled from February (6,225) to March (13,016) and continued to rise through the end of the fiscal year, averaging more than 24,000 a month from March to October.

10.     In FY 2022, DHS reached a high-water mark for encounters at the SWB, with total USBP encounters exceeding 2.2 million.  The continued surge in migration from CHNV nationals accounted for most of the increase in encounters from FY 2021 to FY 2022.[8] Encounters of CHNV nationals more than tripled from 184,716 in FY 2021 to 626,410 in FY 2022, comprising 26 percent of overall FY 2022 encounters and 35 percent of unique[9] FY 2022 encounters.  In fact, in FY 2022, unique encounters of CHNV nationals exceeded unique encounters of Mexican nationals, as well as nationals of El Salvador, Guatemala, and Honduras, for the first time in history.

**Difficulties in Removing CHNV Nationals**

11.     The ability to impose consequences on those who do not establish a legal basis to remain the United States is a key tenet of the U.S. immigration system.  The U.S. immigration system has limited enforcement options available for noncitizens who are ordered removed but

---

[8] USBP encounters of CHNV nationals increased by 441,694 between FY 2021 and 2022, versus an increase of 202,568 for all other nationalities combined.
[9] The term "unique" is meant to distinguish between "repeat" encounters of the same noncitizen.

come from countries whose governments do not abide by international law and do not accept the timely return of their nationals.

12.     DHS's ability to remove CHNV nationals to their home countries under Title 8 authorities is generally limited, just as it was while the CDC's Title 42 public health Order was in effect.  Venezuela currently does not allow repatriations via charter flights, which significantly limits DHS's ability to remove Venezuelan nationals.  Nicaragua currently allows only one charter removal flight every 15 days, equivalent to two percent of Nicaraguan encounters in FY 2022.  And while DHS has recently restarted removal flights to Cuba, conducting a flight on April 24, 2023, and another on May 10, 2023—following a pause in operations since February 2020 as a result of the COVID-19 pandemic—the cadence and volume at which DHS can facilitate such removals would not keep pace with the number of Cuban nationals DHS has encountered at times.  While DHS can operate removal flights to Haiti, the precarious security situation on the ground there, including the security situation at the airport, has at times raised operational challenges in doing so.

13.     In FY 2022, despite best efforts, DHS removed, returned, or expelled to their home countries (under Title 8 and Title 42 authorities) a total of 176 Cubans, 3,024 Nicaraguans, 987 Venezuelans, and 18,449 Haitians—or 0.1 percent of Cuban encounters, 1.8 percent of Nicaraguan encounters, 0.5 percent of Venezuelan encounters, and 34 percent of Haitian encounters.[10]  This means that, prior to the implementation of the CHNV processes and Mexico's independent decision to accept the return of nationals from these countries at the SWB under Title 42, the vast majority of CHNV nationals (i.e., 96 percent in FY 2022) could not be

_____

[10] Data in this paragraph include Title 42 expulsions to home countries and all Title 8 removals and returns.  A portion of Title 8 removals and returns may have been returned to points of embarkation rather than to home countries, in which case the total number of repatriations to home countries was even lower than the rates reported here.

6

expelled under the Title 42 public health Order and were instead generally excepted from the Order and processed pursuant to Title 8.

14.     Additionally, because of the difficulties in removing CHNV nationals, CHNV nationals typically have not been processed for expedited removal—the main consequence available to DHS under Title 8 authorities at the border.  Instead, CHNV nationals processed under Title 8 authorities were generally either placed in removal proceedings under section 240 of the Immigration and Nationality Act ("INA") and conditionally released with a Notice to Appear ("NTA"), or, prior to March 8, 2023, when certain thresholds were met, conditionally released and required to report to U.S. Immigration and Customs Enforcement pending the issuance of an appropriate charging document on Parole plus Alternatives to Detention ("P+ATD"), or on May 10 and 11, 2023, conditionally released and required to schedule an appointment with ICE or request service of an NTA by mail for on Parole with Conditions ("PWC").

15.     As a result of these factors—the inability to expel or remove CHNV nationals from the United States, and legal restrictions on DHS's ability to detain noncitizens where a removal is not feasible in the reasonably foreseeable future—DHS conditionally released most noncitizens who were encountered.  Of the approximately 113,229 Venezuelan nationals encountered at the SWB in the five-plus months between May 1 and October 17—just before the Venezuela process went into effect—approximately 99,055 (87 percent) were conditionally released.  Together, CHNV nationals accounted for 354,177 conditional releases in the months leading up to the Venezuelan parole process, 73 percent of the total during this period of 486,436.  By comparison, countries whose nationals DHS can more effectively return, either to their country of origin or to Mexico, have a much lower rate of conditional release.  In the same

7

time period, just 9 percent of conditional releases were of nationals of Mexico or Northern

Central America (18,384 Mexicans, 16,784 Hondurans, 5,044 El Salvadorans, and 4,187

Guatemalans).  Similarly, in the five-plus months between August 1, 2022 and January 5, 2023,

when the Venezuelan process was expanded into the CHNV processes, approximately 280,238

out of 305,458 CHN encounters (92 percent) were conditionally released, with CHNV countries

together accounting for 57 percent of the total of 619,113 during that period.

16.    This reality is why the CHNV processes are critical to DHS's ability to effectively

manage migratory flows from these countries. The CHNV processes, which have provided a

lawful means for nationals of these countries to come to the United States, and Mexico's

independent decision to accept the return of nationals from these countries at the SWB under

Title 42, and now Title 8, as a result, fundamentally changed migratory flows not just to the

United States, but throughout the region.

**The CHNV Processes**

17.    The CHNV processes provide a lawful and streamlined way for qualifying

nationals of Cuba, Haiti, Nicaragua, and Venezuela to apply to come to the United States,

without making the dangerous journey to the border.  Through a fully online process, individuals

can seek advance authorization to travel to the United States and be considered, on a case-by-

case basis, for a temporary grant of parole for up to two years, as well as employment

authorization, provided that they: pass rigorous biometric and biographic national security and

public safety screening and vetting; have a supporter in the United States who commits to

providing financial and other support; and complete vaccinations and other public health

requirements.  As described above, implementation of the CHNV processes is contingent on

Mexico accepting the return or removal to Mexico of CHNV nationals seeking to enter the

8

United States without authorization at the SWB.

        **a.**        **The Venezuela Process Immediately Reduced Irregular Migration**

      18.      On October 12, 2022, DHS announced coordinated enforcement actions with the Government of Mexico to effectively reduce the number of noncitizens arriving at the SWB and simultaneously establish a more orderly and safe process for nationals of Venezuela.[11]  The Venezuela process was specifically designed to disincentivize Venezuelan nationals from making the dangerous journey to the SWB by imposing significant consequences for those who chose not to avail themselves of the lawful process.[12]   Namely, the Government of Mexico made an independent decision to accept the return of Venezuelan nationals to Mexico at the border, initially under the Title 42 public health Order, and later under Title 8.

      19.      To participate in this process, nationals of Venezuela must have a financial supporter in the United States, meet established eligibility criteria, pass rigorous biometric and biographic national security and public safety screening and vetting, and arrange their own air travel to a domestic airport in the United States.  The process was specifically designed to relieve the strain on DHS frontline resources and border communities of irregular arrivals at the border by requiring Venezuelans who receive travel authorization to fly to an interior port of entry to be considered for a grant of parole on a case-by-case basis.  It also disincentivizes Venezuelans from putting their lives in the hands of smuggling organizations who are looking to exploit them for profit.

      20.      The Venezuela process delivered results immediately, fundamentally changing

---

[11] Gov't of Mexico, *Mexico is Coordinating With the US a New Approach to Orderly, Safe, and Humane Migration in the Region* (Oct. 12, 2022), https://www.gob.mx/sre/prensa/mexico-is-coordinating-with-the-us-a-new-approach-to-orderly-safe-regular-and-humane-migration-in-the-region?idiom=en.

[12] Building upon the success of the Uniting for Ukraine parole process, which significantly decreased flows of Ukrainian nationals at the SWB following Russia's invasion of Ukraine, DHS established a similar parole process for nationals of Venezuela and their qualifying immediate family members to come to the United States in a safe, orderly, and lawful manner.

the migratory patterns of Venezuelan nationals.  Prior to the October 12 announcement, DHS was encountering an average of 1,100 Venezuelan nationals a day along the SWB and the Government of Panama was encountering almost 4,000 Venezuelans a day on its border with Colombia.[13]  Within a week of the announcement of the Venezuelan process on October 12, 2022, the number of Venezuelans encountered at the SWB fell sharply, from an average of over 1,100 a day from October 5–11 to under 200 per day from October 18–24, and further declined to 67 per day as of the week ending November 29, 2022, and 28 per day the week ending January 22, 2023.

21.     Venezuelan arrivals to Panama similarly decreased.  From January through October 2022, the Government of Panama encountered 211,355 irregular migrants having crossed through the Darién Gap—a dangerous 100-kilometer stretch of inhospitable and dense jungle between Colombia and Panama, which is particularly notorious for the violence of the human smugglers operating in lawless stretches of jungle—with 59,773 migrants crossing into Panama irregularly via the Darién Gap in October 2022 alone, a sharp increase compared to the 4,702 migrants encountered in January 2022.  Of the 59,773, Venezuelan nationals comprised 40,593, or 68 percent of total irregular migrants reported in October.  Following the October DHS announcement of the Venezuelan parole process, the number of Venezuelans attempting to enter Panama through the Darién Gap fell substantially to just 668 in November and have generally continued at significantly lower levels.

22.     DHS acknowledges, however, that from mid-April until the Title 42 public health Order ended on May 12, there was a temporary increase in encounters of Venezuelan nationals at the SWB.  Notably, during this same period, encounters of Cubans, Haitians, and Nicaraguans

---

[13] República de Panamá, Panamá Migración, *Irregulares en Tránsito Frontera Panamá—Colombia 2022*, https://www.migracion.gob.pa/inicio/estadisticas.

remained low.  The increase in Venezuelan migration experienced in early May can likely be attributed to a number of factors, including: misinformation campaigns by smugglers, the aftermath of the fire in a Mexican government facility that killed a number of Venezuelan migrants in March and impacted enforcement efforts in Mexico, and the limited number of available CBP One appointments to present at a port of entry to seek an exception from the Title 42 public health Order while it was in effect.[14]

23.     After the end of the Title 42 public health Order, however, and the imposition of stiffened consequences for irregular migration in place at the land border as a result of the return to processing all noncitizens under Title 8 authorities—including a new condition on asylum eligibility, at least a five-year bar on admission to the United States, and the potential for criminal prosecution for repeat illegal entries—as well as the continuing expansion of lawful processes for noncitizens to access the United States, encounters of Venezuelan migrants between ports of entry once again significantly declined.

**b.      Expansion of Processes to Include Nationals of Cuba, Haiti, and Nicaragua Have Led to Similar Decreases in Irregular Migration**

24.     On January 5, 2023, building upon the success of the process for Venezuelans, DHS established similar processes for eligible nationals of Cuba, Haiti, and Nicaragua, and their immediate family members who have a U.S.-based supporter and pass national security and public safety vetting to seek advance authorization to travel to the United States and be considered, on a case-by-case basis, for a temporary grant of parole for up to two years. Once paroled into the United States, noncitizens are eligible to apply for employment authorization to work legally throughout the duration of their parole.

---

[14] Nicole Acevedo & Albinson Linares, *Misinformation Fuels False Hopes Among Migrants after Deadly Fire in Mexico,* NBC News, Mar. 30, 2023, https://www.nbcnews.com/news/latino/misinformation-fuels-false-hopes-migrants-mexico-fire-rcna77398.

25.     This announcement again coupled a lawful, safe, and orderly process for such nationals to seek parole in the United States with consequences—in the form of returns to Mexico—for those who nonetheless crossed the SWB unlawfully or without authorization.  This was again made possible by the Government of Mexico's independent decision to begin accepting returns of nationals from Cuba, Haiti, and Nicaragua—and their continued acceptance of Venezuelan nationals—expelled under the Title 42 public health order.

26.     As was the case following the implementation of the parole process for Venezuelans, the number of Cuban, Haitian, and Nicaraguan nationals encountered between ports of entry dropped significantly after DHS introduced the new processes, from a seven-day average of 1,231 on January 5, 2023 (the date the new processes were implemented), to a seven-day average of 205 just two weeks later.  The reduction occurred even as encounters of other noncitizens began to rebound from their typical seasonal drop and represented a significant decline of 94 percent from the peak CHNV encounters of 3,644 on December 10, 2022.

c.      **The CHNV Processes Free Up Limited DHS Resources**

27.     The positive impacts of these processes are felt in numerous ways, particularly along the SWB.  The CHNV processes enhance security by allowing DHS to vet individuals from those countries who seek to come the United States before they travel.  Through the CHNV screening and vetting processes, noncitizens who could pose threats to national security or public safety are identified earlier in the processes—that is, before they arrive at a port of entry—and can be denied authorization to travel to the United States.  Noncitizens who wish to travel to the United States to seek parole under these processes are required to submit to DHS certain biographic information and a live facial photograph.  The information submitted is vetted against national security and public safety systems at DHS and other federal agencies to identify

12

noncitizens who may pose a threat.

28.     After receiving advance authorization to travel to the United States to seek parole, noncitizens are required to arrange their own air travel to an interior port of entry as opposed to seeking entry at a land port of entry along the SWB.  DHS deliberately required participants to travel to an interior port of entry to avoid negatively impacting DHS operations at the SWB.  The significant reduction in encounters of CHNV nationals along the SWB has allowed DHS has to free up resources to focus on other critical aspects of the DHS mission, including allowing more frontline CBP personnel to return to their primary border security mission.  This is because, during previous increases in CHNV encounters at the SWB, CBP had to pull personnel from the field to perform tasks including processing, transporting, escorting, and detaining noncitizens in custody, as well as other related functions.  This, in turn, decreased CBP's ability to respond to noncitizens avoiding detection, other agency calls for assistance, and noncitizens in distress.

### d.     The CHNV Processes Significantly Reduced Border Releases

29.     The CHNV processes did not just significantly reduce encounters at the border— they also significantly reduced conditional releases of CHNV nationals into border communities. In the five-plus months prior to the implementation of the CHNV processes, DHS conditionally released 2,356 CHNV noncitizens encountered between ports of entry, or at ports of entry not using CBP One to schedule an appointment, per day.  Since the CHNV processes were implemented, conditional releases of CHNV nationals declined by 90 percent to 239 per day.[15]

30.     In the five-plus months prior to the Venezuela process being implemented in October 2022, CBP conditionally released an average of 583 Venezuelans encountered between ports of entry, or at ports of entry not using CBP One to schedule an appointment, per day at the

---

[15] For the purpose of this analysis, the pre-Venezuelan process is defined as May 1 – October 17, 2022, and the post-implementation period is defined as October 18, 2022 – May 31, 2023.

border. By contrast, in the seven-plus months following implementation of the process, DHS

conditionally released 208 such Venezuelans per day, a decrease of 64 percent.

31.     Implementation of the CHNV processes had an even larger impact on conditional

releases of Cubans, Haitians, and Nicaraguans. In the five-plus months prior to the

implementation of the processes for those countries in January 2023, CBP conditionally released

an average of 1,774 nationals of these three countries encountered between ports of entry, or at

ports of entry not using CBP One per day.  In the nearly five months following implementation

of the CHN processes CBP conditionally released an average of just 32 per day, a 98 percent

reduction.[16]

**e.     The CHNV Processes Provide a Safe, Orderly, and Lawful Option**

32.     A key component of DHS's strategy for managing migratory flows is to provide

expanded access to safe, orderly, and lawful pathways and processes for individuals who are

seeking protection, or opportunity, in the United States—even as DHS is committed to imposing

consequences on those who cross the border unlawfully between POEs, or without authorization

at POEs.

33.     As part of the CHNV processes, DHS has, after a case-by-case determination by

an officer at an air port of entry, allowed 43,823 Venezuelan nationals and 86,995 Cubans,

Haitians, and Nicaraguans, who have passed rigorous national security and public safety vetting,

and who have financial supporters who have committed to providing whatever support is

---

[16] As a result of the measures taken by DHS arrivals of noncitizens from CHNV countries have decreased
significantly.  As noted above, conditional releases of CHNV nationals crossing unlawfully between POEs, or
without authorization at POEs, fell from 2,356 per day in the months before the parole processes were implemented
to 239 per day in the months following their implementation, a 90 percent reduction. Accounting for individuals
who came to the United States through a safe, orderly process—either because they are processed at a POE after
making an appointment through the CBP One application (297 per day), or because they are granted a case-by-case
determination of parole through the CHNV processes (791 per day)—total CHNV arrivals fell to approximately
1,326 per day, a 44 percent reduction from their pre-CHNV process levels (Note that these numbers may not add
due to rounding).

required, to enter the United States in a safe and orderly manner—an average of 791 each day.[17]

DHS has also permitted 22,398 Venezuelans, and 28,756 Cubans, Haitians, and Nicaraguans,

who may wish to claim asylum to enter the United States to schedule an appointment via the

CBP One app to be processed at a land border port of entry—an average of 297 a day since the

implementation of the CHNV processes.[18]

**f.      The CHNV Processes Are Reducing the Impact to Communities**

34.      Prior to the implementation of these processes, local officials and non-

governmental organization ("NGO") partners alike reported concerns that shelters established to

house noncitizens and provide support would soon reach full bed space capacity,[19] effectively

limiting key services to support noncitizens once they were processed out of DHS custody.[20]

The sharp decrease in conditional releases of CHNV nationals at the border has helped mitigate

many of these challenges.

35.      Additionally, DHS deliberately designed the CHNV processes to require a U.S.-

based supporter to attest and provide financial responsibility for a potential beneficiary of the

processes.  Supporters must agree to provide financial and other support as needed to

beneficiaries, further reducing the possibility that these noncitizens may need to rely on public

assistance and pose a burden to communities across the United States.  Moreover, upon arrival to

the United States, CHNV nationals are immediately eligible to request employment authorization

by filing a Form I-765, Application for Employment Authorization, with U.S. Citizenship and

---

[17] Data is current through May 31, 2023.
[18] Data is current through May 31, 2023.
[19]  Raquel Torres, *Migrant Aid Goups Stretched Thin as City Officials Seek Federal Help for Expected Wave*, San Antonio Report (Apr. 27, 2022), https://sanantonioreport.org/migrant-aid-groups-stretched-thin-city-officials-seek-federal-help/.
[20] Denelle Confair, *Local Migrant Shelter Reaching Max Capacity as it Receives Hundreds per Day*, KGUN 9 Tucson (Sept. 23, 2022), https://www.kgun9.com/news/local-news/local-migrant-shelter-reaching-max-capacity-as-it-receives-hundreds-per-day.

Immigration Services ("USCIS") to legally work throughout the duration of their parole period. USCIS has generally processed these applications within weeks of receipt, allowing for CHNV nationals to begin employment and contributing to the economy.

### g. The Government of Mexico is Unlikely to Accept Returns if the CHNV Processes are Enjoined

36.     DHS's implementation of these processes relies on enforcement actions that serve as a deterrent to migrants who are thinking of making the dangerous journey to the SWB— something that, prior to the CHNV processes, was challenging.  Cooperation and coordination with the Government of Mexico has been a critical component of these efforts, given the difficulties DHS has returning CHNV nationals to their home countries.  As noted above, Mexico announced on May 2, 2023 that it would accept the return or removal of CHNV nationals at the SWB from the United States under Title 8 processes—the first time in United States and Mexico's bilateral history that the Government of Mexico has indicated its willingness to accept the systemic removal of third country nationals at the border.[21]

37.     The CHNV processes are also directly responsive to requests made by the Government of Mexico and other key foreign partners throughout the hemisphere to address irregular migration through shared responsibilities and require close coordination between foreign governments to successfully implement.  This collaborative approach further aligns with U.S. commitments outlined by three policy-setting documents: U.S. Strategy for Addressing the Root Causes of Migration in Central America ("Root Causes Strategy"); the Collaborative Migration Management Strategy ("CMMS"); and the Los Angeles Declaration on Migration and Protection ("L.A. Declaration"), which was endorsed in June 2022 by 21 countries.

---

[21] The White House, *Mexico and United States Strengthen Joint Humanitarian Plan on Migration*, May 2, 2023. www.whitehouse.gov/briefing-room/statements-releases/2023/05/02/mexico-and-united-states-strengthen-joint-humanitarian-plan-on-migration.

38.     The Government of Mexico has also made clear its willingness to accept returns or removals of CHNV nationals encountered at the SWB is contingent on the United States providing lawful processes for nationals of these countries to come to the United States without needing to make the dangerous journey to cross unlawfully between ports of entry, or without authorization at ports of entry.  As discussed above, if the United States is unable to provide lawful processes for CHNV nationals to come to the United States, Mexico will almost certainly stop accepting returns or removals of CHNV nationals at the border.  Given DHS's continuing inability to repatriate nationals of these countries in large numbers to their home countries, the large number of CHNV nationals currently in Mexico—estimated at more than 100,000, and the well-worn paths from their home countries to the border, this, in turn, will likely result in a surge of migration from these countries.

     **h.**     **Stopping the CHNV Processes Will Lead to a Surge in CHNV Migrants at the Southwest Border**

39.     The data presented here show that migrants who are presented with a lawful and orderly option to come to the United States are more inclined to avail themselves of these safer options and far less inclined to place their lives in the hands of smugglers who exploit them for profit to cross unlawfully at the SWB.  This assessment is informed by compelling evidence over the past year that combining effective disincentives for migrants to cross unlawfully between ports of entry, or without authorization at ports of entry, with incentives for migrants to use safe, orderly processes can meaningfully shift migration patterns in the region and to the SWB.

40.     If these lawful processes are unavailable, as noted above, DHS expects that Mexico will be unlikely to accept the return of CHNV nationals at the border.  This will lead to two interconnected outcomes. First, because there will no longer be lawful process for CHNV nationals to come to the United States or a meaningful consequence that can be rapidly applied at

the border to those who do not establish a legal basis to remain in the United States, there will likely be a surge in encounters of CHNV nationals crossing unlawfully at the SWB between ports of entry, or without authorization at a port of entry. Second, this surge would, in turn, significantly increase the number of CHNV nationals that would be conditionally released into the United States because of DHS's continuing difficulty in removing those who do not establish a legal basis to remain in the United States to their home countries.

41.     The ability to quickly apply consequences at the border—the very thing that the existence of these processes permits—is important because DHS must contend with callous human smuggling networks that weaponize misinformation and look for any opportunity to put intending migrants' lives at risk for profit.[22]  These criminal organizations intentionally twist information about U.S. immigration policy for the express purposes of encouraging would-be migrants to use their services—services that regularly result in tragedy.  Because profit is the motivating factor, criminal organizations have no qualms when it comes to exploiting migrants through false promises—particularly when there are changes in the United States' immigration policy or border operations.  This familiar pattern was seen in the weeks leading up to the lifting of Title 42.

42.     DHS relies on and works closely with its foreign partners to manage migration throughout the region.   The United States' border management strategy is predicated on the belief that migration is a shared responsibility among all countries in the region—something that is reflected by the intensive diplomatic efforts that DHS and the Department of State have been

---

[22] *See* U.S. Dep't of Justice, Press Release, *Defendants Indicted in Tractor Trailer Smuggling Incident That Resulted in 53 Deaths* (July 20, 2022), https://www.justice.gov/usao-wdtx/pr/defendants-indicted-tractor-trailer-smuggling-incident-resulted-53-deaths; U.S. Dep't of Justice, Press Release, *Cuban National Sentenced to Over 38 Years in Prison for Drug Trafficking and Other Crimes after Using His Border Ranch as a Criminal Corridor* (Mar. 9, 2022), https://www.justice.gov/usao-wdtx/pr/cuban-national-sentenced-over-38-years-prison-drug-trafficking-and-other-crimes-after.

making to engage with partners throughout the Western Hemisphere.  Regional partner countries have encouraged and supported DHS's approach to address irregular migration through the application of disincentives for unlawful entry—through increased enforcement and consequences—coupled with incentives to provide intending migrants with expanded lawful pathways and processes, including humanitarian protection, innovative parole processes, and labor migration.

43.     Regional partner countries have repeatedly expressed concerns about the ways in which recent migratory flows challenge their local communities and immigration infrastructure and have regularly highlighted how policy announcements have a direct and immediate impact on migratory flows through their countries.  Following the development of the enforcement process for Venezuelans announced in October 2022, regional partners urged the United States to continue building on this approach, which couples processes for noncitizens to find protection in the region or travel directly to the United States with consequences for those who do not avail themselves of these processes.   But the lawful processes and regional protection mechanisms by themselves are not sufficient, as described above—DHS's ability to implement its border-management strategy is predicated on its ability to impose consequences on those who do not take advantage of lawful processes to access opportunity and protection in the United States.

44.     Thus, in seeking to prevent DHS from operating these processes, which will likely result in another increase in migration from these countries, Plaintiffs are undermining DHS's efforts to work with foreign partners to collectively address the challenges we face from CHNV migration.

19

**The CHNV Processes, Like Prior Parole Processes, are a Critical Tool in the Executive Branch's Foreign Policy Toolbox**

45.     Parole has long been understood as a tool that provides the U.S. Government with flexibility to address emergent situations, many of which have foreign policy implications. DHS's implementation of the CHNV processes is not so different from many historical exercises of parole authority, both pre-Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") and post-IIRIRA.[23]  Early historical examples of the U.S. Government's exercise of parole authority include, in 1956 and 1957, the parole of 31,915 Hungarian nationals who were fleeing revolution and unrest.[24]  In the early 1960s, the United States paroled approximately 5,000 refugees into the country under the Fair Share Refugee Act of July 14, 1960.[25]  In May 1962, the United States implemented the Hong Kong Parole Program, which allowed for the parole of approximately 15,000 Chinese refugees.[26]  In fiscal year 1972, the United States paroled 17,109 Cubans into the country via airlift.[27]  From 1975 to 1979, the United States paroled nearly 360,000 nationals from Vietnam, Cambodia, and Laos who were fleeing years of military and political conflict.[28]

46.     More recent examples of the U.S. Government's exercise of parole authority include the Cuban Family Reunification Parole ("CFRP") process.  This parole process was established in 2007, in part, due to the U.S. Coast Guard's increased interdictions of Cuban

---

[23] The Illegal Immigration Reform and Immigration Responsibility Act of 1996 replaced the original 1952 parole language, "for emergent reasons or for reasons deemed strictly in the public interest," with the current language specifying "on a case-by-case basis for urgent humanitarian reasons or significant public benefit."  Immigration and Nationality Act, Pub. L. No. 82-414, 66 Stat. 163, 188 (1952).

[24] *Annual Report of the Immigration and Naturalization Service* (June 30, 1958).

[25] U.S. Citizenship and Immigration Services, *Refugee Timeline* (Feb. 7, 2023), https://www.uscis.gov/about-us/our-history/history-office-and-library/featured-stories-from-the-uscis-history-office-and-library/refugee-timeline#:~:text=In%20recognition%2C%20Congress%20passed%20the,two%20years%20in%20the%20U.S.

[26] *Id.*

[27] American Immigration Counsel, *Executive Grants of Temporary Immigration Relief 1956 to Present* (Oct. 2014).

[28] *Id*.

nationals.  CFRP, much like the CHNV processes, was implemented to disincentivize Cuban nationals from undertaking dangerous maritime crossings and to meet the U.S. Government's commitment on legal Cuban migration levels under the 1994 U.S.-Cuban Migration Agreement. The Haitian Family Reunification Parole ("HFRP") process was similarly implemented in 2015 to "provid[e] the opportunity for certain eligible Haitians to safely and legally immigrate sooner to the United States."[29]

47.     The Uniting for Ukraine ("U4U") process, established in April 2022, was put in place in the wake of Russia's unprovoked invasion of Ukraine that caused thousands of Ukrainian migrants to spontaneously arrive at SWB ports of entry.  Like the CHNV processes, U4U allowed U.S.-based financial supporters to file applications on behalf of Ukrainian nationals who, after they passed the requisite national security and public safety vetting, were allowed to travel directly to the United States to be considered, on a case-by-case basis, for parole upon their arrival.  Once U4U was implemented, unauthorized arrivals of Ukrainians at the SWB fell sharply as Ukrainians seeking to come to the United States utilized a safe and orderly process to do so.[30]

48.     As noted above, the CHNV processes were implemented in close coordination with the Government of Mexico and are responsive to requests from regional partner countries to help manage irregular migration in the Western Hemisphere and to create lawful pathways for intending migrants.  Promoting a safe, orderly, legal, and humane migration strategy throughout

---

[29] Remarks of Deputy Secretary of Homeland Security Alejandro Mayorkas, U.S. Department of Homeland Security, U.S. Citizenship and Immigration Services, Press Release, *DHS To Implement Haitian Family Reunification Parole Program* (Oct. 14, 2014).
[30] CBP encountered an average of 938 Ukrainians nationals per day in the two weeks prior to the announcement of the U4U Process on April 20, 2022.  After U4U launched and Ukrainian citizens with advance travel authorization were provided the option to fly directly into the United States—coupled with the application of the Title 42 public health Order to Ukrainians who sought to cross at the land border—by May 10, 2022 daily SWB encounters of Ukrainians dropped to a two-week average of just twelve per day, a drop of 99 percent.

the Western Hemisphere has been a top foreign policy priority for the Administration.  This is reflected in three policy-setting documents: the U.S. Strategy for Addressing the Root Causes of Migration in Central America; the Collaborative Migration Management Strategy; and the Los Angeles Declaration on Migration and Protection, which was endorsed in June 2022 by 21 countries.

49.     The Collaborative Migration Management Strategy and the L.A. Declaration call for a collaborative and regional approach to migration, wherein countries in the Western Hemisphere commit to implementing programs and processes to stabilize communities hosting migrants or those of high outward-migration; humanely enforce existing laws regarding movements across international boundaries, especially when minors are involved; take actions to stop migrant smuggling by targeting the criminals involved in these activities; and provide increased regular pathways and protections for migrants residing in or transiting through the 21 countries.  The L.A. Declaration specifically lays out the goal of collectively "expand[ing] access to regular pathways for migrants and refugees."

50.     In support of these goals, the United States and other regional partner countries have undertaken several efforts to provide humanitarian assistance and stabilization to nationals of CHNV countries, among other initiatives.  To stabilize displaced populations throughout the Western Hemisphere, Colombia continues to implement temporary protected status for Venezuelans, and Costa Rica plans to renew temporary protection for Cubans, Nicaraguans, and Venezuelans.  On June 1, 2022, the Government of Ecuador authorized a second regularization process for certain Venezuelans, thereby providing certain Venezuelans a two-year temporary residency visa.  On June 10, 2022, the U.S. Department of State and the U.S. Agency for International Development ("USAID") announced $314 million in new funding for humanitarian

and development assistance for refugees and vulnerable migrants across the hemisphere, including support for socio-economic integration and humanitarian aid for Venezuelans in 17 countries of the region.  And on September 22, 2022, the United States, through USAID, announced nearly $376 million in additional humanitarian assistance which will provide essential support for vulnerable Venezuelans inside Venezuela, as well as urgently needed assistance for migrants, refugees, and host communities across the region, further contributing to stabilizations to address humanitarian crisis in the region.  Canada is also investing nearly $27 million in migration and protection-related capacity building in the Americas.  The United States, Canada, Guatemala, and Mexico also are working together to build circular and seasonal lawful labor and protection pathways, including allocating a certain number of temporary work visas for certain countries in the region.

51.     The CHNV processes have allowed the United States to lead by example as it continues to urge other governments to take affirmative steps to tackle irregular migration and provide much needed humanitarian relief.  These processes have been a critical foreign policy tool that demonstrates the U.S. Government's commitment to meeting the goals laid out in the Los Angeles Declaration and provides proof of the U.S. Government's willingness to share in the burden of responding to the migratory challenges posed by nationals of these countries— challenges that confront the entire region.

**Conclusion**

52.     The CHNV processes' combination of an incentive for noncitizens to use lawful, safe, and orderly pathways and processes to come to the United States, with significant consequences at the border for those who cross unlawfully, or without authorization, has worked. The CHNV processes have successfully changed migratory flows from these four countries, not

23

just at our shared border with Mexico, but throughout the region.  These processes have significantly reduced encounters along the SWB, allowing frontline DHS personnel to return to their primary border security missions.  They have significantly reduced conditional releases of CHNV nationals at the SWB, relieving the pressure on local communities and NGOs.  And they have provided lawful processes for noncitizens from those four countries to come to the United States in a safe and orderly manner, undermining the pernicious criminal organizations that put migrant lives at risk for profit.

53.     If DHS cannot continue to provide lawful processes for CHNV nationals to come directly to the United States, Mexico will almost certainly no longer accept the removal of those who do not establish a legal basis to remain in the United States at the border.  Given the continuing difficulty that the United States has in effectuating removals of CHNV nationals to their home countries, DHS anticipates that the lack of lawful processes or meaningful consequence will once again lead to a surge in migration from CHNV nationals.  If Plaintiffs succeed in this litigation, they will likely achieve the exact opposite of what they claim to want—a sharp increase in encounters at the SWB and conditional releases of CHNV nationals into border communities.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.  Executed on this 20th day of June, 2023.


_____
Blas Nuñez-Neto
Assistant Secretary
Border and Immigration Policy
U.S. Department of Homeland Security