**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | | |
|---|---|---|
| _____ | ) | |
| STATE OF INDIANA, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-00106-DMT-CRH |
| | ) | |
| ALEJANDRO MAYORKAS, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |
| _____ | ) | |

<u>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS**</u>

The Departments of Homeland Security and Justice have adopted a final rule that admits our nation faces a "number of [unauthorized] migrants" that will "increase significantly, to a level that risks undermining the Departments' continued ability" to maintain border security. *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31,314 (May 16, 2023) ("Circumvention Rule"). To address this "potential surge of migration," *id.*, the Circumvention Rule introduces a "rebuttable presumption of asylum ineligibility for certain noncitizens who neither avail themselves of a lawful, safe, and orderly pathway to the United States nor seek asylum or other protection in a country through which they travel." *Id*. That rebuttable presumption is littered with exceptions.

The exceptions to that rebuttable presumption are not lawful and, rather than decreasing illegal entry, appear designed to affirmatively encourage and facilitate it. Under the Rule, noncitizens seeking asylum are exempted from the rebuttable presumption of ineligibility if: (1) they are unaccompanied minors; (2) they scheduled their arrival though the CBP One mobile application ("CBP App"); (3) they were unable to schedule their arrival due to language barriers,

1

illiteracy, significant technical failures, or other ongoing and serious obstacles; (4) they received authorization to travel to the United States ("U.S.") pursuant to a DHS-approved parole process; (5) they were denied asylum or other forms of protection by another country; or (6) they have any "exceptionally compelling circumstances." *See* 88 Fed. Reg. 31,314, 31,449-52.

Defendants assert Plaintiffs lack standing to challenge the exceptions to the Circumvention Rule. Although as the Supreme Court has recognized, States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). The new process created by the Circumvention Rule's exceptions would allow vast numbers of aliens to enter the country, receive instant work authorization, and quick access to public benefits. Plaintiffs are mandated to provide services and benefits to aliens not lawfully in the U.S. These services and benefits are paid by State agencies and are partially financed from State budgets. In addition, Plaintiffs must contend with increasing law enforcement expenditures. Plaintiffs spend hundreds of millions per year because of the federal government's immigration failures. These harms are enough to establish standing because they flow from "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019).

In addition, Plaintiffs have provided sufficient facts to state their claims upon which relief can be granted. As a result, Defendants' Motion should be denied.

## BACKGROUND

Congress has carefully created a comprehensive immigration system that divides responsibilities between (1) Defendant Department of Homeland Security ("DHS"), which is responsible for border security and determining whether aliens with visas should be admitted into the U.S., *see* 6 U.S.C. § 202(2)) (assigning to DHS responsibility for "[s]ecuring the borders); *id.* § 211(c)(2)-(3)) (establishing U.S. Customs and Border Protection within DHS assigning it

responsibility to "ensure the interdiction of persons and goods illegally entering or exiting the United States" and to "facilitate and expedite the flow of legitimate travelers and trade"); (2) Defendant Department of Justice, which administers immigration courts through the Executive Office for Immigration Review ("EOIR") and the Board of Immigration Appeals, *see* 8 U.S.C. § 1103(g)(1)) (stating that, following creation of DHS, the "Attorney General shall [continue to] have such authorities and functions . . . relating to the immigration and naturalization of aliens as were exercised by the Executive [EOIR]"); and (3) the Department of State, which issues visas, the document that gives aliens the right to present themselves at a Port of Entry ("POE") and request admission into the U.S., *see*, *e.g.*, 6 U.S.C. § 236(d)(1)) (establishing that, following creation of DHS, "consular officers" continue as "employees of the Department of State"); 8 U.S.C. § 1202(e) (requiring that application for visas be made to consular officers).

The Immigration and Nationality Act ("INA") provides the statutory basis for noncitizens who arrive in the U.S., "whether or not at a designated port of arrival" and "irrespective of [their] status[ to] apply for asylum." 8 U.S.C. § 1158(a)(1). The Attorney General or Secretary of Homeland Security have discretion to grant asylum to applicants qualifying as refugees. *Id*. § 1158(b)(1)(A). A refugee is defined as a person "unable or unwilling to return to" their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1101(a)(42). "The Attorney General may by regulation establish additional limitations and conditions" on asylum eligibility, so long as such are "consistent with" Section 1158. *Id*. § 1158(b)(2)(C).

The Attorney General and the Secretary of Homeland Security issued the challenged Rule "pursuant to their shared and respective authorities concerning asylum, statutory withhold, and CAT determinations" under the INA. The agencies issued a Notice of Proposed Rulemaking on

February 23, 2023, and received public comments until March 27, 2023. 88 Fed. Reg. at 11,704. The agencies then invoked the foreign affairs and good cause exceptions to the Administrative Procedures Act's ("APA") required 30-day delayed effective date for substantive rules, 88 Fed. Reg. at 31,444-47. The Rule took effect on May 11, 2023. 88 Fed. Reg. at 31,314.

As the Supreme Court recently explained, the parole "authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. 2528, 2543 (2022) (quoting 8 U.S.C. §1182(d)(5)(A)). Thus, DHS "cannot use that power to parole aliens *en masse*." *Texas v. Biden* ("*MPP*"), 20 F.4th 928, 997 (5th Cir. 2021), *rev'd in part on other grounds*, 142 S.Ct. at 2528.

## LEGAL STANDARD

This Court has subject matter jurisdiction over this case and should not dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure. "The plaintiff bears 'the burden of proving the existence of subject matter jurisdiction,' and we may look at materials 'outside the pleadings' in conducting our review." *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019) (citations omitted); *see also Am. Fam. Mut. Ins. Co. v. Vein Centers for Excellence, Inc.*, 912 F.3d 1076, 1081 (8th Cir. 2019) ("[A] motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) raises a factual challenge to the court's jurisdiction, and courts may look to evidence outside the pleadings and make factual findings.") (citing *Davis v. Anthony, Inc.*, 886 F.3d 674, 679 (8th Cir. 2018)). If the jurisdictional issue is "bound up" with the merits of the case, the district court may "decide whether to evaluate the evidence under the summary judgment standard." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018).

Plaintiffs state a claim so this Court should also not dismiss under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). Dismissal under Rule 12(b)(6) is appropriate only if the complaint sets forth no viable cause of action on which relief can be granted. The court must accept all well-pleaded factual allegations in the complaint and the inferences reasonably drawn from them as true and in the light most favorable to the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Little Gem Life Scis., LLC v. Orphan Med., Inc.*, 537 F.3d 913, 917 (8th Cir. 2008).

A complaint need not contain detailed factual allegations, and a plaintiff's claims are subject to dismissal only if no set of facts consistent with the allegations in the complaint would entitle a plaintiff to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for . . . we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)) (alteration in original).

## ARGUMENT

### I.     Plaintiffs Have Article III Standing.

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez***,** 141 S. Ct. 2190, 2203 (2021). "The party invoking federal jurisdiction bears the burden of establishing" each element of standing. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

As mentioned, States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party

to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n. 2 (2006). States are entitled to "special solicitude" in establishing standing. *Massachusetts*, 549 U.S. 497, 520 (2007). And even if Plaintiffs were not entitled to special solicitude, here their harms are obvious. The exceptions make it easier for aliens lacking lawful permission to enter the U.S. and get work authorization. Complaint at ¶¶ 153, 165-68. Even worse, as explained below, the exceptions contravene Congress's express statutory commands.

Defendants contend Plaintiffs lack Article III standing, citing the Supreme Court's ruling in *United States v. Texas* ("*Enforcement Priorities*"), 143 S. Ct. 1964 (2023). But *Enforcement Priorities* is distinguishable because it was based *solely* on the rule that States typically lack standing to compel the Federal Executive Branch to arrest and prosecute someone. *See id*. at 1968, 1970-71. The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to require the Executive Branch to make arrests or bring prosecutions are rare. . .. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id*. at 1974.

This extremely narrow and "highly unusual" case does not apply here. That is because Plaintiffs' injuries are not based on a mere failure to arrest particular aliens on the border—they are based on Defendants' release of aliens into the States via parole—through an adjudicatory process—making them eligible for benefits. This case does not involve any attempt to compel the arrest or prosecution of anyone, it involves the Federal government's actions inviting and then unlawfully paroling people into the country, so *Enforcement Priorities* does not undermine

standing here; none of the relief sought here requires Defendants to take any deportation or criminal action against any particular aliens.

**A. States are injured by the Circumvention Rule.**

Plaintiffs' theory of standing "relies ... on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019). And under binding Supreme Court precedent, injuries arising from such "predictable effect[s]" confer standing. *Id.* Defendants, therefore, are incorrect in their claim that the States' claimed injuries are only "incidental, indirect effects on their public expenditures and general welfare" that "cannot support Article III standing." (MTD at 10.) In *City & County of San Francisco v. USCIS* ("*San Francisco*"), 944 F.3d 773 (9th Cir. 2019), a variety of plaintiffs, including a coalition of 18 States, sued to challenge a proposed new regulation implementing the INA's prohibition on the admission of aliens who might become public charges. *See* 8 U.S.C. 1182(a)(4) (making inadmissible to the U.S. "[a]ny alien who ... is likely at any time to become a public charge"). As here, the federal government argued that the States lacked standing because their claimed harms of the "loss of federal funds and increase in operational costs related to individuals disenrolling from" public benefits were based on an "attenuated chain of possibilities that does not show certainly impending injury." *San Francisco*, 944 F.3d at 787 (cleaned up). Applying the Supreme Court's holding in *Department of Commerce,* the Ninth Circuit squarely rejected this argument, holding that, "the predicted result is premised on the actions of third parties, but this type of 'predictable effect of Government action on the decisions of third parties' is sufficient to establish injury in fact." *Id*. (quoting *Dep't of Commerce*, 139 S. Ct. at 2566).

The Ninth Circuit found such "predictable effect[s]" based on two things: 1) admissions made by the federal government, and 2) "evidence supplied by the States." *Id*. Both such types of

evidence are present in this case. As explained below, DHS's own numbers show that illegal border crossings have *increased* since the adoption of the Circumvention Rule and its many exceptions. And at the motion to dismiss stage, where all well-pled allegations must be assumed to be true, the States have pled sufficient facts to show the harm caused to them by illegal immigration. *See* Complaint ¶¶ 59-120. If this case proceeds to trial, then the administrative record and discovery will provide even more such evidence. But the facts and well-pled allegations presently before this Court are more than enough to show injury to the States sufficient to confer standing.

For example, each individual state is mandated to provide these services and benefits to aliens not lawfully in the U.S.: (1) public education to school-age children[1]; (2) emergency Medicaid for all unauthorized aliens[2]; (3) food stamps[3]; and (4) "any Federal means-tested public benefit."[4] These services and benefits are paid by State agencies and are partially financed from State budgets. Complaint at ¶ 107. And States are already expending significant amounts of money for illegal aliens already present in their borders,[5] and these numbers increase significantly because of the Circumvention Rule. The Supreme Court, in *Enforcement Priorities*, critically, did not say the fiscal injuries suffered by Texas and Louisiana from illegal immigration could not establish injury under Article III, the Court explicitly acknowledged "monetary costs are of course an

---

[1] *Plyler v. Doe*, 457 U.S. 202, 230 (1982).

[2] 42 C.F.R.§440.225(c);

[3] 8 U.S.C. § 1612(2)(L).

[4] 8 U.S.C. § 1613(a).

[5] *See Federation for American Immigration Reform, The Fiscal Burden of Illegal Immigration*, (Mar. 8, 2023).

Indiana has roughly 207,000 illegal aliens; North Dakota has roughly 6,000 to 9,000 illegal aliens; Alaska has roughly 5,000 to 11,260 illegal aliens; Arkansas has roughly 97,000 illegal aliens; Idaho has roughly 83,000 illegal aliens; Iowa was home to an estimated 55,000 to 85,000 illegal immigrants in 2007; Kentucky has roughly 94,000 illegal aliens; Mississippi has roughly 45,000 illegal aliens; Missouri has roughly 104,000 illegal aliens; Montana has roughly 10,000 illegal aliens; New Hampshire has between 11,000 and 19,000 illegal aliens; Oklahoma has roughly 183,000 illegal aliens; South Carolina has roughly 157,000 illegal aliens; Utah has roughly 185,000 illegal aliens; Virginia has roughly 563,000 illegal aliens; and Wyoming has roughly 10,000 illegal aliens. Complaint at ¶¶ 59-104.

States like Indiana and North Dakota shared known numbers of illegal aliens paroled under the Parole + ATD program. For instance, Indiana, between August 2021 and October 2022, was the settling place of nearly 8,000 aliens and as many as 5,000 family units between July 2021 and February 2022. Complaint at ¶¶ 61, 63. North Dakota, between July 2021 and February, was the settling place of as many as 400 family units. Complaint at ¶ 64.

injury." *Enforcement Priorities*, 143 S. Ct. at 1970. Thus, the Circumvention Rule qualifies parolees for benefits.

Moreover, Defendants' reliance on *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973), in *Texas*, 143 S. Ct. at 1970, is misguided. *Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits." *Texas v. United States* ("*DAPA*"), 809 F. 3d 134, 154 (5th Cir. 2015), *aff'd* 579 U.S. 547 (2016). Indeed, an increase in aliens entering the U.S. will also lead to an increase in criminal aliens crossing the border. Criminal aliens impose significant law enforcement costs on Plaintiffs, including costs for the pursuit, prosecution, incarceration, and supervised release of aliens who commit crimes.

Like the injury in *DAPA*, 809 F.3d 134, the Circumvention Rule has and will continue to affect Plaintiffs' expenditures, causing millions of dollars of losses. This is a direct, rather than attenuated cost. Plaintiffs are mandated to provide certain benefits by statute. *See id*. at 153 and Complaint ¶ 107. Here, Plaintiffs have shown their injuries result from the costs incurred by each State because of Defendants' failure to adequately enforce the federal immigration laws and comply with their statutory duties. Accordingly, more aliens continue to make their way to and settle in Plaintiffs resulting in substantial costs. Under the standard enunciated in *Department of Commerce*, these injuries are "fairly traceable" to Defendants' enforcement and immigration policies. *See United States v. State of Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *2 (D. Ariz. Oct. 21, 2011); *Lujan*, 504 U.S. at 562; *cf. Massachusetts v. E.P.A.*, 549 U.S. 497, 524-25 (2007) (finding that where an actual injury was caused by third parties because of a failure of a governmental agency to regulate an identified activity, the injury was traceable enough to the challenged governmental failure to regulate).

**B.      Defendants' claim of a reduction in crossings is contradicted by the most recent border crossing numbers.**

Further, the most up-to-date numbers confirm that illegal border crossings are *increasing,* which confirms the harm the States have alleged. Thus, Defendants' claim of reduced crossings (and thus no injury to the States) following adoption of the Circumvention Rule does not stand up to scrutiny. Defendants claim that "[o]nce the Rule was in effect, irregular entries decreased. From May 12 to July 31, 2023, encounters between POEs at the southwest border decreased by 61 percent compared to the immediately preceding one-week period." (MTD at 13.) However, the "reduction" that Defendants point to is nothing more than a case of cherry-picked numbers. And after Defendants filed their Motion to Dismiss, DHS released more crossing numbers that wholly contradict the claims Defendants make in their Motion to Dismiss. *Owner-Operator Indep. Drivers Ass'n, Inc. v. United States Dep't of Transportation*, 831 F.3d 961, 968 (8th Cir. 2016) (a court may "take judicial notice of publicly available reports").

DHS's updated numbers show that total nationwide encounters with aliens in August have *increased* since July. Total nationwide encounters—including all nationalities—increased to 304,162 in August from 245,213 in July—an astounding 24% increase: *See Nationwide Encounters*, U.S. Customs and Border Protection, https://bit.ly/3tjIiyF (select "2022" and "2023" under "FY"; select "all" under "Citizenship"). The same pattern holds for encounters only along the southwest border, increasing to 232,972 in August from 183,494 in July, a 27% increase. *See Southwest Land Border Encounters*, U.S. Customs and Border Protection, https://bit.ly/3RCmkkD (select "2022" and "2023" under "FY"). And, once again, the trends for FY2022 and FY2023 are similar. The numbers tell a tale 180 degrees at odds with the story Defendants have been telling. In August 2023, CBP encounters with aliens rebounded to levels *higher* than what they were before the Circumvention Rule was adopted.

Additionally, these figures demonstrate that the month-on-month decreases Defendants attributed to the Circumvention Rule have a much simpler (and more logical) explanation. The same month-to-month trends in 2022 closely repeat in 2023. Indeed, most telling is the numbers for August 2023 are significantly higher than for August 2022, which supports States' allegation that the Circumvention Rule and its exceptions have caused higher levels of illegal immigration.

The best evidence available thus contradicts Defendants' claims about decreased illegal immigration. The FY2022 and nationwide figures further confirm that Defendants' interpretation is incorrect. Any decreased immigration that the U.S. experienced from May 12 to July 31, 2023, is more correctly attributed to the hot Southwestern sun than to the Circumvention Rule.

And all indications are that September's numbers are even worse. News reports state that "Border Patrol agents . . . recorded approximately 210,000 apprehensions of migrants who entered the U.S. without authorization in between official ports of entry along the Mexican border, an increase from 181,000 in August, internal statistics from the Department of Homeland Security show." *See* "U.S. immigration agents processed more than 200,000 migrants who crossed the southern border unlawfully in September, *the highest level recorded in 2023*." Montoya-Galvez, Camilo, *Unlawful crossings along southern border reach yearly high as U.S. struggles to contain mass migration*, CBS, https://www.cbsnews.com/news/immigration-unlawful-crossings-along-southern-border-reach-yearly-high/ (Oct. 1, 2023).

Current levels of encounters with illegal aliens are at their highest levels in at least two decades. *Id.* One of the main causes is the Circumvention Rule. Defendants' Motion to Dismiss should therefore be denied.

**C.      Section 1252(f)(1) does not bar relief.**

The Circumvention Rule and its many exceptions rely on, and were issued under, the authority of Section 1182(d)(5), which confers on DHS the authority to parole into the U.S., "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Indeed, the word "parole" appears 212 times in the Circumvention Rule and its preamble. As the Supreme Court recently explained, Section 1252(f) only "deprives courts of the power to issue a specific category of remedies: those that 'enjoin or restrain the operation of 'the relevant sections of the statute," which are "sections 1221 through 1232 of the INA." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). Therefore, Section 1252(f)(1) does not restrict in any way this Court's authority to enjoin the operation of the Circumvention Rule as to the granting of parole to aliens who qualify under the Rule's exceptions.

Nor is Defendants' argument relevant that "[t]he parole processes are not created by the Rule and exist independently of it." (MTD at 18.) The exceptions *are* created by the Circumvention Rule, and it is the exceptions that entitle aliens to receive parole under the Circumvention Rule. This Court, therefore, may enjoin the exceptions and prevent the unlawful grant of parole to aliens who qualify under the unlawful exceptions.

Further bolstering this conclusion is that most of the statutory sections cited as authority for the Circumvention Rule fall outside of Sections 1221 through 1232. The Circumvention Rule cites 32 separate bases of authority for the amendments but only seven of those citations fall within the ambit of Section 1252(f).

Furthermore, even if Section 1252(f)(1) did apply here, it would not foreclose relief. Unlike other provisions in Section 1252 that might entirely prohibit judicial review, Section 1252(f)(1) stands out as merely limiting one otherwise-available form of remedy (*i.e.*, an injunction). Accordingly, Section 1252(f)(1) does not implicate the declaratory relief or vacatur sought by the

States. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999) ("By its plain terms, and even by its title, [section 1252(f)] is nothing more or less than a limit on injunctive relief.").

A bar on injunctive relief does not ordinarily strip courts of authority to issue other forms of relief, such as vacatur or declaratory relief.[6] *See Steffel v. Thompson*, 415 U.S. 452, 472 (1974) ("[T]he only occasions where ... a preclusion of injunctive relief inevitably led to a denial of declaratory relief have been cases in which principles of federalism militated altogether against federal intervention in a class of adjudications.").

Moreover, "there is a 'well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action,' and we will accordingly find an intent to preclude such review only if presented with 'clear and convincing evidence." *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 63–64 (1993) (citations omitted); *see also Regents*, 140 S. Ct. at 1905. Indeed, the APA provides that a "[s]ubsequent statute may not be held to supersede or modify . . . chapter 7 . . . except to the extent that it does so expressly." 5 U.S.C. § 559; *see also, e.g., Citizens for Responsibility & Ethics v. Fed. Elec. Comm'n*, 993 F.3d 880, 889 (D.C. Cir. 2021) (the relevant statute "cannot alter the APA's limitation on judicial review unless it does so expressly.").

"It has never been the policy of Congress to prevent the administration of its own statutes from being judicially confined to the scope of authority granted or to the objectives specified. Its policy could not be otherwise, for in such a case statutes would in effect be blank checks drawn to the credit of some administrative officer or board." *Bowen v. Michigan Acad. of Fam. Physicians*, 476 U.S. 667, 671 (1986) (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). Accordingly,

---

[6] Both vacatur and declaratory relief are traditional APA remedies. Indeed, "vacatur is the default remedy to correct defective agency action." *Nat'l Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 501 (D.C. Cir. 2019).

the government bears a "heavy burden" to show that Congress precluded the States' APA claims. *See Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486 (2015).

Subsection 1252(f)(1) contains no express indication of intent to limit or modify the remedial authority granted by section 706. Nor does it contain "clear and convincing" evidence that Congress intended to deny APA review of executive branch action. The command that a court "shall" "set aside" unlawful agency action thus remains intact. 5 U.S.C. § 706.

Judicial review is therefore available under the APA. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967). If it were otherwise, it would have made no sense for the *Biden* court to remand the case to the district court for consideration of the remaining APA issues. *Biden*, 142 S. Ct. at 2548 ("On remand, the District Court should consider ... whether the October 29 Memoranda comply with section 706 of the APA.").

### 1. This Court has authority to issue declaratory relief.

This conclusion is confirmed by other court decisions. The Supreme Court held in 2019 that "under § 1252(f)(1) ... the [district] court had jurisdiction to entertain the plaintiffs' request for declaratory relief." *Nielsen v. Preap*, 139 S. Ct. 954, 956 (2019). The *Biden* court reaffirmed this holding from *Preap*. *Biden*, 142 S. Ct. at 2540 (citing *Preap* with approval).

Declaratory relief is distinct from injunctive relief and is not even conceivably precluded by section 1252(f). Though a declaratory judgment binds the parties, "Congress plainly intended declaratory relief to act as an alternative" to injunctive relief, *Steffel*, 415 U.S. at 466, because declaratory relief does not directly coerce a party or enjoin any action.

Section 1252(f)(1)'s silence about declaratory relief contrasts with the prior sub-section, which explicitly enumerates "declaratory, injunctive, or other equitable relief." 8 U.S.C. § 1252 (e)(1)(A). The APA similarly distinguishes "declaratory judgments" from "writs of prohibitory or

mandatory injunction." 5 U.S.C. § 703. Yet, section 1252(f)(1) refers to injunctive relief alone. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002) (cleaned up).

A court granting declaratory relief merely "declare[s] the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201; *see Make the Road N.Y. v. Wolf*, 962 F.3d 612, 635 (D.C. 2020) ("[Section 1252(f)] does not proscribe issuance of a declaratory judgment.").

Thus, even if section 1252(f)(1) applies here, it would not limit this Court's power to issue declaratory relief.

### 2. This Court retains authority to vacate the Circumvention Rule.

Section 1252(f)(1) also does not affect a district court's authority under 5 U.S.C. § 706 to vacate and remand the federal government's unlawful Circumvention Rule. This is because, as with declaratory relief, vacatur is distinct from injunctive relief. A district court's authority to set aside or vacate administrative action under 5 U.S.C. § 706 differs from its power to enjoin unlawful action. In *Monsanto Co. v. Geertson Seed Farms*, the Supreme Court distinguished vacatur as a "less drastic remedy" than an injunction. 561 U.S. 139, 165-66 (2010). An order vacating administrative action does not "enjoin or restrain" the INA's operation because vacatur alone does not enjoin anything at all. The relief authorized by section 706(2) is not an injunction, but an order vacating—that is, "hold[ing] unlawful and set[ting] aside"—agency action. 5 U.S.C. § 706(2). *See* Black's Law Dictionary (11th ed. 2019) (defining "set aside" as "to annul or vacate").

Whereas an injunction is an "extraordinary" equitable remedy as to which a court has considerable discretion, *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982), "vacatur is the *default remedy* to correct defective agency action." *National Parks Conservation Ass'n v. Semonite*, 925 F.3d 500, 501 (D.C. Cir. 2019) (emphasis added). The APA mandates that the reviewing court "*shall* ... hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2) (emphasis added); *see Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("shall" "normally creates an obligation impervious to judicial discretion"). Although the APA elsewhere grants courts discretion to withhold the remedy otherwise required by section 706, *see* 5 U.S.C. § 702, exercise of that discretion is appropriate only in carefully defined circumstances not applicable here. *See Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 151 (D.C. Cir. 1993).

Thus, when a reviewing court determines that agency regulations are unlawful, "[t]he ordinary practice is to vacate unlawful agency action." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) (citing 5 U.S.C. § 706(2)). Section 1252(f) does not disturb either this Court's authority to do so or the presumptively appropriate nature of the remedy of vacatur when an agency has violated the APA.

**D.  The States' Claims are Otherwise Redressable and Fall Within the Zone of Interests.**

"In enacting the APA, Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *DAPA*, 809 F.3d at 152. The Circumvention Rule has provided aliens with the ability to enter the U.S. illegally under the Rule's exceptions, which is directly contrary to the INA and the Secure Fence Act. If the Rule and its exceptions did not exist, fewer aliens would be able to meet the strict

standards outlined by Congress to enter the U.S., and thus, there would be less financial burden on Plaintiffs' mandatory provision of benefits.

Defendants fail in their contention that the States are not within the zone of interests. Notably, Defendants gloss over the governing standard: The zone-of-interest requirement is "not ... especially demanding," and the "benefit of any doubt goes to the plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224-25 (2012) (citation omitted). Here, the States need only be "arguably within the zone of interests to be protected or regulated by the statute.'" *Id*. at 224 (citation omitted). The States easily satisfy this "lenient" standard for an APA claim. *Sierra Club v. Trump*, 929 F.3d 670, 703 n.26 (9th Cir. 2019). "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States, which bear many of the consequences of unlawful immigration. *DAPA*, 809 F.3d at 163 (cleaned up) (quoting *Arizona*, 132 S.Ct. at 2500).

While "Congress deemed some unlawfully present aliens ineligible for certain state and local public benefits unless the state explicitly provides otherwise," the benefits at issue in this matter, are federally mandated. Complaint at ¶ 107. Plaintiffs have met the necessary requirements to show Article III standing and Defendants' motion should be denied.

## II.     Plaintiffs have stated viable claims in Counts I-III and VI-VIII.

"[A]dministrative agencies may not act outside the scope of the authority delegated to them by Congress[.]" *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 867–68 (W.D. Wash. 2020); 5 U.S.C. § 706(2)(C). Seven of the eight claims brought by Plaintiffs allege the Defendants' failure to follow the APA, 5 U.S.C. § 706(2). Even "despite the frequent changes within the executive branch, administrative agencies must maintain a sense of consistency,

departing from prior policies only when 'good reasons' support a new direction." *Id.* at 868; *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Plaintiffs' APA claims are asserted under three provisions of the APA. Counts I through IV fall under 5 U.S.C. § 706(2)(A), (C). Counts I through III request the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* Counts IV and V request the agency action be deemed "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and be set aside. *Id.* Counts VI and VII fall under 5 U.S.C. § 706(2)(D), which requires agency action be held unlawful and set aside that is "without observance of procedure required by law."

"The APA establishes a basic presumption of judicial review for one suffering legal wrong because of agency action." *DHS v. Regents of the Univ. of Cal.*, 140 S.Ct. 1891, 1905 (2020) (quotations omitted). Applying that presumption here, this Court should review the challenged policies and Defendants' Motion to Dismiss should therefore be denied.

**A. Plaintiffs allege sufficient facts to show Defendants acted in excess of their statutory authority.**

**1. The Rule's exceptions rely on unlawful programmatic grant of parole.**

Defendants claim that the Circumvention Rule does not create a "programmatic grant of parole." MTD at 21. But the main exception that the Rule relies on is the unlawful programmatic grant of parole to aliens.

The Circumvention Rule relies entirely on creating so-called "lawful, safe, and orderly pathways" that "are authorized separate from this rulemaking." 88 Fed. Reg. at 31,410. The Circumvention Rule adds a regulation that exempts aliens from the Circumvention Rule's rebuttable presumption of ineligibility for asylum if the alien "[w]as provided appropriate

authorization to travel to the U.S. to seek parole, pursuant to a DHS-approved parole process." *Id.*
at 31,322. As the Rule's preamble explains, those pathways are DHS policies to programmatically
grant parole to large classes of aliens, expanding on DHS's prior unlawful programmatic parole
programs for aliens from Cuba, Haiti, Nicaragua, and Venezuela. *E.g., id.* at 31,315-17.

And, as the preamble further explains, those "lawful . . . pathways" will also include the
programmatic grant of parole to aliens who use the CBP App to schedule their unlawful entry into
the U.S. in advance. *Id.* at 31,314 (emphasis added). The Rule itself states that an exception to the
rebuttable presumption is when an alien "[w]as provided appropriate authorization to travel to the
U.S. to seek parole, pursuant to a DHS-approved parole process." 88 Fed. Reg. at 31,450 (creating
exception at new 8 C.F.R. § 208.33(a)(2)(ii)(A)). The Circumvention Rule even goes so far as to
exempt aliens from even needing to use the CBP App to pre-schedule their illegal arrival "if the
alien demonstrates by a preponderance of the evidence that it was not possible to access or use the
DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other
ongoing and serious obstacle." *Id.* (creating exception at new 8 C.F.R. § 208.33(a)(2)(ii)(B)).

But DHS lacks the authority to create a "parole process" involving the programmatic grant
of parole to entire classes of aliens. And because these exceptions to the Circumvention Rule rely
on an unlawful abuse of DHS's extremely limited parole authority, the exceptions to the
Circumvention Rule are unlawful. A plain language reading of the statute makes clear that
programmatic grants of parole are unlawful. Rather, DHS may grant parole "only on a case-by-
case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)

The legislative history, and cases examining it, confirms the intent already evident from
the Illegal Immigrant Reform and Immigrant Responsibility Act's ("IIRIRA") text. "Congress
enacted [IIRIRA] in a comprehensive effort to strengthen and tighten the immigration laws."

*Arevalo v. Ashcroft*, 344 F.3d 1, 4 (1st Cir. 2003). The House Conference Report on IIRIRA similarly made plain that the bill's purpose was "to improve deterrence of illegal immigration to the United States by . . . reforming exclusion and deportation law and procedures." H.R. REP. NO. 104-828, at 1,199 (1996) (Conf. Rep.). President Clinton's signing statement described IIRIRA as "landmark immigration reform legislation that ... strengthens the rule of law by cracking down on illegal immigration at the border, in the workplace, and in the criminal justice system." 32 Wkly. Comp. Pres. Doc. 1935 (1996), *reprinted in* 1996 U.S.C.C.A.N. 3388, 3391 (Sep. 30, 1996).

"Congress, in IIRIRA, specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States. . ..'" *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 (2d Cir. 2011). "The legislative history indicates that this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Id.* at n.15 (citing H. R. Rep. No. 104–169, pt. 1, at 140–41 (1996)). "Congress responded in IIRIRA by narrowing the circumstances in which aliens could qualify for 'parole into the United States' under § 1182(d)(5)(A) . . .." *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1119 (9th Cir. 2007).

If more clues were needed, Congress entitled the IIRIRA amendment to the parole provisions, "limitation on use of parole." Pub. L. No. 104-208, 110 Stat. 3009, § 602; *see Ram*, 243 F.3d at 514 n.3 (section headings and titles "may be used to interpret its meaning").

Accordingly, the exceptions' reliance on the CBP App and daily grants of parole to thousands of aliens also runs headlong into the Fifth Circuit's holding that a programmatic parole provision violates § 1182(d)(5)(A): "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *Texas,* 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en*

*masse.*" *Id.* at 997. Yet the exceptions of the Circumvention Rule rely on precisely the type of programmatic parole that the INA expressly prohibits.

### 2. The Rule violates the Secure Fence Act by incentivizing unlawful entries.

In 2006, Congress passed the Secure Fence Act, which requires the Secretary of Homeland Security to "take all actions the Secretary determines necessary and appropriate to achieve and maintain operational control over the entire international land and maritime borders of the United States." Secure Fence Act of 2006, Pub. L. No. 109–367, 120 Stat 2638 (2006) (codified as 8 U.S.C. § 1701 note). Congress specifically defined "operational control" to mean "the prevention of *all unlawful entries* into the United States, including entries by terrorists, *other unlawful aliens*, instruments of terrorism, narcotics, and other contraband." *Id*. (emphasis added). Defendants incorrectly claim there is no inconsistency between the Secure Fence Act and the Circumvention Rule. Dkt. 57-1 at 23. The Circumvention Rule violates the Secure Fence Act because, as discussed above and in the Complaint, rather than preventing unlawful entries into the U.S., the Rule, through its exceptions, incentivizes them.

Defendants cite the unpublished decision in *United States v. State of Arizona*, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) for the proposition that DHS and the Secretary have discretion in how to maintain operational control. The APA still applies, however, because the Secure Fence Act does not confer unbounded discretion, but instead provides a "meaningful standard against which to judge the agency's exercise of discretion." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). This is because the Secure Fence Act requires that DHS "achieve and maintain operational control over the entire international land and maritime borders of the United States." Secure Fence Act § 2(a).

Thus, the Defendants' reliance on *Arizona* is inapposite. 2011 WL 13137062. In that case, Arizona sought generalized "injunctive, declaratory, and mandamus relief requiring that the United States, the DHS, and the Secretary achieve and maintain operational control of the Arizona-Mexico border, complete 700 miles of fencing, and take temporary measures to protect Arizona." *Id*. at *7. In contrast, in this case, the States are not seeking a generalized injunction requiring the Federal Government to secure the border. Rather, the States are specifically arguing that Defendants' Circumvention Rule's exceptions are unlawful and should be set aside. The States are not asking this Court to dictate particular enforcement decisions to Defendants, but rather simply asking it to set aside unlawful agency action.

Defendants themselves concede that aliens making asylum claims "can wait in the United States for years before being issued a final order denying relief, and that many such individuals are never actually removed, likely incentivizes migrants to make the journey north." Complaint at ¶ 149 (citing 88 Fed. Reg. at 11,704, 11,716). Defendant Raul Ortiz, Chief of Border Patrol, admitted that when citizens of other countries perceive that immigration policy has become more favorable to them, they are more likely to cross United States borders illegally. Complaint at ¶ 52 (citing *Florida v. United States*, No. 21-CV-1066, ECF No. 78-3 at 59:12-60:5, 67:22-68:5, 171:13-172:9, 173:7-12 (N.D. Fla. 2021)).

Not only have Defendants made explicit admissions, the Circumvention Rule itself acknowledges that "the purpose and effect of this rule is not to return noncitizens to Mexico pending their removal proceedings" but instead "to incentivize migrants, including those intending to seek asylum, to use lawful, safe, and orderly pathways to enter the United States." Complaint at ¶ 157 (citing 88 Fed. Reg. 31,329). The Rule's effect is therefore to unlawfully parole aliens *en masse* into the U.S. Thus, the central objective of the Secure Fence Act (the prevention of unlawful

entries) has been controverted by use of the Rule's exceptions, and those exceptions, therefore, are beyond Defendants' statutory authority.

### 3. The Circumvention Rule replaces the visa system with an immigration system created entirely by Defendants.

Defendants note that the creation of the CBP App is wholly separate from the Circumvention Rule. While that may be true, it is irrelevant. It is the use of the CBP App and its effect on the immigration process as contemplated by the Circumvention Rule that is at issue. The Circumvention Rule grants an exception to the rebuttable presumption when the CBP App is used to schedule their unlawful entry into the U.S. in advance. Complaint at ¶ 125 (citing 88 Fed. Reg. at 31,314). Furthermore, Defendants' argument that "[t]he Rule nowhere confers a visa or any similar immigrant or nonimmigrant status on anyone" is a *non sequitur*. The whole point of Count III is that the Circumvention Rule replaces the lawful visa system created by Congress with a replacement immigration system entirely created by Defendants.

Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). The Major Questions Doctrine is a principle of statutory interpretation under which courts will not assume that Congress has assigned to the Executive Branch questions of "deep 'economic and political significance'" unless Congress has done so expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

In *West Virginia v. EPA,* the Supreme Court explained that the Major Questions Doctrine required applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue.... Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." 142 S. Ct. 2587, 2609 (cleaned up).

A central characteristic of our constitutional republic is that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* Thus, the Supreme Court explained that "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme. . .. We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also King*, 576 U.S. at 486; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Here, the federal government is doing exactly what the Supreme Court said the executive cannot do. It is using the Circumvention Rule, and its reliance on the CBP App, as a way of ignoring and circumventing the channels of immigration that Congress has established.  There can be no doubt that one of the questions of deepest political significance is whom the government allows into our country, especially for long-term or permanent residence. *King*, 576 U.S. at 486.

Congress manifestly did *not* expressly or clearly authorize the Circumvention Rule and its many exceptions when it adopted Section 1182(d)(5). The very structure of the INA makes this abundantly clear because Congress already created an entirely separate system that is strikingly similar to the CBP App's reliance on Advance Travel Authorization ("ATA") and the grant of parole; specifically, our country's system for issuing visas.

Congress gets to decide how aliens may enter the U.S. The Circumvention Rule is part of the Defendants' apparent attempt to create a new, parallel immigration system purportedly under the limited parole authority granted in Section 1182(d)(5)(a). On its face, Section 1182(d)(5) does not contain within it a clear and unambiguous grant of such vast authority. It becomes abundantly clear in the context of our immigration system as a whole.

Congress would not have adopted dozens of statutory sections setting forth immigration requirements in detail, just for one small subparagraph to confer on the executive the authority to replace all of that with its own alternate system. The statutory scheme that Congress created to establish our visa system is intricate and detailed. The Circumvention Rule relies on a parole program that copies some of those elements, complete with application forms for aliens and numerical quotas. However, at every step of the process, the parole program omits significant elements and requirements that Congress has imposed and instead replaces them with far less stringent requirements; often replacing them with nothing at all and merely eliminating those congressional requirements. If Congress had meant for something like the CBP App and ATA process to be established, it would have set it up. It didn't. The Circumvention Rule is therefore illegal because it relies on the unlawful CBP App and ATA process.

The Circumvention Rule relies on CBP App and an alien's application through the CBP App for ATA. Defendants have explained that CBP App allows aliens to "schedule a time to arrive at [POE] along the [Southwest Border], to allow an increasing number of migrants who may wish to claim asylum to request an available time and location to present and be inspected and processed at certain POEs." *Circumvention of Lawful Pathways*, 88 Fed. Reg. 31314 at 31317 (May 16, 2023). One "function[] of the CBP One app" is its "Advance Travel Authorization ('ATA') functionality." *Id*. at 31401. CBP App requires that, before arriving at a POE, aliens enter "limited biographic information into CBP One and submit a live photo." 88 Fed. Reg. at 1264; 88 Fed. Reg. at 1253; 88 Fed. Reg. at 1276.

As with ATAs, visas do not give aliens the right to enter the U.S., but only to travel to a POE and request admission. 8 U.S.C. § 1201(h) (nothing in the INA "shall be construed to entitle any alien, to whom a visa ... has been issued, to be admitted the United States, if, upon arrival ...

he is found to be inadmissible.... The substance of this subsection shall appear upon every visa application."). Like with ATAs, when aliens with valid visas arrive at POEs, CBP officers decide whether the alien is admissible and whether to allow the alien to enter the country. 8 C.F.R. § 235.1(f)(1) ("Each alien seeking admission at a United States port-of-entry ... must establish to the satisfaction of the inspecting officer that the alien is not subject to removal ... and is entitled, under all of the applicable provisions of the immigration laws and this chapter, to enter the United States.").

Unlike ATAs, however, the visa process enacted by Congress and implemented through authorized regulation is stricter and much more involved. Defendants' use of the word "limited" is apt, when they describe the ATA process as merely involving the collection of only "limited biographic information." 88 Fed. Reg. at 1264; 88 Fed. Reg. at 1253; 88 Fed. Reg. at 1276.

For example, Congress has defined 22 different classifications of non-immigrant visas covering a variety of possible allowable travel purposes, and concomitant restrictions and limitations. 8 U.S.C. 1101(a)(15)(A)-(V) (defining 22 different classifications of non-immigrant visa); *see also*, *e.g.*, *id*. § 1182(a) (setting forth factors making an alien ineligible for a visa and inadmissible to the U.S.); *id*. § 1184 (imposing specific visa classification-based restrictions and limitations for several different visa categories).

Congress has also established numerical limitations and quotas for a variety of different visa classifications. *E.g.*, *id*. § 1151 (imposing annual numerical caps for various immigrant visa classifications); *id*. § 1184(e) (imposing "annual numerical limit" on certain nonimmigrant professionals); *id*. § 1184(g) (imposing "limitation on numbers" of [t]emporary workers and trainees"); *id*. § 1184(p) (imposing "numerical limitations" on annual number of recipients of visa for certain victims of crimes). Congress has also imposed specific requirements for the documents

aliens must have to enter the U.S. *E.g. id.* § 1181 (imposing documentary requirements for admission of immigrant aliens); *id.* §§ 1201, 1204 (imposing standards and requirements for issuance of visas); *id.* § 1202 (imposing requirements for visa applications).

Furthermore, Congress has empowered the Secretary of State, and *not* the Defendants, to issue regulations for the issuance of entry documents into the U.S. *See, e.g.,* § 1202 (making nine separate references to regulations "prescribed" or "issued" related to issuance of visas and specifically providing for "regulations issued by the Secretary of State" and empowering the Secretary of State with discretion to establish different "application forms for the various classes of nonimmigrant admissions"). Indeed, the Secretary of State has established a detailed regulatory scheme for the issuance of visas, including detailed visa application forms, and procedures for the assessment of aliens for ineligibility for admission into the U.S. and for national security and public health and safety. 22 C.F.R. §§ 40.1–46.7.

The requirements that an alien must fulfill to get a visa are extensive. For example, to get an immigrant visa, aliens must pay a substantial fee of between $205 and $345 for each applicant applying for an immigrant visa, and a fee between $185 and $315 for each applicant applying for a nonimmigrant visa, and an identical fee must be paid for every member of a family, including children. Dep't of State, *Fees for Visa Services,* (accessed Sep. 25, 2023) https://tinyurl.com/uhdz4x5e. Then, aliens must appear in person for a visa interview with a Department of State consular officer at an embassy or consulate. 8 U.S.C. § 1202(e). Aliens applying for immigrant visas must submit to a number of other requirements, such as comprehensive medical exams, 42 C.F.R. § 34.1 et seq.; strict vaccination requirements, 8 U.S.C. § 1182(a)(1)(ii); and must provide conclusive proof that they have the financial means to support themselves. 8 U.S.C. §§ 1182(a)(4) and 1183a.

Through its exceptions, the Circumvention Rule evades the process Congress has created for immigration into the U.S.—it completely ignores numerous limits Congress has imposed, such as numerical quotas and caps, visa security requirements, required visa fees, security and medical vetting, and affidavits of support to prove aliens have sufficient financial support.

The ATA process allows aliens to travel to the U.S. without a visa. Congress, however, has already implemented such a process. For countries with populations representing a low risk of overstaying in the U.S., Congress has created the Visa Waiver Program ("VWP"), 8 U.S.C. § 1187, which allows visa-free travel for temporary non-immigrant travelers who fill out a simple form through the Electronic System for Travel Authorization. Nearly all aliens taking advantage of the Circumvention Rule are from non-VWP countries. Yet even though Congress has clearly established that these aliens do not qualify for visa-free travel to the U.S., Defendants have created by executive fiat what is essentially a parallel system for visa-free immigration to the U.S. for aliens from countries with populations with a high risk of overstaying in the U.S.

The Circumvention Rule's parole program creates an entirely new and parallel immigration system never authorized by Congress. If that were not bad enough, this new system lacks most of the procedures and protections that Congress has carefully created and imposed.

The parole statute does not contain a clear and unambiguous grant of authority to establish a new, parallel system for the visa-free immigration to the U.S. of hundreds of thousands of aliens every year, in perpetuity. When Congress wrote the statutory section that establishes the VWP, it used 8,635 words. *Id.* In contrast, Congress only used 190 words to draft the statutory subsection that confers the parole authority. *Id.* § 1182(d)(5). Defendants are trying to shoehorn their gargantuan new immigration system into the "modest words, vague terms, [and] subtle devices"

of a small subsection buried in the middle of one section out of the 208 sections of the INA. *West Virginia v. EPA*, 142 S. Ct. at 2609 (cleaned up).

"Congress . . . does not . . . hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001). And Congress did not hide the elephant of an entirely new immigration system in the mousehole of Section 1182(d)(5).

**B. Defendants have violated the APA's notice and comment requirements.**

The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register. Complaint at ¶ 171 (citing 5 U.S.C. § 553(b)). Interested persons must be given "an opportunity to participate in the rule making through submission of written data, views, or arguments. *Id*. (citing 5 U.S.C. § 553(c)). The effect of allowing interested parties the opportunity to participate "enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." Complaint at ¶ 172 (quoting *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n. 17 (5th Cir. 1984)). Exceptions to this rule include interpretive rules, general statements of policy, or a rule affecting agency organization, procedure, or practice. Complaint at ¶ 173. The Circumvention Rule certainly does not fall under any of the listed exceptions.

**1. The changes in the Circumvention Rule are not a "logical outgrowth" of the Proposed Rule.**

With certain exceptions that Defendants do not try to invoke here, the APA requires rulemaking to be conducted through notice-and-comment procedures. *See* 5 U.S.C. § 553(b)-(c). A notice of proposed rulemaking thus must include "the terms or substance of the proposed rule or a description of the subjects and issues involved. *Id.* § 553(b). And the public must be given a chance to comment on the proposed rule, *id.*, § 553(c), which the agency then must respond to,

*see*, *e.g.*, *HBO v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977) ("[T]he opportunity to comment is meaningless unless the agency responds to significant points raised by the public.").

To evaluate whether the notice provided is sufficient, federal courts use the "logical outgrowth" test. Under that test, "the final rule the agency adopts must be "a 'logical outgrowth' of the rule proposed. The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). "If interested parties should have anticipated that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule." *Am. Coke & Coal Chemicals Inst. v. E.P.A.*, 452 F.3d 930, 938–39 (D.C. Cir. 2006) (cleaned up).

A "final rule" that is "'surprisingly distant' from the proposed rule" fails the logical outgrowth test. *International Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1260 (D.C. Cir. 2005) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 245 (D.C. Cir. 2003) (citation omitted)). The Eighth Circuit engages in a "fair notice" inquiry that requires that "the notice must be sufficient to give interested persons an opportunity to participate in the rule making." *Citizens Telecommunications Co. of Minnesota, LLC v. Fed. Commc'ns Comm'n*, 901 F.3d 991, 1005 and n.11 (8th Cir. 2018) (cleaned up) (noting "[t]here is no meaningful difference between the" logical outgrowth test and the Eighth Circuit's traditional "fair notice" standard). If a final rule "did not allow for informed participation by interested parties in that portion of the rulemaking, [then] its notice was insufficient." *Id.* (cleaned up).

Here, the changes in the Circumvention Rule "did not allow for informed participation" by the States and "its notice was insufficient" under any reasonable understanding of those terms. Defendants never even claim that the Circumvention Rule is a logical outgrowth of the Proposed

Rule. Merely skimming Defendants' *2,700-plus-word summary* of the *6 major changes* they made from the proposed rule is sufficient to conclude that the deviations here wildly exceed the "fair notice" standard. The result is a final rule that is radically different from what was proposed to the public and on which the public submitted comments. This does not comport with 5 U.S.C. § 553.

The six changes to the Circumvention Rule are not a "logical outgrowth" of the Proposed Rule because a "reasonable commenter" would not "have anticipated that such ...requirement[s] would be promulgated," and the Circumvention Rule did not provide notice "sufficient to advise interested parties that comments directed to the controverted aspect of the final rule should have been made." *First Am. Discount Corp. v. Commodity Trading Futures Ass'n*, 222 F.3d 1008, 1015 (D.C. Cir. 2000) (cleaned up). The Circumvention Rule therefore may not take effect until commenters are provided "their first occasion to offer new and different criticisms which the agency might find convincing." *Ass'n of Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058-59 (D.C. Cir. 2000) (citation omitted).

In any event, even if all 6 major changes were individually logical outgrowths, the *cumulative effect* of all the changes renders the final rule "surprisingly distant" and "deviat[ing] too sharply" from the proposal, thereby violating the APA. Any other outcome would undermine the logical outgrowth test's purpose of ensuring "fair notice." *Citizens Telecommunications Co.*, 901 F.3d at 1005 n.11. Again, the "'essential inquiry' … 'is whether the commentators have had a fair opportunity to present their views on the contents of the final plan.'" *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985) (citation omitted). No such "fair opportunity" was present here. The final rule deviates so profoundly from the proposed rule that no one could fairly have commented on anything that remotely looked like the former without having to "divine

[DHS's and DOJ's] unspoken thoughts." *International Union*, 407 F.3d at 1260. The APA prevents agencies from engaging in those kinds of tactics.

Specifically, as for the second change, the fact that the rebuttable presumption would continue to apply in perpetuity after the Rule's expiration, Defendants maintain they received and responded to Comments. MTD at 27. Defendants can't just simply skirt the issue. The Comments do not specifically address the substance of this change; the Comments focus on the concerns about the temporary nature of the Rule and whether there is enough time to evaluate the Rule's effectiveness. See 88 Fed. Reg. at 31,422. In other words, the Comments only speak to the two-year period and do not touch on the application in perpetuity to aliens rebutting the presumption. Thus, there was no opportunity or notice for Plaintiffs to submit meaningful comment.

As for the fourth change, Defendants expanded the applicability of the Rule for unaccompanied alien children. MTD at 29. Defendants concede the initial Rule did not specify whether the child must qualify as to when the child is determined as unaccompanied. *Id.* Defendants contend they merely clarified that it was at entry rather than at the time of adjudication and place the burden on Plaintiffs essentially saying that because of all the other portions of the Rule on entry, they should have known that what was happening here as well. Plaintiffs should not have been placed in this position. Unaccompanied children at entry versus unaccompanied children at adjudication is likely to result in drastically different numbers. Again, Plaintiffs are highly invested as to this exception because of the federally mandated benefits applied partially from the pockets of Plaintiffs (i.e., public education to school-age children[7]; emergency Medicaid for all

---

[7] *Plyler v. Doe*, 457 U.S. 202, 230 (1982).

unauthorized aliens[8]; food stamps[9]; etc.). Plaintiffs should have been afforded an opportunity to submit meaningful Comment on this substantive so-called "clarification."

As for the fifth change, Defendants contend they sought Comment on the expansion of the family unity provision. MTD at 29. But that is a substantial change. Defendants added to the provision that noncitizens who have spouses or minor children are eligible to join them under the asylum statute. *Id.* at 30. This expansion will create a greater influx of aliens to the U.S., and thus States. For the same reasoning regarding unaccompanied minors, the provision of federally mandated benefits applied partially from the pockets of Plaintiffs. Plaintiffs should have been afforded an opportunity to submit meaningful Comment on this substantive expansion of the Rule's exception.

### 2.     The States' comments were not adequately considered.

The Circumvention Rule failed to take account of the States' comments, either summarily rejecting them without substantive explanation, or outright ignoring them. For example, a coalition of 22 states that includes most of the Plaintiffs submitted a 15-page comment that raised general concerns, as well as five specific comments about serious deficiencies in the proposed rule, particularly focused on the exceptions and the CBP App. *See* Comment Submitted by Indiana and 21 other States, USCIS-2022-0016-12295 at 8 (Mar. 27, 2023), https://tinyurl.com/3jyd4hnd. Defendants ignored much of the States' comment and, for the aspects of the comment that they purported to address, they summarily disposed of the States' comment in a cursory, dismissive fashion that refused to offer any substantive legal or factual basis for dismissing the States' comment. *E.g.*, 88 Fed. Reg. at 31,438 (cursorily rejecting States' reliance concerns without offering substantive legal or factual justification for rejection). Thus, the exceptions to the

---

[8] 42 C.F.R.§440.22(C);
[9] 8 U.S.C. § 1612(2)(L).

Circumvention Rule must be "held unlawful and set aside" as they were promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

The whole purpose of the notice and comment requirement is to "provid[e] a forum of the robust debate of competing and frequently complicated policy consideration having far-reaching implication and, in so doing, foster reasoned decisionmaking." *NRDC*, 894 F.3d. at 115.

In contrast to these requirements, Defendants summarily dismissed the States' concerns. The totality of Defendants' response was simply to state the following:

> With respect to commenters' statement that States have significant reliance interests in the Federal Government's enforcement of the immigration laws, this rule does not set any policy against enforcement of the immigrations laws. Commenters' objections to other enforcement policies, or any lack thereof, have little relationship to this rule, which, as previously stated, creates a rebuttable presumption of asylum ineligibility for certain migrants who enter the United States at the southwest land border or adjacent coastal borders after traveling through a third country during a designated period. The Departments are unaware of any existing policies altered by this rule in which States have a substantial reliance interest. For example, States cannot have substantial reliance interests in the Proclamation Bar IFR or TCT Bar Final Rule because neither rule is being enforced.

88 Fed. Reg. 31,438.

This is wholly insufficient. "'Stating that a factor was considered ... is not a substitute for considering it.'" *State v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021). The agency must provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016). By not offering any substantive legal or factual basis for ignoring or dismissing the coalition's comment, Plaintiffs were not able to effectively participate in the formation of a Rule that directly impacts their mandated benefits or State budgets. Thus, Defendants did not engage properly in observance of the procedure required by law, and Plaintiffs must have the opportunity to engage in robust discussion since their injuries

result from Defendants failure to consider all ramifications of enacting the Circumvention Rule and its exceptions to the rebuttable presumption.

C. **An *ultra vires* claim is viable and Plaintiffs alleged sufficient facts to show Defendants acted *ultra vires*.**

Count VIII contends the Government acted unconstitutionally and engaged in *ultra vires* agency action. The Supreme Court recognized the right to assert a cause of action for non-statutory review of executive action in *American Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902). "The reasoning of *McAnnulty* has been employed repeatedly," until the present day. *Chamber of Com. of U.S. v. Reich* ("*Reich*"), 74 F.3d 1322, 1327 (D.C. Cir. 1996). "[G]enerally, judicial review is available to one who has been injured by an act of a government official which is in excess of his express or implied powers." *Id*. "Courts will ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Id*. at 1328. (cleaned up).

Such *ultra vires* claims have been successfully asserted in a variety of contexts. Courts have held there to be a valid non-statutory cause of action against (1) an "Executive Order barring the federal government from contracting with employers who hire permanent replacements during a lawful strike," *Chamber of Com. v. Reich*, 74 F.3d 1322, 1324 (D.C. Cir. 1996); (2) travel bans, *Hawaii v. Trump*, 878 F.3d 662, 672 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); (3) claims against the Secretary of Commerce for acting "in excess of his delegated authority under the [Export Administration Act]," even though the statute precluded judicial review, *United States v. Bozarov*, 974 F.2d 1037, 1045 (9th Cir. 1992); and (4) the President's construction of a border wall, *Sierra Club v. Trump*, 963 F.3d 874, 891–93 (9th Cir.), *vacated*[10] *on*

---

[10] A vacated case in the Ninth Circuit "'continues to have persuasive force.'" *Hart v. Massanari*, 266 F.3d 1155, 1159 (9th Cir. 2001); *see also United States v. Clark*, 617 F.2d 180, 184 (9th Cir. 1980).

*other grounds sub nom. Biden v. Sierra Club*, No. 20-138, 2021 WL 2742775 (U.S. July 2, 2021) (cleaned up).

If these all fall within the scope of federal action that may be challenged through non-statutory action, then an unprecedented, sweeping, and unlawful executive action to incentivize increased illegal immigration does too.

### 1. *Ultra vires* remains a viable cause of action after enactment of the APA.

The Supreme Court has never overruled the *McAnnulty* rule allowing for non-statutory review of *ultra vires* actions. Nor has Congress abrogated it through statute. "[N]othing in the subsequent enactment of the APA . . . repeal[ed] the [doctrine allowing] review of *ultra vires* actions . . .. [W]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* (citation omitted); *see Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988) (explaining that the APA's reviewability limitation in Section 701 "serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review"— "not repeal the review of ultra vires actions that was recognized long before" the APA).

This is true also for actions challenging executive actions as *ultra vires*: "when Congress limits its delegation of power, courts infer (unless the statute clearly directs otherwise) that Congress expects this limitation to be judicially enforced. The passage of the APA has not altered this presumption. Prior to the APA's enactment courts had recognized the right of judicial review of agency actions that exceeded authority, and nothing in the subsequent enactment of the APA altered that doctrine of review to repeal the review of *ultra vires* actions. When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Sierra Club v. Trump*, 963 F.3d at 891. Thus, "review is ordinarily available when an agency exceeds its delegation of authority," *Id.* (citing *Reich*, 74 F.3d at 1325–26).

Defendants cannot ignore federal statutes. The States have a non-statutory cause of action to challenge the government's unlawful, *ultra vires* conduct, which does indeed "survive[] displacement by the APA." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (citing *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 690–91 (1949)). Thus, review is available to parties who lack any future alternate remedy for judicial review of unlawful agency action. *Leedom v. Kyne*, 358 U.S. 184, 188-90 (1958); *see also Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin.*, 502 U.S. 32, 43-44 (1991) (holding *Kyne* not to apply where there was an available "meaningful and adequate opportunity for judicial review of the. . . regulation").

### 2. Even if a statute otherwise bars review, an *ultra vires* claim is viable.

Even where a statute would otherwise bar review, the Supreme Court has long recognized an exception for plaintiffs alleging *ultra vires* action. *See Kyne,* 358 U.S. at 188-90. Even if Defendants were right when they contend that Section 1252(f) precludes review here, Plaintiffs' *ultra vires* claim would still survive. The *Kyne* exception permits courts to review claims seeking "to strike down [administrative action] made in excess of [an agency's] delegated powers and contrary to ... specific" statutory language, even if a statute purports to "foreclose[] review ... in a District Court." *Id.* at 188; *see also Breen v. Selective Serv. Loc. Bd. No. 16, Bridgeport, Conn.*, 396 U.S. 460, 467–68 (1970) (holding the draft board had strayed beyond its statutory mandate and acted in a lawless manner and thus *utra vires* exception applied); *Oestereich v. Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne, Wyo.*, 393 U.S. 233, 238–39 (1968) (same).

In *Kyne*, the NLRB claimed that the National Labor Relations Act, 9 U.S.C. § 159(d), precluded district court jurisdiction to review NLRB actions except under specific circumstances not present in that case. 358 U.S. at 188. The Supreme Court rejected that argument. It held that district courts retain authority to review agency action: "If the absence of jurisdiction of the federal

courts meant a sacrifice or obliteration of a right which Congress had created, the inference would be strong that Congress intended the statutory provisions governing the general jurisdiction of those courts to control." *Id.* at 190. The district court thus had jurisdiction in *Kyne* because that action was "an attempted exercise of power that had been specifically withheld [by Congress]" and, as such, the NLRB was acting "in excess of its delegated powers and contrary to a specific prohibition in the Act." *Id.* at 184.

This case fits squarely within the *Kyne* exception. Here, the States allege that Defendants have acted beyond the limits of their statutory authority under the INA, and the Secure Fence Act in an unlawful attempt to facilitate illegal immigration into the U.S. and improperly expand DHS's control over the admission of aliens into the country beyond the plain language of the statutes and beyond Congress's clear intent. DHS's actions are thus patently *ultra vires*.

"[A] clear departure from designated authority *demands* judicial review." *Manges v. Camp*, 474 F.2d 97, 99 (5th Cir. 1973) (emphasis added). Federal district courts may exercise Article III jurisdiction under *Kyne* to enjoin administrative enforcement actions where agency action is *ultra vires*. *See, e.g.*, *Terminal Freight Handling Co. v. Solien*, 444 F.2d 699, 703 (8th Cir. 1971) ("the district court had jurisdiction ... to determine whether ... [agency] action exceeded ... delegated powers"). "[T]he question of whether actions of an agency or commission are *ultra vires* is whether there is a 'plain violation of an unambiguous and mandatory provision of the statute. . . . [The dispute] must come down to whether the agency's action was a clear departure from the statutory mandate or an abridgment of an interested party's statutory right." *United States v. Feauto*, 146 F. Supp. 3d 1022, 1031 (N.D. Iowa 2015) (quoting *Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 962 (8th Cir. 2014)).

If this Court finds that relief is unavailable to Plaintiffs under the APA, then the exceptions would still be reviewable as *ultra vires* action under *Kyne* since the States would otherwise be deprived of "meaningful and adequate means of vindicating [their] rights." *MCorp Fin., Inc.*, 502 U.S. at 43.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Respectfully Submitted,

*/s/ Philip Axt*
Drew H. Wrigley, Attorney General
Philip Axt (ND Bar No. 09585),
Solicitor General
North Dakota Attorney General's Office
600 E Boulevard Ave, Dept. 125
Bismarck, ND 58505
(701) 328-2210 / pjaxt@nd.gov
*Counsel for Plaintiff State of North Dakota*

*/s/ Betsy DeNardi*
Betsy M. DeNardi, 23856-71
Director of Complex Litigation
Office Of the Indiana Attorney General
I.G.C.S, 5th Floor, 302 W Washington St.
Indianapolis, IN 46204
(317) 232-6231 / Betsy.DeNardi@atg.in.gov
*Counsel for State of Indiana*

*s/Christopher A. Robinson*
Treg Taylor, Attorney General of Alaska
Cori M. Mills, Deputy Attorney General
Christopher A. Robison,
Assistant Attorney General
Alaska Bar No. 2111126
Texas Bar No. 24035720
Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501-1994
chris.robison@alaska.gov
*Counsel for the State of Alaska*

*s/ Dylan L. Jacobs*
Tim Griffin, Arkansas Attorney General
Nicholas J. Bronni, Solicitor General
Dylan L. Jacobs, Deputy Solicitor General
Office Of the Arkansas Attorney General
323 Center St, Ste 200, Little Rock, AR 72201
Nicholas.Bronni@Arkansasag.Gov
*Counsel for the State of Arkansas*

*s/ James H. Percival*
James H. Percival, Chief of Staff
Ashley Moody, Attorney General
Office of the Attorney General
The Capitol, PL-01, Tallahassee, FL 32399
james.percival@myfloridalegal.com
*Counsel for the State of Florida*

*s/Joshua N. Turner*
Raúl R. Labrador, Idaho Attorney General
Theodore J. Wold, Solicitor General
Joshua N. Turner, Deputy Solicitor General
Idaho Attorney General's Office
Statehouse, Room 210, Boise, ID 83720
Josh.Turner@ag.idaho.gov
*Counsel for the State of Idaho*

*/s/ Eric H. Wessan*
BRENNA BIRD, Attorney General of Iowa
Eric H. Wessan, Solicitor General
1305 E. Walnut Street, Des Moines, IA 50319
eric.wessan@ag.iowa.gov
*Counsel for State of Iowa*

*s/Marc Manley*
Daniel Cameron, Attorney General of Kentucky

Marc Manley, Associate Attorney General
Kentucky Office of the Attorney General
700 Capital Ave, Ste 118, Frankfort, KY
*Counsel for the Commonwealth of Kentucky*

*/s/ Justin L. Matheny*
Justin L. Matheny (MS Bar No. 100754),
Deputy Solicitor General
Mississippi Attorney General's Office
P.O. Box 220, Jackson, MS 39205-0220
justin.matheny@ago.ms.gov
*Counsel for State of Mississippi*

*s/Joshua Divine*
Andrew Bailey, Missouri Attorney General
Joshua M. Divine, Solicitor General
Maria A. Lanahan, Deputy Solicitor General
Post Office Box 889, Jefferson City, MO 65101
Josh.Divine@ago.mo.gov
Maria.Lanahan@ago.mo.gov
*Counsel for the State of Missouri*

*/s/ Christian B. Corrigan*
Austin Knudsen, Attorney General
Christian B. Corrigan, Solicitor General
Montana Department of Justice
P.O. Box 201401, Helena, MT 59620-1401
christian.corrigan@mt.gov
*Counsel for the State of Montana*

*s/ Brandon F. Chase*
John M. Formella, Attorney General
Brandon F. Chase, NH Bar No. 270844,
Assistant Attorney General
New Hampshire Department of Justice
33 Capitol Street, Concord, NH  03301
brandon.f.chase@doj.nh.gov
*Counsel for the State of New Hampshire*

*/s/ Garry M. Gaskins, II*
Gentner F. Drummond, Attorney General
Garry M. Gaskins, II, Solicitor General
Zach West, Director of Special Litigation
Audrey A. Weaver, Assistant Solicitor General
Oklahoma Attorney General's Office
313 N.E. 21st Street, Oklahoma City, OK 73105
*Counsel for the State of Oklahoma*

*/s Joseph D. Spate*
Alan Wilson, South Carolina Attorney General
Robert D. Cook, Solicitor General
J. Emory Smith, Jr., Deputy Solicitor General
Thomas T. Hydrick,
Assistant Deputy Solicitor General
Joseph D. Spate,
Assistant Deputy Solicitor General
Post Office Box 11549, Columbia, SC 29211
josephspate@scag.gov
*Counsel for the State of South Carolina*

*/s/Whitney Hermandorfer*
Jonathan Skrmetti,
Tennessee Attorney General and Reporter
Whitney Hermandorfer, Director of Strategic
Litigation Unit and Assistant Solicitor General
Office of the Tennessee Attorney General
P.O. Box 20207, Nashville, TN 37202
whitney.hermandorfer@ag.tn.gov
*Counsel for the State of Tennessee*

*s/Christopher A. Bates*
Sean D. Reyes, Attorney General of Utah
Melissa A. Holyoak, Solicitor General
Christopher A. Bates, Deputy Solicitor General
Office of the Attorney General
Utah State Capitol Complex
350 N State St, Ste 230,
Salt Lake City, UT 84114-2320
chrisbates@agutah.gov
melissaholyoak@agutah.gov
*Counsel for the State of Utah*

*s/ Andrew N. Ferguson*
Jason S. Miyares, Attorney General
Andrew N. Ferguson, Solicitor General
Kevin M. Gallagher, Deputy Solicitor General
Virginia Attorney General's Office
202 North 9th Street, Richmond, VA 23219
aferguson@oag.state.va.us
kgallagher@oag.state.va.us
*Counsel for Commonwealth of Virginia*

*s/Ryan Schelhaas*
Bridget Hill, Wyoming Attorney General
Ryan Schelhaas, Chief Deputy Attorney General
109 State Capitol, Cheyenne, WY 82002
ryan.schelhaas@wyo.gov
*Counsel for the State of Wyoming*