IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| STATE OF INDIANA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO MAYORKAS, et al.,<br><br>Defendants. | Civ. No. 1:23-cv-00106-DMT-CRH |

BRIEF FOR *AMICUS CURIAE* IMMIGRATION REFORM
LAW INSTITUTE IN SUPPORT OF PLAINTIFFS AND
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

All parties have consented to the filing of this *amicus curiae* brief. *See* D.N.D. Civ. L.R. 7.1(G)(1) (permitting any *amicus curiae* to file a brief if "all parties have consented to its filing"). No party or party's counsel authored any part of this brief. No person or entity, other than *amicus*, its members, or its counsel, has made a monetary contribution to this brief's preparation or submission.

INTEREST OF *AMICUS CURIAE*

*Amicus curiae* Immigration Reform Law Institute ("IRLI") is a non-profit 501(c)(3) public interest law firm dedicated to litigating immigration-related cases in the interests of United States citizens, and also to assisting courts in understanding and accurately applying federal immigration law. IRLI has litigated or filed *amicus curiae*

1

briefs in a wide variety of cases, including *Trump v. Hawaii*, 138 S. Ct. 2392 (2018); *United States v. Texas*, 579 U.S. 547 (2016); *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957 (9th Cir. 2017); *Wash. All. Tech Workers v. U.S. Dep't Homeland Security*, 50 F.4th 164 (D.C. Cir. 2022); and *Matter of Silva-Trevino*, 26 I. & N. Dec. 826 (B.I.A. 2016).

## SUMMARY OF THE ARGUMENT

The Supreme Court's recent decision in *United States v. Texas*, No. 22-58 (U.S. June 23, 2023), is distinguishable from this case. As Plaintiffs point out, in contrast to *Texas*, the parole policies challenged here do not solely involve decisions about which illegal aliens to arrest or prosecute, but instead concern the conferral of legal benefits. In addition to the benefits identified by Plaintiffs, parolees are also eligible for adjustment of status, which if granted would put them on a path to citizenship itself. Even if Plaintiffs would lack standing to challenge the executive's exercise of discretion to choose which aliens to arrest or charge with removability, under *Texas* there is no bar to its standing to challenge the conferral of such benefits as these.

Plaintiffs have raised a viable claim that Defendants exceeded their statutory authority in promulgating a rule that relies on unlawful parole processes. The text of the governing statute requires that parole be given "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." Defendants claim that the exceptions to the rule will discourage irregular migration across the southwest border.

Even if the parole policies tend to discourage such migration, the parole of any specific alien would not significantly serve that purpose. At best, the parole of any

2

particular alien, *in addition* to the parole of many other similarly situated aliens, would be necessary to attain the alleged public benefit. Thus, parole of any particular alien by itself does not significantly increase the alleged public benefit. It is only *en masse* parole that does so. In short, the government is not paroling any particular alien on the basis that doing so will significantly benefit the public or meaningfully address an urgent humanitarian concern.

DHS's justification for its parole program also runs counter to the text and structure of the statute, legislative history, contemporary interpretations by the agency charged with enforcing the provision, and other regulations interpreting the statute. Since the parole statute was amended in 1996, regulations have contemplated that parole of aliens subject to mandatory detention under 8 U.S.C. § 1225(b) is only available in cases of medical emergencies or for law enforcement purposes (such as parole for prosecution or to testify). The test for parole has been whether a specific alien is in circumstances, or has qualities, that would render his or her presence in the United States, by itself, either of urgent humanitarian concern or of significant benefit to the public. For example, the rule governing parole for entrepreneurs properly construes the parole statute as requiring a particular alien to demonstrate that his presence in the United States would provide a significant public benefit. Because the exceptions to the rule rely on unlawful and programmatic parole programs, Plaintiffs have a viable claim that the rule exceeds Defendants' statutory authority.

# ARGUMENT

I. ***United States v. Texas* is distinguishable because the parole exception challenged here confers substantial legal benefits upon parolees.**

The Supreme Court recently held that States do not have standing to challenge the government's policies about whether to arrest or charge aliens with removability under the Immigration and Nationality Act. *United States v. Texas*, 143 S. Ct. 1964, 1969-73 (2023). The Court held that "a party 'lacks a judicially cognizable interest in the prosecution . . . of another.'" *Id.* at 1970 (quoting *Linda R. S. v. Richard D.*, 410 U. S. 614, 619 (1973)).

Nevertheless, the Court acknowledged that its decision does not necessarily govern situations in which a challenged policy involves the conferral of a legal benefit or the continued detention of an alien who has already been arrested and whose removal is sought. *See id.* at 1974. Under the parole exception challenged here, parolees become eligible for certain legal benefits. Accordingly, this case falls outside the reach of *Texas*.

Plaintiff States identify several benefits for which parolees are eligible, including work authorization and other public benefits such as public education and nutritional assistance. Dkt. 61 at 2, 8. In addition to those benefits identified by Plaintiffs, parolees are eligible to adjust status within the United States. *See* 8 U.S.C. § 1255(a) ("The status of an alien who was inspected and admitted *or paroled* into the United States … may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe, to that of an alien lawfully admitted for permanent residence ….") (emphasis

added). Only aliens who enter the United States legally (that is, are "admitted or paroled") are eligible to adjust their status within the United States.

Aliens who attempt to enter the United States without proper entry documents are ineligible to adjust their status and are generally only eligible for asylum-related relief or protection. *See* 8 U.S.C. § 1225(b)(1)(A)(i) (requiring the expedited removal of any alien who is inadmissible under § 1182(a)(7)—that is, an alien without proper entry documents—"without further hearing or review unless the alien indicates either an intention to apply for asylum … or a fear of persecution"); *see also Texas v. United States (DACA)*, 549 F. Supp. 3d 572, 612-14 (S.D. Tex. 2021) (explaining how parole enables otherwise ineligible aliens to become eligible for adjustment of status). The challenged parole exception therefore circumvents the general bar to adjustment of status otherwise applicable to aliens who enter the country illegally and provides parolees with a pathway to adjustment of status and ultimately citizenship. In other words, parole opens an entirely new pathway to relief from removal that would otherwise be unavailable to the aliens who fall within the parole exception.

Finally, whatever prosecutorial discretion DHS exercises in choosing which aliens to arrest or charge with removability, that kind of prosecutorial decision is not at issue in this case. Every alien who is subject to the Circumvention of Lawful Pathways rule challenged here is subject to removal proceedings, and Plaintiff States are neither seeking an order directing DHS "to alter its arrest policy" nor seeking the removal of "more noncitizens." *Texas*, 143 S. Ct. at 1969. Only challenges to such prosecutorial policies give rise to the standing problems the Supreme Court found in that case.

## II. The exceptions to the Rule are unlawful insofar as they rely upon unlawful parole programs.

As the Plaintiff States argue, Dkt. 61 at 18-28, the exceptions to the rule rely upon unlawful programmatic parole processes that exceed Defendants' statutory authority. The exceptions to the rule should therefore be severed from the rule and vacated. *See* 88 Fed. Reg. at 31451-52 (promulgating severability clauses codified at 8 C.F.R. §§ 208.33(d) & 1208.33(e)).

### A. The exceptions to the rule rely on an unlawful abuse of DHS's extremely limited parole authority and therefore violate 8 U.S.C. § 1182(d)(5)(A).

The current language in 8 U.S.C. § 1182(d)(5)(A) authorizing parole "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit" was added by section 602(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA")[1] "to limit the scope of the parole power and prevent the executive branch from using it as a programmatic policy tool." *Texas v. Biden (MPP)*, 20 F.4th 925, 947 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). The statute's "only on a case-by-case basis" language calls for an individualized determination that the parole of "any [individual] alien applying for admission to the

---

[1] Title VI of division C of Pub. L. No. 104-208, 110 Stat. 3009, 3009-689; *see also* § 203(f) of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, 107-08 (codified at 8 U.S.C. § 1182(d)(5)(B)) (providing that DHS "may not parole into the United States an alien who is a refugee unless [DHS] determines that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled into the United States rather than be admitted as a refugee") (emphasis added).

United States" serves an "urgent humanitarian" purpose or that the presence of *that particular alien* would provide a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

This individualized understanding of the parole authority is buttressed by the text that follows, which directs that "*the* alien" temporarily paroled "shall forthwith return or be returned to the custody from which *he* was paroled and thereafter *his* case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States" "when the purposes of such parole shall … have been served[.]" *Id.* (emphasis added). This language makes it abundantly clear that any applicant for parole must show that his or her own presence in the United States satisfies either the "urgent humanitarian" reason or "significant public benefit" standard for parole.

In contrast to an individualized test for parole, DHS adopted the Circumvention of Lawful Pathways rule along with its parole exception to "discourage irregular migration by encouraging migrants to use lawful, safe, and orderly pathways," that is, one of DHS's mass parole programs. 88 Fed. Reg. 31314, 31317 (May 16, 2023). But the purported benefits of such parole programs can only be attained if a sufficient number of aliens are paroled *en masse*.[2] Because the public benefit of paroling any particular alien depends on the aggregate effect of paroling many similarly-situated aliens *en masse*, the public

---

[2] Indeed, the government has found the parole of tens of thousands of purportedly low-priority aliens was insufficient to stem the tide at the border. *See, e.g.,* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279, 1280 (Jan. 9, 2023) (finding a one-time parole limit of 24,000 was insufficient to provide an adequate alternative to crossing the border illegally and replacing that limit with a *monthly* limit of 30,000 travel authorizations spread across four countries so that the program may "serve[] as a meaningful alternative to irregular migration.").

benefit of paroling an individual alien is marginal and insignificant; if any particular alien were not paroled, the public benefit allegedly produced by paroling numerous other aliens would not be appreciably lessened. In other words, there is no significant public benefit in paroling any particular alien; at best, the alleged public benefit only comes from paroling that alien *in addition to* numerous other aliens *en masse*. And the *significant* public benefit only comes from the *en masse* parole, not from the parole of any individual alien.

> **B.     Legislative history confirms that Congress intended the parole authority to be exercised only on an individual basis.**

The legislative history leading up to the enactment of IIRIRA reflects Congress's disapproval of the Executive Branch's overuse of the parole authority. For example, the House Judiciary Committee Report complained of "recent abuse of the parole authority" by the Clinton administration "to admit up to 20,000 Cuban nationals *annually*." H.R. Rep. No. 104-469, pt. 1 at 140 (1996) (emphasis added). One of DHS's recently enacted parole programs results in the parole of up to 30,000 aliens *per month*. *See* 88 Fed. Reg. at 31408 ("Each month, DHS issues advance travel authorizations for up to 30,000 CHNV nationals to travel to the United States to be considered by CBP on a case-by-case basis for a temporary grant of parole for a period of up to two years."). As Plaintiffs point out in their response to the motion to dismiss, moreover, the number of border encounters are increasing to record highs. Dkt. 61 at 10-11. Thus, the parole programs underlying the

parole exception challenged here are more than an order of magnitude larger than the parole abuse complained of by the House Judiciary Committee in 1996.

Further, the House Judiciary Committee report included examples of what sorts of situations would warrant humanitarian or public interest parole:

> Parole should only be given on a case-by-case basis for specified urgent humanitarian reasons, *such as life-threatening humanitarian medical emergencies*, or for specified public interest reasons, *such as assisting the government in a law-enforcement-related activity*. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission under established legal immigration categories.

H.R. Rep. No. 104-469, pt. 1 at 141 (emphasis added). The Senate Judiciary Committee Report similarly stated that its parole reform provision was intended to "reduce[] the abuse of parole" and "[t]ighten[] the Attorney General's parole authority," and that "[t]he committee bill is needed to address ... the abuse of humanitarian provisions such as asylum and parole." S. Rep. No. 104-249 at 2 (1996).

In sum, the legislative history supports reading 8 U.S.C. § 1182(d)(5)(A) as requiring an individual and particularized showing of an "urgent humanitarian" need or a "significant public benefit" resulting from the parole of any particular alien. Clearly, Congress never intended to authorize the very *en masse* parole "abuse" it decried.

### C. Contemporaneously-enacted agency rules comported with a narrow, individualized approach to parole, particularly with respect to aliens amenable to expedited removal, and other, current regulations still take that approach.

Within six months of the passage of IIRIRA, the Department of Justice, which preceded DHS as the agency charged with enforcement of the Immigration and Nationality Act, amended the regulations governing parole to comport with the newly enacted law. *See* Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10312 (Mar. 6, 1997). In that rulemaking, the agency restricted parole for aliens who (like those covered by DHS's parole programs) are subject to expedited removal:

> because section 235(b)(1)(B)(iii)(IV) of the Act [8 U.S.C. § 1225(b)(1)(B)(iii)(IV)] requires that an alien in expedited removal proceedings "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed," the Department feels that parole is appropriate only in the very limited circumstances specified in § 235.3(b)(4).

62 Fed. Reg. at 10320. As first promulgated in 1997, 8 C.F.R. § 235.3(b)(4) permitted parole of aliens awaiting a credible fear interview only where "parole is required to meet a medical emergency or is necessary for a legitimate law enforcement objective." 62 Fed. Reg. at 10356 (setting forth 8 C.F.R. § 235.3(b)(4)(ii)).[3]

These medical-emergency and law-enforcement-objective restrictions on parole remained in place for aliens subject to expedited removal (and who had not established a

---

[3] The same restrictions on parole applied to aliens subject to expedited removal who did not make a claim of asylum. *See id.* at § 235.3(b)(2)(iii), (5)(i).

10

credible fear of persecution,[4] like the aliens covered by DHS's parole programs) until March 29, 2022, when DHS issued an interim final rule removing the "medical emergency" or "legitimate law enforcement objective" language and replacing it with the following: "Parole of such alien shall only be considered in accordance with [8 U.S.C. § 1182(d)(5)] and § 212.5(b) of this chapter." Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers, 87 Fed. Reg. 18078, 18220 (Mar. 29, 2022) (revising 8 C.F.R. § 235.3(b)(2)(iii), (b)(4)(ii), and (c)).

Under the generally applicable regulation promulgated soon after the enactment of IIRIRA, parole is generally deemed appropriate only for: (1) aliens who have a serious medical condition; (2) women who are pregnant; (3) juvenile aliens; (4) witnesses in judicial, administrative, or legislative proceedings; and (5) aliens whose continued detention is not in the public interest. *See* 62 Fed. Reg. at 10348 (8 C.F.R. § 212.5(a)). Even now, under the more general parole regulations applicable to arriving aliens, similar restrictions remain for aliens subject to mandatory detention under current 8 C.F.R. § 235.3(b) or (c). *See* 8 C.F.R. § 212.5(b) (2023). And the regulations still require that parole be granted "in accordance with" 8 U.S.C. § 1182(d)(5)(A), and include some

---

[4] The agency explained that only those "aliens found to have a credible fear will be subject to the generally applicable detention and parole standards contained in the Act," that is, those standards set forth in 8 C.F.R. § 212.5(a) (1998). 62 Fed. Reg. at 10320. "[P]arole authority is specifically limited while a credible fear determination is pending under § 235.3(b)(4), [but] those found to have a credible fear and referred for a hearing under section 240 of the Act will be subject to the rule generally applicable to arriving aliens in § 235.3(c)." 62 Fed. Reg. at 10320.

11

circumstances in which denial of parole is mandatory. *See id.*; *see also* 8 C.F.R. § 212.5(c) (2023).

Other regulations reflect DHS's acknowledgment that parole is only justified where a particular alien's *presence in the United States* provides a significant public benefit. For example, when DHS promulgated the International Entrepreneur Rule in 2017, it explained that its adjudicators would be required to determine, *inter alia*, "whether the specific applicant's parole would provide a significant public benefit[.]" 82 Fed. Reg. 5238, 5239 (Jan. 17, 2017); *see also id.* at 5250 (providing that DHS will evaluate "whether granting parole to a particular individual would provide a significant public benefit"); *id.* at 5260 ("Imposing a limit on the number of entrepreneurs who may be granted parole based on the same start-up entity is thus consistent with ensuring that *each* entrepreneur's parole will provide a significant public benefit.") (emphasis added). Indeed, the regulation governing parole for entrepreneurs requires DHS to find "that an applicant's presence in the United States will provide a significant public benefit[.]" 8 C.F.R. § 212.19(d).

In sum, the agency's contemporaneous interpretation of 8 U.S.C. § 1182(d)(5)(A) when it was first enacted required an individual and particularized showing of an "urgent humanitarian" need or a "significant public benefit" resulting from the parole of any specific alien. Nothing in the contemporaneous interpretations suggested that an insignificant or marginal public benefit aggregated with the purported benefit of *en masse* parole would be sufficient to meet the statutory standard for parole under § 1182(d)(5)(A). Other, current regulations, such as the International Entrepreneur Rule,

12

reaffirm that there must be something particular about the specific alien's presence in the United States that would provide a significant public benefit in order to satisfy the standard under the parole statute. DHS's various parole programs, which weigh the purported public benefit in the aggregate and do not depend on any particular humanitarian concern or public benefit attributable to a specific alien's presence, stand in stark contrast with the requirements of 8 U.S.C. § 1182(d)(5)(A).

## CONCLUSION

For the foregoing reasons, the Court should deny the motion to dismiss.

DATED: October 17, 2023                    Respectfully submitted,

/s/ Matt Crapo
MATT A. CRAPO
CHRISTOPHER J. HAJEC
Immigration Reform Law Institute
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
Telephone: (202) 232-5590
Email: mcrapo@irli.org

Attorneys for *Amicus Curiae*