## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| STATE OF INDIANA, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-00106-DMT-CRH |
| | ) | |
| ALEJANDRO MAYORKAS, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

### REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS'
### MOTION TO DISMISS COMPLAINT

Dated:      November 14, 2023          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
Senior Litigation Counsel

*Attorney for Defendants*

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................... 1

ARGUMENT ......................................................................................................................... 1

I.  Plaintiffs Lack Article III Standing.................................................................... 1

    A.  Plaintiffs Lack Standing Because Their Claimed Injury Stems from Parole,
        not the Rule, and Cannot Be Redressed by the Relief they Seek. ......................... 1

    B.  Plaintiffs' Claimed Harm from Indirect Effects of Alleged Immigration Non-
        Enforcement Is Not a Cognizable Injury for Purposes of Article III.................... 6

    C.  The Relief Sought is Unavailable. ......................................................... 7

II.  Plaintiffs Fall Outside the Relevant Zone of Interests. ........................................ 9

III.  Counts I–III Do Not State a Claim. ................................................................. 9

    A.  The Rule Does Not Implicate or Exceed Statutory Parole Authority (Counts I,
        III). ................................................................................................ 9

    B.  The Rule Does Not Conflict with the Secure Fence Act (Count II). ................... 17

IV.  Counts VI and VII Do Not State a Claim. ........................................................ 18

V.  A Non-Statutory *Ultra Vires* Remedy Is Unavailable (Count VIII)................................. 20

CONCLUSION ................................................................................................................... 21

## **INTRODUCTION**

Plaintiffs' lawsuit seeks to declare unlawful or invalidate the exceptions and rebuttal grounds to the presumption of asylum ineligibility (collectively, the "Exceptions") contained in Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2013) ("the Rule"). Plaintiffs, however, lack standing to challenge the Exceptions because indirect impacts from discretionary immigration enforcement decisions like those reflected in the Rule are not cognizable injuries. Further, as their Opposition (ECF No. 61) makes clear, although Plaintiffs are challenging the Exceptions, the injury they claim relates to the parole of noncitizens into the United States, which is not governed by the Rule. There is thus a mismatch between the regulation they challenge and the source of their alleged harms. The Rule does not set any standards for the grant of parole, which is governed by pre-existing statutory authority. The Rule also does not create the parole processes that Plaintiffs complain of, nor does it provide the only incentive for their use. The parole processes would continue even if the parole-process exception to the presumption of asylum ineligibility were enjoined or vacated. Accordingly, the alleged harms Plaintiffs complain of are not redressable here, even if the relief sought were not foreclosed by statute and were available under the Administrative Procedure Act (APA).

Plaintiffs' APA claims at Counts I–III and VI–VII also fail as a matter of law. Plaintiffs' arguments that the current parole processes exceed the parole authority are both incorrect and irrelevant to whether the Rule and its Exceptions—which govern eligibility for asylum and set no standards for parole—are inconsistent with or exceed statutory authority. And the Complaint points to no procedural errors in the notice-and-comment process for the Rule.

## **ARGUMENT**

### I.   **Plaintiffs Lack Article III Standing.**

####    A.   <u>Plaintiffs Lack Standing Because Their Claimed Injury Stems from Parole, not the Rule, and Cannot Be Redressed by the Relief they Seek.</u>

The Opposition has no meaningful response to Defendants' argument that Plaintiffs' alleged injury stems from the exercise of parole authority under 8 U.S.C. § 1182(d)(5)(A), not the

Exceptions, and thus their claimed injury cannot be redressed by any relief they could possibly obtain in this challenge to the Rule. Mem. in Supp. of Mot. to Dismiss (ECF 57-1) ("Mot.") 15, 18–19. Plaintiffs' theory of injury stems from parole practices and statutory parole authority that do not depend on the Rule or its Exceptions to operate. But this lawsuit seeks elimination of the Rule's Exceptions, not the parole policies. Thus, Plaintiffs are aiming at the wrong target, as the relief they seek would not redress their claimed harms.

Indeed, Plaintiffs' arguments in opposition only underscore their lack of standing, making clear that Plaintiffs' theories of injury are based on the exercise of statutory parole authority rather than from the Rule's conditions on asylum eligibility. Pls.' Resp. to Mot. to Dismiss (ECF 61) ("Opp.") 6, 19. For example, Plaintiffs and Amicus assert that the recent Supreme Court decision in *United States v. Texas*, 143 S. Ct. 1965 (2023), does not preclude a finding of standing to challenge the Rule because they claim the Rule involves a "conferral of benefits," a distinction the Supreme Court in dicta said "could lead to a different standing analysis." *See id.* at 1974; Opp. 8–9 (arguing that "the Circumvention Rule qualifies parolees for [public] benefits"); Amicus Br. (ECF 68) ("IRLI Br.") 4–5. Neither the Rule nor its Exceptions confer an immigration or other benefit. Rather, they address the circumstances under which adjudicators impose a *limitation* on asylum and thus on asylum-related benefits. The Rule is designed to disincentivize noncitizens from entering between ports of entry (POEs) or presenting at POEs without appointments both by imposing a presumption of asylum ineligibility and by allowing for exceptions that incentivize the use of orderly processes to seek parole or to schedule appointments to present at POEs. The Exceptions to the presumption do not grant parole, affirmatively qualify anyone for asylum or other immigration status, or set standards for eligibility for employment authorization, all of which are governed by separate statutes and regulations. And the Exceptions do not confer public education, welfare, or Medicaid benefits on any noncitizen. At most, it is the grant of parole under 8 U.S.C. § 1182(d)(5)(A)—not the Rule, and not the parole processes referenced in the Rule's exceptions—that potentially renders a noncitizen eligible for employment authorization or able to

access public benefits. But even parole does not directly confer those benefits.[1] And contrary to Amicus's argument (IRLI Br. 4–5), the grant of parole alone does not generally confer eligibility for adjustment of status. A noncitizen seeking adjustment under 8 U.S.C. § 1255(a)[2] must be admissible and must have some basis to obtain an available immigrant visa—such as an approved family- or employment-based petition. *See* 8 U.S.C. § 1255(a) (requiring the noncitizen to be "eligible to receive an immigrant visa and … admissible to the United States for permanent residence"), 1153 (discussing immigrant visas). Although an adjustment applicant under § 1255(a) must be admitted or paroled to demonstrate eligibility, adjustment of status is grounded not simply in parole status but in the availability of and eligibility for an immigrant visa. Thus, adjustment under § 1255(a) is not a benefit conferred by parole, let alone the Rule.

As the Exceptions themselves do not confer parole, Plaintiffs are clearly incorrect to characterize state expenditures for public education and public benefits on paroled noncitizens as "direct" costs of the Rule. Opp. 7 (citing *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019)), 9. Plaintiffs argue and allege that "Defendants' enforcement and immigration policies" "make it easier" for noncitizens to be paroled into the United States, which will eventually increase the number of noncitizens within the States' borders and allegedly lead to the states making additional expenditures. Opp. 6, 9; *see also* Compl. ¶¶ 5, 106–07 (claiming financial injury based on "higher numbers of aliens being paroled into the United States"). The Rule does not "make it easier" for noncitizens to be paroled. The Exceptions do not grant parole to noncitizens or set policies regarding the grant of parole under 8 U.S.C. § 1182(d)(5)(A). Mot. 15; *see also id.* at 21. Plaintiffs

---

[1] For this reason, the Fifth Circuit's decision in *Texas v. United States*, 809 F.3d 134, 157 (5th Cir. 2015) ("*DAPA*"), which was affirmed without precedential effect by an equally divided Supreme Court, 579 U.S. 547 (2016), is not instructive. In that case, the challenged program directly provided "lawful presence" to qualifying noncitizens. *DAPA*, 809 F.3d at 148. And the standing analysis in *DAPA* relies on the concept of "special solicitude" that has been called into question. *See Texas*, 143 S. Ct. at 1975 n.3; *id.* at 1977 (Gorsuch, J., concurring in judgment) (noting "that lower courts should just leave" the concept of special solicitude "on the shelf"); *Missouri v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022).

[2] Section 1255(a) is not the only statute governing adjustment. For example, and contrary to Amicus's implication (at 5), those granted asylum may adjust their status under 8 U.S.C. § 1159(b) and are not required to have been admitted or paroled.

cannot allege an injury from an independent action (parole) to support their challenge to the Rule. In *California v. Texas*, 141 S. Ct. 2104 (2021), the Supreme Court rejected precisely such a theory, holding that the plaintiff states' alleged costs arising from independent provisions of the Affordable Care Act could not support their claim that the unenforceable individual mandate provision was unconstitutional. *Id.* at 2120. Instead, the states were required to allege injury arising from the challenged provision. *Id.* Similarly here, any purported injury from the discretionary exercise of parole authority—which Defendants do not concede—would not confer standing to challenge the Rule or the Exceptions. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (plaintiffs must establish standing for each claim raised); *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review.").

The Rule also does not direct states or state agencies to make expenditures for public education. The Rule does not influence whether parolees will rely on public benefits such as education, Medicaid, food stamps, or any "federal means-tested public benefit." *See* Opp. 8. In contrast, Plaintiffs' cited cases reflect a more direct relationship between the "predicted effect" of government action on third parties and the loss or expenditure of State funds. *See* Opp. 7. In *Department of Commerce*, States argued that the inclusion of a citizenship question on the census would cause a direct financial loss to them, because it would result in an undercount of the States' population such that the States would "lose out on federal funds that are distributed on the basis of state population" that they otherwise would have received. 139 S. Ct. at 2565. And the Ninth Circuit case of *City and County of S v. USCIS*, which involved a finding that a challenged rule would cause noncitizens to disenroll from public benefits, impacting Medicaid reimbursement payments to the states for the noncitizens' treatment, is not binding here. *See* 944 F.3d 773, 787 (9th Cir. 2019). Although Defendants disagree that the claimed injury in that case was in fact "direct," here, the claimed impacts on the Plaintiff States are even more attenuated. There is no direct relationship between the Rule and the authority to parole, or between parole and State

expenditures on public benefits. Further, a noncitizen who is paroled into the United States and subsequently receives employment authorization is *less likely* to rely on public benefits and more likely to contribute to their community by paying taxes. In any event, *Texas* stands for the proposition that even a "predictable effect of Government action" is not a cognizable injury in the immigration enforcement context. *See infra* § I(B). Yet Plaintiffs have not shown "a sufficiently direct causal connection between the challenged action and the identified harm" under general traceability principles, *Agred Found. v. U.S. Army Corps of Eng'rs*, 3 F.4th 1069, 1073 (8th Cir. 2021), let alone under the principles set forth in *Texas*.

Regardless of the number of encounters with noncitizens at the Southwest border or Plaintiffs' claimed expenditures with respect to paroled individuals, Plaintiffs' alleged harms—which are not caused by the Exceptions—would not be alleviated by elimination of the Exceptions. Thus, any relief the Court could grant would have no practical effect. This result is illustrated by *California v. Texas*, in which the Supreme Court found that the plaintiffs' requested relief—an injunction of the individual mandate in the Affordable Care Act and a declaration that the mandate was unconstitutional—would have no practical effect on Plaintiffs' expenditures on health insurance because the health-insurance mandate was unenforceable and did not require those expenditures. 141 S. Ct. at 2115; *see also Texas*, 143 S. Ct. at 1978–79 (Gorsuch, J., concurring). Similarly, an injunction here or vacatur of the Exceptions would have no practical impact on the availability of parole or the parole processes. This result precludes a finding that the harms Plaintiffs allege are traceable to the Rule or the Exceptions and redressable in this suit.

Plaintiffs are simply incorrect that enjoining the Exceptions would "prevent" the grant of parole to noncitizens. *See* Opp. 12. Even if the Exceptions were made inoperative by order of this Court, that would not alter the existing parole processes referred to in the Exceptions or preclude the Executive's use of statutory authority to grant parole under 8 U.S.C. § 1182(d)(5)(A). *See* Mot. 4 (explaining that immigration officers may parole inadmissible noncitizens). No relief Plaintiffs could obtain regarding the Rule, including elimination of the Exceptions, would affect either the existence of parole processes or the underlying authority to parole.

B.     Plaintiffs' Claimed Harm from Indirect Effects of Alleged Immigration Non-
       Enforcement Is Not a Cognizable Injury for Purposes of Article III.

Plaintiffs also lack Article III standing because the Rule—which establishes a condition on
asylum eligibility—causes no judicially cognizable injury to them. Mot. 9–12. As the Supreme
Court recently affirmed in *Texas*, 143 S. Ct. 1965, States' allegations of indirect financial harm
are insufficient to challenge immigration enforcement decisions, such as those reflected in the
Rule. *See id.* at 1972–74 & n.3. Plaintiffs and Amicus argue that the holding of *Texas* has no
application here because Plaintiffs are not seeking to require Defendants "to take any deportation
or criminal action against any particular aliens." Opp. 6–7; *id.* at 8–9; IRLI Br. 4, 5. But although
the claims at issue in *Texas* related to such decisions, the Court's reasoning was not so cabined.
To the contrary, *Texas* articulates a broader principle that third parties generally lack any judicially
cognizable interest in avoiding attenuated effects that flow from discretionary decisions about how
to enforce immigration laws against others. And each rationale given by the Court to support that
principle applies equally to the range of discretionary immigration enforcement decisions—
including the exercise of authority to establish conditions on asylum eligibility as set forth in the
Rule. Mot. 10–11; *Texas*, 143 S. Ct. at 1972 n.3. As illustrated, Plaintiffs' theory of injury is
precisely the theory of indirect harm that was deemed insufficient in *Texas*.

Indeed, Plaintiffs' theory of injury is even more indirect because they claim that States will
make expenditures by providing benefits to those who are paroled into the United States, but the
Rule does not set parole policies. *See supra* § I(A). The principles relied on in *Texas* would apply
even if Plaintiffs were directly challenging the parole processes or grants of parole, however,
because those actions too are exercises of immigration enforcement discretion and their alleged
injury is at most an indirect effect of those decisions. Indeed, Plaintiffs assert that their claim is
based on Defendants' alleged "failure to enforce the federal immigration laws." Opp. 9. Plaintiffs
thus admit that they are contesting the federal government's discretionary choices about how to
implement immigration enforcement and removal policies as to those who are migrating to the
United States without documents sufficient for admission. These policy choices implicate the same

separation-of-powers and foreign-policy concerns that the Supreme Court weighed against recognizing third-party injury in *Texas*. *See* 143 S. Ct. at 1971–73. Accordingly, just as in *Texas*, indirect effects of these policies on state expenditures cannot support state standing.

Moreover, the evidence and allegations do not justify Plaintiffs' speculation that the Rule will result in an increased number of noncitizens released into the United States on parole. Plaintiffs cite recent data showing that the number of irregular crossings has increased since the data discussed in Defendants' Motion. Opp. 10. But the average daily encounter rate is still lower than the rate immediately preceding the end of the Title 42 orders despite some increases in such crossings. *See* Ex. 4 hereto, ¶ 13. Further, the numbers of encounters do not present the full picture. As Defendants demonstrated, because the availability of expedited removal has increased and the percentage of noncitizens who pass a credible-fear screening has decreased due to application of the presumption, there are likely to be fewer noncitizens released into the United States with the Rule in place than without. Mot. 13–14; Mot. Ex. 1 ¶ 5. Even if irregular crossings do increase, the Rule strengthens the consequences for such crossings by adding to them a presumption of asylum ineligibility. And Plaintiffs have not shown that an unconditional bar on asylum eligibility, without any exceptions, would alleviate the harms they allege. In contrast, Defendants presented evidence demonstrating a rule that imposes ineligibility alone—without any accompanying incentives for safe, orderly, and lawful entry—would not meaningfully impact migration trends. *See* Mot. Ex. 2 ¶¶ 20, 25–81; *see also* 88 Fed. Reg. at 31,430 & n.304; Mot. 15 (explaining evidence of success of approaches that couple incentives with consequences). For these reasons, Plaintiffs have not met their minimal burden at the motion-to-dismiss stage to demonstrate cognizable injury.

    C.    <u>The Relief Sought is Unavailable.</u>

Plaintiffs' claimed injuries are not redressable in this lawsuit for the additional reason that the relief they seek is unavailable under 8 U.S.C. § 1252(f)(1). Mot. 17–18. As explained, while the eligibility condition was promulgated under 8 U.S.C. § 1158, the Rule's conditions *operate* in expedited removal and standard removal proceedings under covered statutory provisions in 8

U.S.C. §§ 1225, 1229a, and 1231. *Id.*; *see also* 88 Fed. Reg. at 31,323. Further, Plaintiffs' assertion (Opp. 12) that the Rule was instead issued under the parole authority at 8 U.S.C. § 1182(d)(5) is incorrect. *See* 88 Fed. Reg at 31,323–24 ("The Secretary and the Attorney General jointly issue this rule pursuant to their shared and respective authorities concerning asylum, statutory withholding of removal, and [Convention Against Torture] determinations."). The Rule does not create any procedures or conditions regarding the grant of parole and operates independently of any grants of parole or the complementary parole processes. *See, e.g.*, *id.* at 31,331, 31,337, 31,369.

Section 1252(f)(1) likewise limits the availability of declaratory relief or vacatur where that relief would have the same effect of enjoining or restraining Defendants' operation of these statutes. Universal vacatur would certainly have this effect. Further, the APA does not expressly authorize such universal vacatur of a rule, or portions of it. Mot. 18. Accordingly, because the injunctive relief Plaintiffs seek is unavailable, and because the declaratory relief they seek would not address the underlying parole processes and thus cannot redress their claimed harms, the redressability element of standing cannot be met. *See California*, 141 S. Ct. at 2115 (the availability of declaratory relief cannot establish jurisdiction that is otherwise absent).

Plaintiffs argue a finding that their injury is not redressable would run contrary to the presumption of judicial review. *See* Opp. 13. Reviewability and redressability are distinct concepts, however. And contrary to Plaintiffs' implication, Defendants do not argue that § 1252(f)(1) precludes *review*, only that it limits the available relief and contributes to a finding that their claimed injuries are not redressable. Mot. 17. Defendants do argue that the INA's jurisdictional provisions governing challenges to the expedited removal system at 8 U.S.C. § 1252(a)(2)(A)(iv), (e)(1), and (e)(3) preclude relief *and* review in this Court that pertains to the portions of the Rule that operate in expedited removal. Mot. 17. Defendants also argue that the INA precludes review of Plaintiffs' claims. Mot. 20 (citing 8 U.S.C. § 1252(a)(5), (b)(9), (e), (g). The presumption of judicial review is overcome as to review sought by third parties like Plaintiffs, as Congress has expressly circumscribed or channeled judicial review of the application of the removal statutes and related regulations, rendering it available largely only to individual

noncitizens subject to those rules or in particular fora.  Mot. 17, 20.

## II.      Plaintiffs Fall Outside the Relevant Zone of Interests.

Plaintiffs fail to explain (Opp. 16) why they would fall within the zone of interests of the relevant asylum statute. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987) (holding that to be "aggrieved" under the APA "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute ... in question"). And, as explained, the statute indicates that third parties like Plaintiffs do not, as it expressly eliminates any cause of action against the government to enforce its provisions. Mot. 19 (citing 8 U.S.C. § 1158(d)(7)). Plaintiffs claim instead that they have a general interest in immigration and that this matter involves "federally mandated" public benefits. Opp. 17. As to the former, *Texas* makes clear that non-regulated parties have no cognizable interest in how the INA is enforced against others. *See supra* § I(B). As to the latter, neither the Rule nor its authorizing statute requires providing public benefits, so that does not supply any basis to find Plaintiffs within the zone of interests. Even if the States could establish Article III standing to challenge the federal statutes and regulations they claim require them to pay for certain welfare benefits for paroled noncitizens, they do not challenge those provisions here.

## III.      Counts I–III Do Not State a Claim.

### A.      The Rule Does Not Implicate or Exceed Statutory Parole Authority (Counts I, III).

Contrary to Plaintiffs' and Amicus' assertions with respect to Counts I and III of the Complaint, the exceptions to the presumption of asylum ineligibility for noncitizens who use the parole processes and the CBP One appointment scheduling system do not exceed the parole authority or create "an entirely new" immigration system based on parole and accompanying travel authorization. Opp. 18–21, 23–29; IRLI Br. 6–13. The Rule sets forth the circumstances under which noncitizens who enter the United States at the southwest land or adjacent coastal borders may be ineligible for asylum, and the Departments' authority to set such conditions is not in dispute. *See* Mot. 21. The Rule does not set forth any policy for DHS's exercise of parole authority or for admission to the United States, and Plaintiffs cannot use this lawsuit to indirectly challenge

non-specific "parole processes" writ large or challenge the same processes they challenge in separate lawsuits. *See id.* 21–22.

        *1.   The Exceptions' Lawfulness Does Not Turn on the Lawfulness of the Referenced Processes.*

     First, for the reasons already stated, the Rule's and the Exceptions' lawfulness do not depend on the lawfulness of specific processes that may fall within the Exceptions. Contrary to Plaintiffs' assertions, the two exceptions they challenge in Counts I and III do not "rely" on a "programmatic grant of parole," *see* Opp. 18, 21, or on the existence of a particular parole process. These exceptions are intended to encourage the use of orderly means of entry into the United States, but they do not depend on ultimately granting parole to any noncitizen. They except from the presumption of asylum ineligibility those who (or who are traveling with a family member who) "[were] provided appropriate authorization to travel to the United States to seek parole, pursuant to a DHS-approved parole process," 8 C.F.R. § 208.33(a)(2)(ii)(A), or "presented at a port of entry, pursuant to a pre-scheduled time and place, or presented at a port of entry without a pre-scheduled time and place, if the alien demonstrates by a preponderance of the evidence that it was not possible to access or use the DHS scheduling system due to language barrier, illiteracy, significant technical failure, or other ongoing and serious obstacle," *id.* § 208.33(a)(2)(ii)(B). Both exceptions are written flexibly to include both current or future DHS-approved parole processes or scheduling systems. For example, if certain processes—like the parole processes for nationals of Cuba, Haiti, Nicaragua, and Venezuela ("CHNV"), which Plaintiffs have challenged elsewhere, *see* Mot. 22—were declared unlawful, this would not invalidate *all* parole processes, nor would it invalidate the parole-process or appointment exceptions to the Rule's presumption of asylum ineligibility. Further, the parole-process exception applies to those who use the parole process to obtain travel authorization, and its applicability does not require the noncitizen to be paroled into the United States. *See* 8 C.F.R. § 208.33(a)(2)(ii)(A).

     Further, Plaintiffs' argument as to Count III that the Rule "replace[s] the lawful visa system ... with a replacement immigration system," Opp. 23–24, is misplaced. As already stated, the

challenged Rule—including the Exceptions—set forth conditions on asylum eligibility, which are undisputedly within the Executive's authority governing asylum and removal. The Exceptions do not implicate the parole authority, set any guidance for admission or entry into the United States, or preclude the use of expedited removal. Mot. 20, 24–26. Even if the Rule "contemplate[s]" that the parole-process exception will have an "effect on the immigration process," Opp. 23, as discussed, the question of whether the separate but complementary parole processes exceed statutory authority or require clearer Congressional authorization is not before this Court.

*2.   The Current Parole Processes Are Within Statutory Parole Authority.*

Next, even if the lawfulness of the processes referenced in the Exceptions were relevant to the lawfulness of the Exceptions, the current parole processes do not exceed statutory authority. As an initial matter, Plaintiffs do not raise any arguments challenging the lawfulness of the use of an appointment system, through CBP One or otherwise. Instead, they focus only on the parole processes. Although Plaintiffs nominally cite the appointment exception in Counts I and III, Plaintiffs appear to conflate two distinct processes underlying two distinct exceptions: the parole processes referred to in 8 C.F.R. § 208.33(a)(2)(ii)(A) are distinct from the ability of those already in Mexico to use CBP One to schedule their arrival at a POE to satisfy the appointment exception in § 208.33(a)(2)(ii)(B). *See* Opp. 25; Mot. 25 n.5. Although the CBP One app is also used as part of the current CHNV parole processes to allow noncitizens to request an "Advance Travel Authorization" (ATA) to travel by air to the United States to be considered for parole, Mot. 25 n.5, this is a "separate and distinct" function from the use of the CBP One app by those in Mexico to make appointments at land-border POEs (which does not involve travel authorization). 88 Fed. Reg. at 31,401 (distinguishing between the two functions); https://www.cbp.gov/about/mobile-apps-directory/cbpone (last visited Nov. 14, 2023); https://www.uscis.gov/CHNV (last visited Nov. 14, 2023). As Plaintiffs do not challenge the lawfulness of appointments, they have forfeited any arguments against dismissal of Counts I and III that could be based on the appointment

exception at § 208.33(a)(2)(ii)(B) or the current use of CBP One to schedule appointments.[3]

Contrary to Plaintiffs' and Amicus's arguments (*e.g.*, Opp. 19, 24; IRLI Br. 6), the general use of a parole process is lawful because these processes still provide for case-by-case determinations of whether to grant parole. Section 1182(d)(5)(A) authorizes parole on a case-by-case basis for urgent humanitarian reasons or significant public benefit:

> The [Secretary] may … in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States.

8 U.S.C. § 1182(d)(5)(A). The CHNV processes, for example, establish a procedure for individuals to apply to travel to the United States by commercial air to be considered for parole on a case-by-case. Mot. 7.[4] DHS first reviews information submitted by a potential U.S.-based supporter, vets that supporter, and then reviews information provided by the applicant, including information uploaded into CBP One, before determining whether to grant advance travel authorization (ATA) to that particular applicant. *See, e.g.*, 88 Fed. Reg. at 1,252; https://www.uscis.gov/CHNV. Moreover, an ATA does not guarantee parole will be granted upon arrival—a CBP officer at the POE must still inspect the individual and consider whether it is appropriate to grant parole to them. 87 Fed. Reg. at 63,516; 88 Fed. Reg. at 1,253, 1,264, 1,276. No one is entitled to parole under these processes. These processes place no restrictions on an immigration official's discretion to deny or grant parole in any individual case. *See Reno v. Flores*, 507 U.S. 292, 313 (1993) (noting agency need not "forswear use of reasonable presumptions and generic rules" even where statute required "some level of individualized determination"). Accordingly, as evidenced by the currently existing CHNV processes, parole processes involve case-by-case determinations and do not

---

[3] Further, although Plaintiffs argue in passing that Congress did not authorize through the parole statute the Rule "and its many exceptions," Opp. 24, none of the other Exceptions involve travel authorization or mention parole.

[4] *See* Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63,507, 63,516 (Oct. 19, 2022); Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1,243, 1,252–53 (Jan. 9, 2023); Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1,255, 1,264 (Jan. 9, 2023); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1,266, 1,276 (Jan. 9, 2023).

provide for "programmatic parole" as Plaintiffs claim. *See* Opp. 20.

These processes thus comport with the statute and reflect a long understanding that designating a class of nationals whose members may be appropriate candidates for parole does not conflict with a "case-by-case" decision requirement, because the adjudicator must individually determine whether the person is a member of the class and whether there are reasons to exercise the parole authority for the particular national in each individual case. This longstanding interpretation of the parole authority is evidenced by a long history of the Executive using the authority to parole noncitizens of particular nationalities, often based on foreign policy concerns.[5]

Amicus argues that, for parole to be authorized, the "*particular* alien's presence in the United States" must provide a "significant public benefit." IRLI Br. 7, 12, 13. Yet the words "particular alien's presence" or any similar words do not appear in the statute. Congress did not expressly define "significant public benefit" in § 1182(d)(5)(A) when it adopted the current parole provision in 1996, leaving DHS flexibility to determine what constitutes a significant public benefit. In contrast, § 1182(d)(5)(B), which governs "parole into the United States [of] an alien who is a refugee," includes additional requirements that Congress did not include in the adjacent provision at § 1182(d)(5)(A), such as the requirement for a "determin[ation] that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled." (emphasis added). By requiring findings "with respect to" a "particular alien" to grant parole under § 1182(d)(5)(B), but not requiring findings limited to a "particular alien" in the adjacent section at issue, Congress left open the possibility that urgent humanitarian reasons and significant public benefits under § 1182(d)(5)(A) might be presented by many similarly situated noncitizens, and that the Executive could consider the aggregate benefits of paroling noncitizens because they fall

---

[5] *See, e.g.*, "Hong Kong Parole Program," https://www.uscis.gov/about-us/our-history/stories-from-the-archives/refugee-timeline (describing 1962 use of parole authority to parole Chinese who had fled to Hong Kong); American Immigration Council, "Executive Grants of Temporary Immigration Relief 1956-Present," 3, 5 (Oct. 2014) (describing parole of Cubans, Haitians, and Indochinese in the 1960s through 1980s); Cuban Family Reunification Program, 72 Fed. Reg. 65,588 (Nov. 16, 2007); Implementation of Haitian Family Parole Reunification Program, 79 Fed. Reg. 75581 (Dec. 18, 2015).

within certain groups. *See Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 140 S. Ct. 768, 777 (2020) ("[W]e generally presume that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another.").

Further, although some members of Congress proposed in 1996 that parole be statutorily limited only to cases involving medical emergencies or cases where the noncitizen was or is a witness for law enforcement or needed to be brought in to be prosecuted, that proposal was ultimately rejected by Congress. *See* H.R. Rep. No. 104–469, at 78 (§ 523(a)) (1996) (cited in Opp. 20, IRLI Br. 9); H.R. Rep. 104–828, 162, 245 (accepting Senate provision on parole and rejecting House version, and requiring reporting "concerning the numbers and categories of aliens paroled" "for each country of origin"). Congress rejected these narrow definitions and declined to define "significant public benefit" in the statute, all with the knowledge that parole had historically been used in a manner similar to the CHNV processes to provide entry to tens of thousands of individuals from particular countries or regions. *See supra* at 13 n.5; *cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2413 (2018) (declining to "confine expansive language [in the INA] in light of its past applications" by the Executive). In light of this history, the "return to custody" language that Amicus claims buttresses its reading of "significant public interest," but pre-existed the 1996 amendments, is not supportive of Amicus's interpretation. Nor do the heading of the public law amending the parole statute in 1996 (*see* Opp. 20)[6] or prior regulations enacted in the Executive's discretion governing the circumstances under which parole could be granted to those processed for expedited removal who had not established a credible fear of persecution (*see* IRLI Br. 10–12) address the definition of "significant public benefit" or support imposing Plaintiffs' interpretation of that term. Indeed, Amicus acknowledges that regulations promulgated in 1997 governing parole for certain noncitizens contemplate parole where the continued detention of the noncitizen is not in the public interest and do not require a determination that the particular noncitizen's presence must provide a significant public benefit. *See* IRLI Br. 11.

---

[6] Headings cannot override the actual text of a statute. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Amicus's argument also largely ignores that parole may be granted for "urgent humanitarian reasons." 8 U.S.C. § 1182(d)(5). And it is. The CHNV parole processes enumerate reasons why an immigration officer may conclude that parole of a noncitizen from one of the covered countries is justified for urgent humanitarian reasons. 87 Fed. Reg. at 63,515 (citing "the urgent humanitarian reasons faced by so many Venezuelans subject to the repressive regime of Nicolás Maduro"); 88 Fed. Reg. at 1,262–63 (citing the "urgent humanitarian needs of Nicaraguan nationals who have fled the Ortega regime and Nicaragua" because "[t]he Government of Nicaragua continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions"); 88 Fed. Reg. at 1,275 (citing "the urgent humanitarian needs of Cuban nationals who have fled crippling economic conditions and social unrest in Cuba" where the government "continues to repress and punish all forms of dissent and public criticism of the regime and has continued to take actions against those who oppose its positions"); 88 Fed. Reg. at 1,251–52 (citing the humanitarian needs of Haitian nationals based on "escalating gang violence, the aftermaths of an earthquake, and a cholera outbreak" which "have worsened already concerning political, economic, and social conditions in Haiti"). Thus, even if Amicus were correct about the statutory interpretation regarding "significant public benefit," it would not render the CHNV parole processes invalid.

In general, contrary to Amicus's suggestion (IRLI Br. 7), even if many of the anticipated 30,000 CHNV nationals monthly who will be issued advance authorization to travel to the United States (after extensive vetting) are ultimately granted parole after a case-by-case determination, that does not mean that the "case-by-case" requirement of parole has not been observed. Further, because the parole statute places no caps on the number of individuals paroled, the number of grants of parole is not relevant to the lawfulness of parole. And the CHNV processes reduced *overall* migration from nationals of the affected countries, which belies Amicus's assertion that the processes depend on mass parole to provide a benefit. *See* Mot. 15.

Plaintiffs also argue, as to Count III, that the "Major Questions Doctrine" requires clear Congressional authorization for the Rule's parole-process exception because, they say, the Rule

"replace[s] the lawful visa system ... with a replacement immigration system." Opp. 23–24. Again, however, the crux of Plaintiffs' argument is that the *parole processes* and the accompanying ATA (not the Rule) exceed the parole authority and allegedly seek to substitute those processes for the visa system. *See* Opp. 25–28. If the lawfulness of the CHNV parole processes were before this Court, the Major Questions Doctrine would still not apply. The doctrine applies only in "extraordinary cases" where an agency invokes new, unanticipated regulatory power, such as power that falls outside its domain, *see West Virginia v. EPA*, 142 S. Ct. 2587, 2608–09 (2022); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000), or where it is relying on a "long-extant statute" to claim "unheralded power," *Util. Air Regulatory Grp. v. EPA*, 529 U.S. 120, 159 (2000), and where the agency's action has "vast political and economic significance," *Ala. Ass'n of Realtors v. Dep't of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021).  The Executive has long used the parole authority in a manner like the CHNV parole processes, including after the 1996 amendment. *See, e.g.*, *supra* at 13 n.5. The parole processes fit well within the statutory text and this long historical tradition of using the parole authority with respect to certain groups from certain countries, often to advance foreign affairs goals. This is therefore not a scenario where the agency is extending its authority to areas that were not contemplated by the governing statute or using statutory authorization in a novel way.

Plaintiffs argue that the CHNV parole processes' ATA application process sidesteps requirements for individuals seeking visas to come to the United States, which they claim is within the State Department's authority. Opp. 25–28. But the ATA process does not confer a visa or specific immigration status. And DHS's statutory authority to parole indisputably exists—and has long existed—alongside the visa system, and there are no numerical caps for parole. *See* 6 U.S.C. § 202(4) (charging the Secretary with "[establishing and administering rules ... governing the granting of visas or other forms of permission, including parole, to enter the United States"). When it amended the parole statute in 1996, Congress contemplated that the number of individuals paroled would work alongside the visa quota system, amending 8 U.S.C. § 1151 to provide "that aliens paroled into the United States in the second previously fiscal year who do not depart within

365 days and who have not yet become permanent resident alien ... will be counted towards the worldwide level of family-sponsored immigrants." H.R. Rep. No. 104–828, at 162, 245 ("Treatment of Long-Term Parolees in Applying Worldwide Numerical Limitations"); *see also* 8 U.S.C. § 1151(c)(4). Thus, even if the parole processes or the Exceptions had a significant impact, it would not be a departure from the history and language of § 1182(d)(5)(A) that would warrant invoking the Major Questions Doctrine.

For all these reasons, the Rule's parole-process and appointment exceptions do not implicate or exceed the Executive's statutory authority under § 1182(d)(5), and Counts I and III must be dismissed. Even if the Court were to look behind the face of the Rule to examine the current parole processes, those processes fall squarely within the parole authority.

B.     The Rule Does Not Conflict with the Secure Fence Act (Count II).

Plaintiffs do not dispute that the Secure Fence Act contains no specific directive that conflicts with the Rule or its Exceptions. Mot. 23. They rely on the general, aspirational statement that the Secretary maintains discretion to determine what is "necessary and appropriate to achieve and maintain operational control," *see* Opp. 21, but they do not explain how the statute supplies any meaningful standard by which a Court could judge the Secretary's exercise of discretion, let alone determine that unrelated regulations conflict with that standard, *see* Mot. 23. Further, the Exceptions do not conflict with the Act's general objective of maintaining operational control over the U.S. border. To the contrary, the Rule is designed to promote orderly entry and enable more resources to be devoted to preventing improper entries between POEs. *See id.* 23–24. Plaintiffs' claim that the Act's "central objective" is "controverted" because the "Rule's effect is ... to unlawfully parole aliens *en masse* into the U.S." is incorrect for several reasons. *See* Opp. 22. First, Plaintiffs do not cite any statutory language or other authority to support the argument that "operational control" touches on anything other than control over the border to prevent irregular entries and apprehend those who enter irregularly.[7] They cite no authority demonstrating that the

---

[7] Although neither the Secure Fence Act nor the INA define the term "unlawful entries," "improper entry" is defined as (1) entering or attempting to enter the United States at any time or

Secure Fence Act has any bearing on humanitarian protection or the availability of the pre-existing statutory authority to parole noncitizens—particularly where that authority is exercised at interior airport POEs (not at the land border), as is the case for most noncitizens who use the current CHNV parole processes. Second, as discussed above, the Rule does not provide for parole *en masse*. The Rule does not require parole or set policies as to who shall be paroled, and thus it cannot have the "effect" that Plaintiffs attribute to it. *See* Mot. 21. Third, parole processes are not unlawful. *See supra* § III(A)(2). Accordingly, the Rule does not conflict with the Secure Fence Act.

## IV.    Counts VI and VII Do Not State a Claim.

The claims of deficiencies in the Rule's notice-and-comment process are defeated on their own terms or by the language of the Rule. Accordingly, Counts VI and VII should be dismissed.

*First*, contrary to Plaintiffs' arguments in Count VI, the Final Rule did not depart in any unanticipated way from the Notice of Proposed Rulemaking (NPRM), Circumvention of Lawful Pathways, 88 Fed. Reg. 11,704 (Feb. 23, 2023), and thus the NPRM provided fair notice to commenters. Mot. 26–31. The NPRM proposed a rule with the same presumption of asylum ineligibility with the same temporal effect and the same exceptions as the final Rule, with anticipated clarifications and modifications to certain rebuttal provisions. The six "changes" Plaintiffs cite in the Final Rule were either not changes at all or were logical outgrowths of the NPRM, both individually and cumulatively. *Id.* Plaintiffs do not explain how the "cumulative effect" of the six "changes" somehow made the final Rule "radically different." *See* Opp. 31. In their Opposition, Plaintiffs do not respond to Defendants' arguments regarding the first, third, and sixth changes, forfeiting reliance on those individual "changes" in support of this claim. *See* Opp. 31–33. As to the remaining changes addressed in Count VI, all were a logical outgrowth of the NPRM.[8]

---

place other than as designated by immigration officers, (2) eluding examination or inspection by immigration officers, or (3) attempting or obtaining entry to the United States through fraud. 8 U.S.C. § 1325(a). It does not include entry with inspection at a POE unless that entry involves fraud. *See United States v. Corrales-Vazquez,* 931 F.3d 944, 950 (9th Cir. 2019).

[8] Plaintiffs also appear to have abandoned their claim regarding the Unfunded Mandates Reform Act, apparently conceding that this aspect of count VI fails to state a claim.

As to the second purported "change," the NPRM explained that the Rule's presumption would continue to apply to subject noncitizens after the sunset date of the rule. 88 Fed. Reg. at 11,726 ("After the sunset date, the proposed rule would continue to apply to those noncitizens."). The Final Rule merely added text to the regulation to avoid any ambiguity about the presumption's continuing applicability. Mot. 27–28. Plaintiffs are incorrect that comments did not "specifically address the substance of this change." (Opp. 32). The Rule summarizes and responds to comments that expressed concerns with the "permanent impact" of the Rule despite the two-year effective period, demonstrating that the public had a fair opportunity to comment on this provision. 88 Fed. Reg. at 31,422. Notably, Plaintiffs do not have standing to challenge this provision, as they do not claim harm from the presumption itself, and allowing the presumption to permanently affect those who entered during the Rule's effective period aligns with Plaintiffs' claimed interests.

As to the fourth "change," Plaintiffs argue that they could not have anticipated that a child must meet the "unaccompanied alien child" definition at the time of entry to qualify for this exception to the presumption. 8 C.F.R. §§ 208.33(a)(2)(i), 1208.33(a)(2)(i) (exempting a noncitizen if "[t]he alien was, at the time of entry, an unaccompanied alien child"). Yet this is indeed a logical outgrowth of the NPRM, which is focused on the circumstances at the time of entry or presentation at a POE. *See, e.g.*, 88 Fed. Reg. at 11,707. In any event, Plaintiffs do not provide any "new and different criticisms" that they would have raised as to this exception. *See Ass'n v. Battery Recyclers, Inc. v. EPA*, 208 F.3d 1047, 1058–59 (D.C. Cir. 2000).

As to the fifth change, Plaintiffs ignore that the NPRM expressly sought comment on the family unity provision, including whether it should be modified. *See* 88 Fed. Reg. at 11,752 (proposing 8 C.F.R. § 1208.33(d)); *id.* at 11,708; Mot. 30. In the NPRM, the Departments had proposed to allow for rebuttal where an applicant: (1) qualifies for asylum but for the presumption; (2) qualifies for withholding of removal; and (3) has an accompanying spouse or child who does not qualify for asylum or withholding. In response to comments received, the Rule expanded this rebuttal ground to also apply to those who meet the first two requirements and have a spouse or minor child eligible to join them. 88 Fed. Reg. at 31,425–26 (discussing and responding to

comments). This was a reasonable response to comments and was a reasonably anticipated consequence of the notice-and-comment process. *See* Mot. 30; *Nw. Airlines, Inc. v. Goldschmidt*, 645 F.2d 1309, 1319 (8th Cir. 1981) (the NPRM "need not contain every precise proposal which the agency may ultimately adopt as a rule"). For these reasons, the NPRM allowed for informed participation by interested parties, and Count VI must be dismissed.

*Second*, contrary to the allegations in Count VII, the Departments did substantively engage with Plaintiffs' comments as part of the notice-and-comment process. *See* Mot. 32; 88 Fed. Reg. at 31,437–39. Plaintiffs do not cite any authority to show that Defendants' consideration of these comments was inadequate as a procedural matter, which is their claim in Count VII.  *See* Compl. ¶ 184 (alleging that the exceptions were promulgated "without observance of procedure"). They instead cite inapposite cases that address whether an agency's *substantive* evaluation was adequate under the APA's arbitrary and capricious standard, which is a different claim not addressed on this motion. *See* Opp. 3 (citing *State v. Biden*, 10 F. 4th 538, 556 (5th Cir. 2021), and *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016)). Accordingly, Count VII must be dismissed.

## V.    A Non-Statutory *Ultra Vires* Remedy Is Unavailable (Count VIII).

As Plaintiffs have a duplicative APA claim, their *ultra vires* claim must be dismissed, regardless of whether those APA claims are viable. Plaintiffs have no response to the argument that, even if the non-statutory "*ultra vires*" cause of action survives the 1976 amendment to the APA, it would only be available if the APA or another statute did not provide for judicial review. Mot. 32–33. The cases they cite (at 35–36) generally stand for the proposition that a non-statutory review claim may be available where no other specific or general statutory review provision is available at all, such as in challenges to Presidential action.  *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327–28 (D.C. Cir. 1996) (concerning review of legality of Executive Order where there was "a lack of a statutory cause of action"); *Hawaii v. Trump*, 878 F.3d 662, 672 (9th Cir. 2017) (holding that, if there is no final agency action to review under the APA, courts "may review *ultra vires* actions by the President that go beyond the scope of the President's statutory

authority"); *United States v. Bozarov*, 974 F.2d 1037, 1045 & n.8 (9th Cir. 1992) (cabining the D.C. Circuit's holdings in *Reich* and *Dart v. United* States, 848 F.2d 217, 224 (D.C. Cir. 1988) to actions in excess of delegated authority under the Export Administration Act).

Plaintiffs argue that their claim for non-statutory review should not be dismissed, because it survives even if statutes preclude review, citing *Leedom v. Kyne*, 358 U.S. 184 (1958). Opp. 35–36. Yet the Supreme Court rejected Plaintiffs' interpretation of *Kyne*, indicating that its holding would only apply to cases where the statute did not expressly provide for judicial review, and not where, as here, statutes expressly preclude this Court's review of asylum and removal issues (*see* Mot. at 17, 20 (citing 8 U.S.C. § 1252(a), (b)(9), (e), (g)). *Bd. of Governors of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991) ("Viewed in this way, *Kyne* stands for the familiar proposition that only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review."). Moreover, even if an equitable *ultra vires* claim were available, it would be confined to "cases of extreme agency error" and "only for the narrow purpose of obtaining injunctive relief against agency action taken in excess of its delegated powers and contrary to a specific prohibition in the law." *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022); *see also Key Med. Supply, Inc. v. Burwell*, 764 F.3d 955, 962 (8th Cir. 2014) ("Although an *ultra vires* action may be reviewed even in the face of statutory bar on review, our court has expressed a clear disinclination to accept plaintiffs' characterization of agency actions as *ultra vires* where it is possible to characterize a dispute merely as one of statutory interpretation concerning the scope of agency authority."). Plaintiffs also cite no authority that their claim for non-statutory review can overcome § 1252(f)(1)'s limits on injunctive relief that apply "regardless of the nature of the action or claim," and the Departments are well within their statutory authority to enact a Rule governing eligibility for asylum. *See* Mot. 34; *supra* § III. Accordingly, Count VIII must be dismissed.

<u>CONCLUSION</u>

This Court should dismiss Plaintiffs' Complaint under Rule 12(b)(1). Alternatively, the Court should dismiss Counts I–III and VI–VIII under Rule 12(b)(6).

Dated: November 14, 2023          Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

PATRICK GLEN
CHRISTINA P. GREER
Senior Litigation Counsel

*Attorneys for Defendant*