# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA
# WESTERN DIVISION

|  |  |
|---|---|
| STATE OF INDIANA, et al., ) <br> ) <br> *Plaintiffs,* ) <br> ) <br> v. ) <br> ) <br> ALEJANDRO MAYORKAS, et al., ) <br> ) <br> *Defendants.* ) <br> ) | Civil Action No. 1:23-cv-00106-DMT-CRH |

## RESPONSIVE SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COMPLAINT

Dated:    November 8, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EREZ REUVENI
Acting Deputy Director

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

CHRISTINA P. GREER
PATRICK GLEN
BRIAN C. WARD
Senior Litigation Counsel

*Attorney for Defendants*

## INTRODUCTION

Plaintiffs' lawsuit seeks to declare unlawful or invalidate the exceptions and rebuttal grounds to the presumption of asylum ineligibility (collectively, the "Exceptions") contained in the regulation titled Circumvention of Lawful Pathways, 88 Fed. Reg. 31,314 (May 16, 2023) ("the Rule"). As Defendants argued in their motion to dismiss, the Plaintiff States lack standing to challenge the Exceptions because indirect impacts from discretionary immigration enforcement decisions like those reflected in the Rule are not cognizable injuries. *See* Mem. in Supp. of Mot. to Dismiss (ECF 57-1) ("Mot.") at 9–12; Reply in Supp. of Mot. to Dismiss (ECF 71) ("Reply") at 6–7. But even assuming those indirect impacts on State expenditures are legally cognizable, Plaintiffs cannot possibly establish the injury required to show standing. *See* Mot. at 12–16, 18; Reply at 1–5.

The Court has requested additional briefing on standing, seeking briefing from the Plaintiff States "as to the effect of the asylum exceptions on their financial harms," as well as responsive briefing from Defendants and briefing from both parties "on whether the Court considers border report numbers at filing or as of today." Order for Additional Briefing (ECF 83) ("Order"), at 3. Defendants agree with Plaintiffs that they must have had standing at the time the Complaint was filed. Accordingly, the Court should consider the circumstances—including border crossing numbers—as they existed at the time of the filing of the Complaint on May 31, 2023, to determine whether Plaintiffs faced imminent injury at that time. Defendants disagree, however, that these circumstances show any certainly impending financial harms to Plaintiffs due to the Exceptions. Indeed, regardless of what border crossing numbers the Court considers, Plaintiffs have not adequately pleaded an injury, nor have they adequately supported their allegations of injury to withstand Defendants' factual attack on standing.

As this Court recognized in its Order requesting supplemental briefing, it is not sufficient for Plaintiffs to assert or show harm based on the "cumulative effect of this administration's immigration policies and administrative actions." Order at 2 (citing *Arizona v. Garland*, --- F. Supp. 3d ---, 2024 WL 1645417, at *11 (W.D. La. 2023)). In other words, Plaintiffs cannot merely

point to the continuing entry of migrants across the Southwest border, or even a relative increase in migration, to show injury from the Exceptions. Nor is it sufficient for Plaintiffs to predict that some noncitizens have been granted parole since the Rule took effect and moved to one of the Plaintiff States, allegedly causing the state to spend more money on education, law enforcement, or health care. Instead, the Plaintiff States must show that the particular policy they challenge— here, the Rule's Exceptions to the presumption of asylum ineligibility—has caused, or will imminently cause, injury "relative to the status quo, and *relative to [their] position absent the challenged policy*." *Arizona*, 2024 WL 1645417, at *11 (emphasis added). In other words, Plaintiffs must show that, at the time of the Complaint, there was a certainly impending increase in noncitizens in their States as a result of the Exceptions, relative to the number of noncitizens that would be present in their States absent the Exceptions. Regardless of what border crossing numbers or data related to credible fear claims the Court examines, Plaintiffs have not alleged any facts to demonstrate such an increase, nor can they possibly make such a showing.

## ARGUMENT

### I.     Plaintiffs Must Have Standing at the Time of the Filing of the Complaint.

Defendants agree that, to have standing, Plaintiffs must establish injury at the time of the Complaint. *See Park v. Forest Serv. of U.S.,* 205 F.3d 1034, 1037 (8th Cir. 2000) (determining that later-occurring events could not be used to establish that an imminent threat of injury existed at the time the lawsuit was filed). Prospective injury may qualify to establish standing, but that injury must be "certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). "[A]llegations of *possible* future injury are not sufficient." *Id.* (cleaned up; emphasis in original). "In cases of alleged future injuries to unregulated parties from government regulation, the causation requirement and the imminence element of the injury in fact requirement can overlap." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 385 n.2 (2024). Although standing must exist at the time of the filing of the Complaint, evidence post-dating the operative complaint may be relevant to the standing analysis. For example, post-complaint evidence may demonstrate that the "original allegations were false" and defeat subject-matter jurisdiction. *See*

2

*Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473 (2007) (internal quotations and citations omitted).

Plaintiffs' claimed injury—alleged indirect, downstream impacts on their expenditures allegedly caused by a federal policy that regulates others—is not legally cognizable. *See, e.g.*, Mot. at 9–12; Reply at 6–7. On Plaintiffs' view, States may sue in federal court about any federal policy that they claim will increase their population and thus affect social-services spending. This boundless view of standing is inconsistent with separation of powers. Even assuming this type of injury is cognizable, however, Plaintiffs have not shown that their claimed prospective injury was foreseeable and certainly impending at the time of the Complaint. As discussed below, the data concerning border crossings and other evidence concerning the state of affairs at the time Plaintiffs' Complaint was filed do not support Plaintiffs' assertions of prospective injury. But even later border crossing numbers and data related to credible fear claims do not support Plaintiffs' claim of imminent injury at the time the Complaint was filed.[1]

## II. Neither Plaintiffs' Complaint Nor Border Crossing Data Show Injury in Fact Traceable to the Exceptions or Redressable by their Vacatur.

Whether the Court considers only the data concerning border crossings as they existed at the time of the filing of the Complaint, or any later data, Plaintiffs have not met their burden to

---

[1] Plaintiffs use their supplemental brief to again argue that they are entitled to "special solicitude." Pls.' Suppl. Br. (ECF 85) at 2–3. This is incorrect. The Supreme Court rejected the plaintiff States' reliance on this doctrine in their challenge to immigration enforcement guidelines in *Texas v. United States*, 599 U.S. 670, 685 n.6 (2023). In that case, the plaintiff States specifically argued, like here, that they were entitled to special solicitude because they were challenging an agency's alleged failure to protect "sovereign prerogatives that are now lodged in the Federal Government." Br. For Respondents at 16–17, *Texas v. United States*, 599 U.S. 670 (No. 22-58); ECF No. 79 at 69–70. The *Priorities* majority explicitly rejected the states' argument that they were entitled to such solicitude, explaining that their reliance on *Massachusetts* was misplaced because that case "involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion." *Priorities*, 599 U.S. at 685 n.6; *see also id.* at 689 (Gorsuch, J., concurring) (noting lower courts should leave the concept of "special solicitude" "on the shelf"). But "even if the States as sovereigns are entitled to some undefined 'special solicitude' in the standing analysis"—a "controversial, unsettled" question— "they still must satisfy the basic requirements of Article III standing." *State of Missouri v. Biden*, 52 F.4th 362, 369 (8th Cir. 2022), *cert. denied*, 144 S. Ct. 278 (2023); *see also* Mot. at 16.

show injury in fact. Defendants raised a factual attack on jurisdiction by introducing facts outside the Complaint in support of their Motion to Dismiss—including a declaration and expert report from Professor of Economics Michael A. Clemens, as well as declarations from a DHS official attesting to the anticipated and actual impacts of the Rule. *See* ECF 57-2, 57-3, 57-4. In the face of this factual attack on jurisdiction, Plaintiffs' factual allegations are not entitled to any presumption of truthfulness, *see Branson Label, Inc. v. City of Branson, Mo.*, 793 F.3d 910, 915 (8th Cir. 2015), and Plaintiffs have not met their burden to supply evidence to address the controverted points, *see Hertz Corp. v. Friend,* 559 U.S. 77, 96–97 (2010) ("When challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof."); *Tharp v. Nw. Bank*, No. 24-cv-4001, 2024 WL 3527233, at *5 (N.D. Iowa July 23, 2024) (citing cases on this point).

In their Supplemental Brief, Plaintiffs advance two different theories of injury based on border crossing numbers, but neither satisfies their burden to demonstrate Article III standing in this posture. Neither theory supports Plaintiffs' claim that there will be an imminent increase in noncitizens in their States as a result of the Exceptions, and, in any event, their Complaint does not establish that an increase in noncitizens will have imminent downstream impacts on their expenditures.

First, Plaintiffs claim that they can show injury based on their prediction that at least one noncitizen who crossed the border has been "granted release . . . under" an Exception and moved to one of the Plaintiff States. *See, e.g.*, Pls.' Suppl. Br. (ECF 85) at 3–4. There are two fundamental problems with this argument. As an initial matter, this claimed injury does not arise from the Rule. *See* Mot. at 15, 18–19; Reply at 2–5. The Rule is about whether a noncitizen can overcome a threshold presumption of asylum ineligibility in the context of consideration of their asylum claim. It does not set any standards for grants of parole, and it says nothing about whether to release any noncitizen, regardless of whether they qualify for an Exception. *See, e.g.*, 88 Fed. Reg. at 31,331 (the Rule does not "set any policy regarding DHS's discretionary authority to make parole determinations for those who use the CBP One app"). Instead, it is the statutory discretionary

4

parole authority at 8 U.S.C. § 1182(d)(5)(A) that governs release on parole. *See* Pls.' Resp. to Mot. to Dismiss ("Opp.") (ECF 61) (arguing that Plaintiffs' injuries "are based on Defendants' release of aliens into the States via parole"). Although one of the exceptions to the presumption of asylum eligibility is for those who use certain DHS-approved parole processes to travel to the United States, *see* 8 C.F.R. §§ 208.33(a)(2), 1208.33(a)(2), those parole processes exist separately from the Rule and themselves do not guarantee parole upon arrival in the United States. *See* Mot. at 7; Reply at 18.[2] There is thus no such thing as someone being "granted release into this country under the Rule's . . . exceptions," *see* Suppl. Br. at 4, because the Exceptions only relate to the presumption of asylum ineligibility, and do not dictate release or set any standards for release.[3]

Because the Rule does not set forth any policy, standards, or mandate concerning the parole or other release of individuals who may qualify for an exception to the rebuttable presumption of asylum ineligibility or who may be able to rebut that presumption, this case is distinct from *Florida v. United States*, 2023 WL 2399883 (N.D. Fla. Mar. 8, 2023) (cited in Suppl. Br. at 5). Although the government disagrees with the standing analysis in the *Florida* case—as the plaintiffs' injury was premised on non-cognizable indirect costs from federal immigration policy—that case is not

---

[2] Those who receive advance travel authorization under the parole processes for Cubans, Haitians, Nicaraguans, and Venezuelans (CHNV parole processes) are required to enter the United States by commercial air, *see* Mot. at 7, and thus would not generally even be subject to the Rule's presumption of asylum ineligibility, which only applies to those noncitizens who enter the United States at the Southwest land border or adjacent coastal borders, *see* 8 C.F.R. §§ 208.33(a)(1), 1208.33(a)(1).

[3] Further, the Exceptions to the presumption do not affirmatively qualify anyone for any immigration benefit, including asylum or other immigration status, or set standards for eligibility for employment authorization. All of these standards are governed by separate statutes and regulations. The Rule governs whether a noncitizen can overcome a threshold presumption of ineligibility for asylum that is applied at the credible fear stage in expedited removal or during further consideration on the merits of an asylum application either before an asylum officer or an immigration judge. And even if the noncitizen establishes at the credible fear stage that an Exception likely applies to them, they still have to satisfy the pre-existing credible fear standards to be referred for a consideration of the merits of their claims to asylum or other forms of protection. *See generally* Mot. at 4–5. On the merits, they will still need to meet all other existing statutory and regulatory requirements to obtain asylum. If not eligible for asylum, noncitizens may still be eligible for mandatory protections from removal such as statutory withholding of removal or protection under the Convention Against Torture.

like this one, because it involved a challenge to policies concerning parole and release of noncitizens, not a rule concerning asylum eligibility. Here, it is very clear that vacatur or injunction of the Exceptions could not possibly redress Plaintiffs' claimed injury from grants of parole, as it would not alter the existing discretionary authority to parole, nor would it eliminate the parole processes of which Plaintiffs complain. Reply at 1–5; *see also* Mot. at 15, 18–19, 21. Because of this fundamental deficiency in Plaintiffs' theory of standing, the overall numbers of border crossings or releases are immaterial.

But even assuming Plaintiffs' injuries based on the parole of noncitizens were traceable to the Exceptions or redressable by relief relating thereto, Plaintiffs' assertion that it is "foreseeable that at least one illegal alien granted release into this country . . . resides in one of the Plaintiff States," Suppl. Br. at 4, is still misplaced. As the Court's Order implicitly recognizes, the relevant baseline number of releases for purposes of assessing injury here is not zero. *See* Order (ECF No. 83) at 2 (citing *Texas v. U.S. DHS*, --- F. Supp. 3d ---, 2024 WL 1021068, at *16 (S.D. Tex. Mar. 8, 2024)). The relevant question is thus not whether any noncitizens have been released who now reside in the Plaintiff States, or even whether such noncitizens have been released after being processed under the Rule and qualifying for one of the Exceptions or after availing themselves of methods or pathways of safe, orderly entry such as a parole process. Plaintiffs claim general costs related to an increase in noncitizens in their State. *See* Suppl. Br. at 4 (asserting public education costs). Accordingly, the costs incurred "under the challenged agency action" are only relevant if Plaintiffs can show an increase in releases relative to the number of releases if the Exceptions did not exist. *See Texas*, 2024 WL 1021068, at *15. And they have not done so. As explained, the applicability of an Exception does not govern the parole decision. Further, Defendants submitted evidence tending to show that the Rule's Exceptions would not lead to more releases. Defendants submitted evidence that an imposition of asylum ineligibility without any incentives for safe, orderly, and lawful entry would likely not have a meaningful impact on migration trends and border crossings. *See infra* at 7–8. Defendants also introduced evidence that DHS was able to make better use of expedited removal under the Rule. Defs.' Ex. 1 (ECF 87-2) ¶¶ 3, 12, 16–19. Enabling

6

the government to increase its use of expedited removal would have the effect of lowering the number of individuals released. *See, e.g.*, *id.* ¶¶ 16, 28. Indeed, Defendants showed that, at the time of the filing of the Complaint, *overall* releases—even when accounting for certain noncitizens who arrived in the United States via commercial air and were not subject to the Rule—were trending lower than when the Title 42 Orders were in effect. *See id.* ¶ 12 & n.4 Plaintiffs have not disputed this evidence. Accordingly, at the time of the Complaint, the evidence did not demonstrate that there was likely to be a net increase in releases as a result of the Rule or its Exceptions.

Plaintiffs' alternate theory of injury is that the Rule's Exceptions to the presumption of asylum ineligibility provide "an incentive for further migrants to make unlawful crossings and specious asylum claims." Suppl. Br. at 4. But Plaintiffs have not shown that the Exceptions have led to an overall increase in migration relative to what would be the case in their absence. Even assuming there were an overall increase in migration (which, as shown below, there was not), Plaintiffs cannot show this is traceable to the Exceptions, rather than the cumulative effect of immigration policies or independent migration factors. Establishing causation in this case is "substantially more difficult" for Plaintiffs because they challenge the "regulation . . . of *someone* else." *FDA v. All. for Hippocratic Medicine*, 602 U.S. 367, 392 (2024).

Further, to show a *relative* increase in migration as a result of the Exceptions, Plaintiffs would have to demonstrate that the Rule's presumption of asylum ineligibility, without the Exceptions, would result in fewer noncitizens entering the United States who then move to their States and cause certain expenditures. Plaintiffs have provided no evidence that a categorical bar on asylum eligibility, without any exceptions and incentives for safe, orderly, and lawful entry, would disincentivize migration and entry into the United States more than the approach embodied in the Rule. Defendants presented expert evidence demonstrating that a rule that imposes ineligibility alone—without any accompanying incentives for safe, orderly, and lawful entry such as via a pre-scheduled appointment at a Port of Entry—would not meaningfully impact migration trends. *See* Defs.' Ex. 2 (ECF 57-3) ¶¶ 20, 25–81; *see also* 88 Fed. Reg. at 31,430 & n.304. Defendants also submitted evidence showing that similar approaches to the Rule—where

7

incentives for lawful, orderly entry were coupled with consequences for failure to follow them—reduced overall encounters. *See* ECF 57-4 at ¶ 31 n.16; Mot. at 15 (explaining evidence of success of approaches that couple incentives with consequences). For example, the use of the CHNV parole processes for nationals from Cuba, Haiti, Nicaragua, and Venezuela, coupled with swifter consequences for removal, effectively lowered overall entries from nationals of those countries, even while providing them the opportunity to seek advance authorization to travel to the United States. *See id.*; 88 Fed. Reg. at 31,317 & n.26; *see also Texas*, 2024 WL 1021068, at *10–11, 17 (finding no standing to challenge CHNV processes). Plaintiffs have not attempted to rebut that evidence.

  Thus, for various reasons, the overall number of encounters at the Southwest Border do not demonstrate the full picture and cannot support Plaintiffs' theory that the Exceptions incentivize migration. Regardless, the border crossing numbers—at the time of the Complaint or after—do not support a finding of increased migration. As already shown, at the time the Complaint was filed on May 31, 2023, the numbers of overall entries by noncitizens had not increased over the pre-Rule period. As Plaintiffs themselves alleged in their Complaint, the number of encounters with undocumented noncitizens along the Southwest border were high in the months leading up to the Rule's effective date. Compl. ¶¶ 49–50; *see also* Mot. at 13. In the 11 days leading up to when the Rule took effect on May 12, 2023, encounters were extremely high, "amounting to an average of approximately 9,500 per day the week ending May 11, 2023," for a total of approximately 66,500 encounters for just the week of May 5 to May 11, 2023. Decl. of Nunez-Neto (ECF 57-2) ¶ 9. Moreover, DHS anticipated that these numbers would rise or remain at elevated levels—an estimated 11,000 a day—after the end of the Title 42 public health orders on May 11, 2023. 88 Fed. Reg. at 31,331.

  The data shows that the average number of daily encounters did not increase after the Rule took effect. The total number of encounters for the month of May 2023 was 206,690, which, after removing the 66,500 approximate encounters for the week of May 5 to May 11, constitutes an approximate daily average of 5,841 encounters, much lower than the approximate daily encounter

rates of 9,500 for the week leading up to the Rule's effective date and the end of the Title 42 public health Orders. *See* Suppl. Br. at 3; Defs.' Ex. 5, Southwest Land Border Encounters, *available at* https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (accessed Nov. 3, 2024). The submitted data thus shows that, at minimum, on May 31, 2023, the average encounter levels had not increased in the weeks since the Rule took effect on May 12. And Defendants' data showed that the encounter levels decreased over the time period between May 12 and July 31. *See* ECF 87-2 ¶ 11. Thus, at the time Plaintiffs filed their Complaint on May 31, 2023, the encounter numbers did not support their claim of imminent injury.

Later border crossing numbers, even if the Court could consider them, do not help Plaintiffs' theory. *See* Suppl. Br. at 6–7. Indeed, Plaintiffs do not even argue that there has been a relative increase in the number of border crossings as compared to the status quo—they merely argue that migrants continue to enter the United States and be released. *See, e.g.*, Suppl Br. at 3–4, 7. But, as explained, that is not the relevant inquiry.

The numbers show that, overall, migration levels have gone down since the Rule took effect. For years before the Rule took effect, the Title 42 public health Orders were in place. This meant that, due to public health concerns presented by Covid-19, only very limited numbers of migrants were permitted to enter the United States to be processed under the immigration authorities, including to seek asylum. Mot. at 3. Even under the Title 42 Orders, there were, on average, 208,000 encounters per month in the eight months leading up to the Rule's inception and the Title 42 Orders' end. *See* Defs.' Ex. 5 (attached hereto) at 2–3 (average of monthly encounter numbers from September 2022 through April 2023). In the year and a half since the Rule took effect and the Title 42 Orders ended, migration across the Southern border has not relatively increased overall. Indeed, Plaintiffs themselves assert that, over the past eight months, there have been on average, 155,994 encounters per month—lower than the average encounter numbers in the months leading up to the Rule's effective date. *See* Suppl. Br. at 7 (citing 1,438,246 encounters in the seven months preceding May 2023, or an average monthly rate of 205,464 encounters, and 1,247,948 encounters between January and August 2024).

Although the monthly encounter rate has at times increased, the overall rate of encounters have remained lower than before the Rule took effect. Nor is there any showing that increases were a result of the Rule or the Exceptions. U.S. Customs and Border Protection's number of overall encounters with inadmissible noncitizens along the Southwest border in Fiscal Year 2024 is less than it was in Fiscal Year 2022, when the Title 42 Orders were in effect for all twelve months. *See* Defs.' Ex. 5 at 2–3. And it is also less than Fiscal Year 2023, during which the Title 42 Orders were in effect eight out of the twelve months. Further, as discussed, the numbers of encounters do not present the full picture. As Defendants demonstrated, when the availability of expedited removal increases and the percentage of noncitizens who pass a credible-fear screening decreases due to application of the presumption, there are likely to be fewer noncitizens released into the United States with the Rule in place than without. Mot. at 13–14; ECF 57-2 ¶ 5.

But even assuming Plaintiffs could show an imminent increase in noncitizens in their own States traceable to the Rule's exceptions, Plaintiffs have not adequately explained how an increase in noncitizens in their States would cause an imminent increase in their expenditures. *See* Mot. at 15–16. For example, the States cannot predict that noncitizens will result in law enforcement costs. *See* Mot. at 11 (citing *Arizona v. Biden*, 40 F.4th 375, 386–87 (6th Cir. 2022), and *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015)). They also do not adequately allege or show that they will incur direct social services costs for each noncitizen, nor that social services expenditures will not be outweighed by a noncitizen's financial contributions to the State. For example, North Dakota asserts that its average cost per student is $14,435.87 (Suppl. Br. at 4), but this appears to be merely the aggregate funding divided by student—North Dakota has not alleged or shown that each additional student increases the overall State funding for education, particularly after funding has been committed for the year. *See* Compl. ¶¶ 64–65. Nor has North Dakota or any of the Plaintiff States shown that any noncitizen child who entered after the Rule went into effect is using public education costs, or that the student costs the State more than the State receives in revenue. *See* North Dakota Dep't of Public Instruction, *Financial Transparency*, at https://portal.nddpistarsreporting.nd.gov/public-home (showing revenue per pupil exceeding costs

10

per pupil by nearly $3,000) (last visited Nov. 8, 2024). And, although Indiana cites a per-student tuition support payment, it has not alleged or demonstrated that the per-student tuition support payment does not change depending on the year, or that the State's overall funding amount will increase per noncitizen child in any given year. *See* Suppl. Br. at 4; Compl. ¶¶ 62.

For these reasons, the Court should determine that Plaintiffs have not adequately shown standing to proceed with their claims in this lawsuit.

### III.     Discovery from the Government Is Unnecessary.

Plaintiffs argue that, if the Court determines that they have not met their burden at this stage to establish standing, the Court should permit jurisdictional discovery into the "numbers and demographics of the illegal aliens who have crossed the border since the Rule's promulgation and received the benefits of the Rule's exceptions." Suppl. Br. at 5. For the reasons explained, this data would not overcome the deficiencies in Plaintiffs' theory of standing—primarily because they would not go to whether there has been a *relative* increase in migration and releases.

Moreover, Plaintiffs have not met their burden to obtain jurisdictional discovery at this juncture. The Eighth Circuit has explained that "courts look to decisions under Rule 56 for guidance in determining whether to allow discovery on jurisdictional facts," and have required parties seeking such discovery to "file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Johnson v. United States*, 534 F.3d 958, 965 (8th Cir. 2008); *see also* Fed. R. Civ. P. 56(d). Plaintiffs have not submitted such an affidavit, but even if they did, they could not show how the facts they seek would suffice to support standing.

For these reasons, the Court should dismiss the Complaint for lack of standing without allowing discovery. But if the Court were to decline to dismiss the Complaint at this stage, Defendants agree that jurisdictional discovery would be appropriate to allow Defendants to test Plaintiffs' allegations concerning their claimed injury.

## CONCLUSION

This Court should dismiss Plaintiffs' Complaint under Rule 12(b)(1) for lack of Article III standing.

Dated: November 8, 2024							Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

EREZ REUVENI
Acting Deputy Director

By: /s/ *Katherine J. Shinners*
KATHERINE J. SHINNERS
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation – DCS
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8259
Email: katherine.j.shinners@usdoj.gov

PATRICK GLEN
CHRISTINA P. GREER
BRIAN C. WARD
Senior Litigation Counsel

*Attorneys for Defendant*